# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| SCOTT PURRONE, Derivatively on behalf of ENVISION HEALTHCARE CORPORATION f/k/a/ ENVISION HEALTHCARE HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM A. SANGER, CHRISTOPHER A. HOLDEN, CAROL J. BURT, JAMES A. DEAL, LEONARD M. RIGGS, JR., JOHN T. GAWALUCK, STEVEN I. GERINGER, JAMES D. SHELTON, JOEY A. JACOBS, MICHAEL L. SMITH, CYNTHIA S. MILLER, KEVIN P. LAVENDER, RANDEL G. OWEN, CLAIRE M. GULMI, MARK V. MACTAS, RICHARD J. SCHNALL, and RONALD A. WILLIAMS, <br><br> Defendants, <br><br> -and- <br><br> ENVISION HEALTHCARE CORPORATION f/k/a/ ENVISION HEALTHCARE HOLDINGS, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

By and through his undersigned counsel, Plaintiff Scott Purrone ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Envision Healthcare Corporation, ("Envision" or the "Company"), formerly known as Envision Healthcare Holdings, Inc., and against certain current and former officers and directors of the Company for issuing false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Envision and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Individual Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Envision's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related securities fraud class actions, consolidated as *In re Envision Healthcare Corp. Securities Litigation*, No. 3:17-cv-01112 (M.D. Tenn.) (the "Securities Class Action"); and (e) review of other publicly-available information concerning Envision and the Individual Defendants.

## NATURE AND SUMMARY OF THE ACTION

1.     This derivative action arises from: (i) a fraudulent and illegal scheme by the Individual Defendants to cause the Company to artificially inflate and/or maintain its financials throughout the Relevant Period (defined below) by systematically and surreptitiously overbilling and unnecessarily billing medical patients; (ii) the Individual Defendants' causing the Company to repeat false and misleading public statements regarding Envision's business practices,

operations, financials, financial prospects, compliance policies, and internal controls, including those concerning the source and sustainability of revenue and growth achieved from Envision's EmCare segment; (iii) the Individual Defendants' massive personal gains, including exorbitant compensation and enormous sales of personally-held Envision stock (***nearly $41 million worth***) at artificially inflated prices, while they were breaching their fiduciary duties to the Company and its shareholders, and while they (but not the market) were aware of the truth regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and lack of internal controls; (iv) the grave harms caused to the Company by the Individual Defendants' misconduct, including a loss of billions of dollars in market capitalization resulting from the precipitous decline in Envision's stock price, as well as its corporate goodwill.

2.      Envision, a Delaware corporation headquartered in Nashville, Tennessee and founded in 1992, is a nationwide provider of healthcare services, claiming to offer an array of clinical solutions that includes physician-led services, medical transportation services, and ambulatory services.  In its current form, the Company, previously known as Envision Healthcare Holdings, Inc. ("EHH"), is the result of a merger consummated December 1, 2016 between EHH and AmSurg Corp. ("AmSurg") (the "Merger").  Following the Merger, the newly created entity retained Envision's name, and continued operations as Envision Healthcare Corporation.[1]

3.      Prior to and following the merger, and at all relevant times, Envision has operated a substantial portion of its business through one of its primary operating subsidiaries, EmCare, Inc. ("EmCare").  According to the Company, EmCare is the nation's leading provider of integrated facility-based physician services across five service lines (including emergency medicine, hospital

---

[1] Since the Relevant Period covers allegedly unlawful conduct both pre- and post-Merger, EHH and Envision are referred to herein collectively as Envision, unless otherwise noted.

medicine, acute care surgery, anesthesiology, and radiology/teleradiology), with nearly 16,000 affiliated physicians and other clinicians.

4.      As detailed further below, from at least March 2, 2015 through the present (the "Relevant Period"), the Individual Defendants caused the Company to engage in systematic, deceptive business practices involving overbilling and unnecessarily billing medical patients.  For example, arranging for patients who sought treatment at in-network facilities to be treated by out-of-network physicians so that EmCare could subsequently "surprise-bill" those patients at higher rates, ordering tests that were medically unnecessary, admitting patients from the emergency room into a hospital for financial rather than medical reasons, and billing for the most complex, expensive level of care in unwarranted situations.  Envision also engaged in "surprise-billing," in which patients who sought treatment at in-network facilities were treated by out-of-network physicians and subsequently billed at higher rates.

5.      The Individual Defendants' scheme was final revealed when, on July 24, 2017, *The New York Times* published an article titled: "The Company Behind Many Surprise Emergency Room Bills."  The article reported that hospitals associated with Envision's subsidiary EmCare were disproportionately likely to engage in "surprise-billing" practices.

6.      Immediately following publication of *The New York Times* article, Envision's share price fell $2.33 (or approximately 3.72%), on unusually high trading volume, to close at $60.28 on July 24, 2017, and erasing approximately $281.9 million in market capitalization.

7.      On September 18, 2017, Envision announced significant organizational changes, including the retirement of its Chief Financial Officer ("CFO"), a newly established position of Chief Operating Officer ("COO"), and the resignation of the President of Physician Services.

8.      Following this announcement, Envision's stock price continued its freefall, declining another $4.56 per share (or nearly 10%), on unusually high trading volume, to close at $43.11 per share on September 19, 2017, and erasing approximately $551.7 million more in market capitalization.

9.      The Individual Defendants also caused the Company to make false and misleading statements regarding expected earnings for Envision in 2015, with investors being told repeatedly that the Company anticipated an Adjusted EBITDA within a range of $653 million to $665 million.

10.     Contrary to their prior, repeated representations, on October 22, 2015, the Individual Defendants caused the Company to issue a press release entitled, "Envision Healthcare Reports 2015 Third Quarter Results," which announced that "performance at EmCare fell short of our expectations," and that Envision was "adjusting its 2015 annual Adjusted EBITDA guidance to a range of $600 million to $605 million." Remarks made on a conference call held that same day by Defendants Sanger and Owen (Envision's CEO and CFO, respectively, at that time), to discuss the Company's financial results, demonstrated that the Individual Defendants were well aware of the issues that resulted in Envision missing its guidance, and necessitating the change in guidance months before the October 22, 2015 announcement.

11.     Following this revelation, Envision's stock price once again declined drastically, tumbling $11.09 per share (or ***over 30%***), on unusually high trading volume, to close at $25.40 per share on October 22, 2015. Nonetheless, the stock price remained artificially inflated because of the continuing scheme described herein, which was not revealed until July 2017.

12.     The exposure of the Individual Defendants' wrongful acts and omissions, and their prior false and misleading statements regarding the Company's business practices, operations,

financials, financial prospects, compliance policies, and lack of internal controls, has caused the Company to suffer significant damages and harm. Indeed, Envision's share price has continued to decline, currently trading at $28.99 as of November 20, 2017—a loss of approximately $5.2 billion in total market capitalization since the truth began to be revealed upon publication of *The New York Times* article.

13. During the Relevant Period, and as detailed further below, the Individual Defendants caused Envision to issue false and misleading statements concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls. Specifically, the Individual Defendants made, or caused the Company to make, false and/or misleading statements, and/or failed to disclose that: (1) EmCare routinely arranged for patients who sought treatment at in-network facilities, to be treated by out-of-network physicians, and accordingly, EmCare "surprise-billed" these patients at higher rates than if the patients had received treatment from in-network physicians; (2) EmCare also engaged in a concerted practice of overbilling and unnecessarily billing patients by ordering physicians to, *inter alia*, frequently order tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial rather than medical reasons, and bill for the most complex, expensive level of care in unwarranted situations; (3) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of these unlawful and deceptive business practices; (4) the Company's statements attributing EmCare's growth during the Relevant Period to other factors, while failing to disclose that these unlawful and deceitful practices were materially contributing to the Company's growth, were therefore false and/or misleading; (5) Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct was discontinued and/or revealed; (6) Envision had inadequate corporate accounting and corporate financial-

reporting resources; (7) Envision inadequately assessed the risks associated with the Company's financial reporting; (8) Envision failed to maintain effective internal controls over financial reporting; and (9) as a result of the foregoing, Envision's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the Relevant Period.

14. Then, while the Company's stock price was artificially inflated due to the aforementioned unlawful business practices and the false and misleading statements made by the Individual Defendants, certain Individual Defendants exploited their positions as corporate fiduciaries of Envision and sold their personal stock holdings for *nearly $41 million* in insider profits, with knowledge of material, adverse, and non-public information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and lack of internal controls.

15. Envision's Board has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims. Among other things, a substantial majority of the Board members: (1) are directly interested in the personal financial benefits challenged herein that were not shared with Envision shareholders; (2) face a substantial likelihood of liability to Envision for breaching their fiduciary duties of loyalty and good faith by (i) authorizing or failing to correct the false and misleading statements alleged herein, (ii) engaging in unlawful insider sales, and (iii) engaging in corporate waste through the authorization of compensation packages to themselves and other directors and executives while they were in breach of their fiduciary duties; and/or (3) otherwise lack the

requisite independence or disinterestedness. Accordingly, as a matter of Delaware law, a pre-suit demand upon Envision's Board to bring these claims would be, and is, a useless and futile act. Thus, Plaintiff rightfully brings this action in the name of, and on behalf of, Envision to vindicate the Company's rights against the Individual Defendants named herein, and to hold them responsible for the damages that they, as wayward fiduciaries, have caused—and continue to cause—the Company.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this district under 28 U.S.C. § 1391 because: (a) Envision maintains its principal executive offices in this District; (b) one or more of the Defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein— including the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

18.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A.     Plaintiff

19.     Plaintiff Scott Purrone has been an Envision shareholder since 2013, and is currently, and at all relevant times has been, a holder of Envision common stock.

### B.     Nominal Defendant

20.     Nominal Defendant Envision Healthcare Corporation was originally founded in 1992, is incorporated in Delaware, and maintains its principal executive offices at 1A Burton Hills Boulevard, Nashville, Tennessee 37215.  On or about August 2013, Envision conducted its initial public offering and began trading on the New York Stock Exchange ("NYSE") under the symbol "EVHC."  On or about December 1, 2016, the Company, previously operating as Envision Healthcare Holdings, Inc., completed a merger with AmSurg, creating a combined entity operating as Envision Healthcare Corporation, and continuing to trade on the NYSE under the symbol "EVHC."  The Company currently has approximately 121 million shares outstanding.

### C.     Individual Defendants

21.     Defendant William A. Sanger ("Sanger") serves as Executive Chairman and Director of Envision.  Prior to the Merger, Sanger served as Director, President, and Chief Executive Officer ("CEO") of Envision's predecessor entity, Envision Healthcare Holdings, Inc. ("EHH") from May 2011 through November 2016, and also served as Chairman of Envision's Board of Directors (the "Board") from November 2014 through November 2016.  Prior to May 2011, Sanger served for over 10 years as President and CEO of predecessor and affiliated entities of EHH.  Prior to the Merger, Sanger served as a member of Envision's Compliance and Quality Committee.  Sanger received a sum of $8,418,344 in total compensation from Envision from 2015 to 2016, including $1,486,360 in 2015, and $6,931,984 in 2016.  Additionally, as part of the Merger, Sanger received substantial compensation, including $2,996,301 in cash

and $3,000,000 in equity, for a total of $5,996,301. During the Relevant Period, while in possession of material, non-public information, Sanger sold at least 768,500 personally-held shares of Envision stock at artificially-inflated prices for proceeds of approximately $31,590,299.76. The Company acknowledges that Sanger is not an independent director. Sanger is a defendant in the Securities Class Action.

22. Defendant Christopher A. Holden ("Holden") has served as Director, President, and CEO of Envision since December 2016, when the Merger was completed. Prior to the Merger, Holden served as Director, President, and CEO of AmSurg, from October 2007 through November 2016. As part of the Merger, Holden received substantial compensation, including $8,254,269 in cash, $28,578,171 in equity, $858,367 in pension/NQDC, and $47,454 in perquisites/benefits, for a total of $37,738,261. The Company acknowledges that Holden is not an independent director. Holden is a defendant in the Securities Class Action.

23. Defendant Carol J. Burt ("Burt") has served as a Director of Envision (previously with EHH) since August 2011, and continues to serve as a Director following the Merger. Burt serves as Chair of Envision's Nominating Committee, as well as a member of the Audit Committee, and prior to the Merger, she served as Chair of Envision's Nominating and Corporate Governance Committee, as well as a member of the Audit Committee, and the Compensation Committee. Burt received a sum of $443,258 in total compensation from Envision from 2015 to 2016, including $219,508 in 2015, and $223,750 in 2016. Burt is a defendant in the Securities Class Action.

24. Defendant James A. Deal ("Deal") has served as a Director of Envision since December 2016, when the Merger was completed. Prior to the Merger, Deal served as a director of AmSurg, from 1992 through November 2016. Deal serves as Chair of Envision's Audit

Committee.  Deal received a sum of $293,958 in total compensation during 2016, part of which time he was a Director of Envision following the Merger, and thus, Deal received some or all of his compensation in 2016 from Envision.

25.    Defendant Leonard M. Riggs, Jr. ("Riggs") has served as a Director of Envision (previously with EHH) since August 2011, and continues to serve as a Director following the Merger.  Riggs was previously a director of the predecessor to EHH from July 2010 to May 2011. Riggs serves as a member of Envision's Compliance and Quality Committee, and prior to the Merger, he served as Chair of Envision's Compliance and Quality Committee, as well as a member of the Compensation Committee.  Riggs received a sum of $439,092 in total compensation from Envision  from 2015 to 2016,  including $221,758 in 2015,  and  $217,334 in 2016.   During the Relevant Period, while in possession of material, non-public information, Riggs sold at least 12,000 personally-held shares of Envision stock at artificially-inflated prices for proceeds of approximately $460,520.  Riggs is a defendant in the Securities Class Action.

26.    Defendant John T. Gawaluck ("Gawaluck") has served as a Director of Envision since December 2016, when the Merger was completed.  Prior to the Merger, Gawaluck served as a director of AmSurg, since 2015.  Gawaluck serves as a member of Envision's Audit Committee and Compliance and Quality Committee.   Gawaluck received a sum of $262,500 in total compensation during 2016, part of which time he was a Director of Envision following the Merger, and thus, Gawaluck received some or all of his compensation in 2016 from Envision.

27.    Defendant Steven I. Geringer ("Geringer") has served as a Director of Envision since December 2016, when the Merger was completed.  Prior to the Merger, Geringer served as a director of AmSurg, from March 1997 through November 2016, and served as Chairman of the Board of AmSurg from July 2009 until November 2016.  Geringer serves as member of Envision's

Compensation Committee and Nominating Committee. Geringer received a sum of $362,500 in total compensation during 2016, part of which time he was a Director of Envision following the Merger, and thus, Geringer received some or all of his compensation in 2016 from Envision.

28.     Defendant James D. Shelton ("Shelton") has served as a Director of Envision (previously with EHH) since July 2015, and continues to serve as a Director following the Merger. Shelton serves as a member of Envision's Compliance and Quality Committee, and prior to the Merger, he served as a member of Envision's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Shelton received a sum of $407,456 in total compensation from Envision from 2015 to 2016, including $192,206 in 2015, and $215,250 in 2016. Shelton is a defendant in the Securities Class Action.

29.     Defendant Joey A. Jacobs ("Jacobs") has served as a Director of Envision since December 2016, when the Merger was completed. Prior to the Merger, Jacobs served as a director of AmSurg, since 2013. Jacobs serves as a member of Envision's Nominating Committee. Jacobs received a sum of $250,417 in total compensation during 2016, part of which time he was a Director of Envision following the Merger, and thus, Jacobs received some or all of his compensation in 2016 from Envision.

30.     Defendant Michael L. Smith ("Smith") has served as a Director of Envision (previously with EHH) since August 2011, including as Lead Director from April 2015 until November 2016, and continues to serve as a Director following the Merger. Smith serves as a Chair of Envision's Compensation Committee, as well as a member of the Audit Committee, and prior to the Merger, Smith served as Chair of Envision's Audit Committee, as well as a member of the Compliance and Quality Committee, and the Nominating and Corporate Governance Committee. Smith received a sum of $590,258 in total compensation from Envision from 2015 to

2016, including $292,508 in 2015, and $297,750 in 2016. Smith is a defendant in the Securities Class Action.

31.     Defendant Cynthia S. Miller ("Miller") has served as a Director of Envision since December 2016, when the Merger was completed. Prior to the Merger, Miller served as a director of AmSurg, since 2011. Miller serves as Chair of Envision's Compliance and Quality Committee, as well as a member of the Audit Committee. Miller received a sum of $285,833 in total compensation during 2016, part of which time he was a Director of Envision following the Merger, and thus, Miller received some or all of her compensation in 2016 from Envision.

32.     Defendant Kevin P. Lavender ("Lavender") has served as a Director of Envision since December 2016, when the Merger was completed. Prior to the Merger, Lavender served as a director of AmSurg, since 2004. Lavender serves as a member of Envision's Compensation Committee. Lavender received a sum of $283,250 in total compensation during 2016, part of which time he was a Director of Envision following the Merger, and thus, Lavender received some or all of his compensation in 2016 from Envision.

33.     Defendant Randel G. Owen ("Owen") has served as Envision's President of Ambulatory Services since December 2016, when the Merger was completed. Prior to the Merger, Owen served in various executive roles with Envision since joining the Company in 1999, including as Director from August 2011 until February 23, 2016, Executive Vice President ("VP") from December 1, 2005 until April 30, 2017, CFO from February 10, 2005 until December 3, 2016, COO from September 7, 2012 until December 3, 2016, Executive VP and CFO of American Medical Response Inc. (one of Envision's primary operating subsidiaries) from March 2003 until 2005, and Executive VP and CFO of EmCare (one of Envision's primary operating subsidiaries) from June 2001 to March 2003. Owen received a sum of $2,954,860 in

total compensation from Envision from 2015 to 2016, including $710,429 in 2015, and $2,244,431 in 2016. Additionally, as part of the Merger, Owen received substantial compensation, including $3,419,266 in cash and $1,102,787 in equity, for a total of $4,522,053. During the Relevant Period, while in possession of material, non-public information, Owen sold at least 210,000 personally-held shares of Envision stock at artificially-inflated prices for proceeds of approximately $8,932,800. Owen is a defendant in the Securities Class Action.

34.     Defendant Claire M. Gulmi ("Gulmi") served as Executive VP and CFO of Envision from December 2016, when the Merger was completed, until she retired on October 2, 2017. Prior to the Merger, Gulmi served in various executive roles with AmSurg, including as AmSurg's CFO from September 1994 to 2016, Secretary from December 1997 to 2016, Executive VP from February 21, 2006 to 2016, Senior VP from March 1997 to February 2006, VP from September 1994 to March 1997, Principal Accounting Officer, and as a director of AmSurg from May 20, 2004 to 2016. Gulmi agreed to remain with the Company for one year following her retirement, in an advisory role, purportedly to assist with the transition of her responsibilities to the new Executive VP and CFO. In connection with her advisory role, Gulmi will continue to receive base salary and benefits at her current level, a value of approximately $2 million. As part of the Merger, Gulmi received substantial compensation, including $2,075,990 in cash, $3,380,146 in equity, $991,389 in pension/NQDC, and $14,752 in perquisites/benefits, for a total of $6,462,277. Gulmi is a defendant in the Securities Class Action.

35.     Defendant Mark V. Mactas ("Mactas") served as a Director of Envision from November 2013 until December 2016. Prior to the Merger, Mactas served as Chair of Envision's Compensation Committee, as well as a member of the Compliance and Quality Committee. Mactas received a sum of $426,175 in total compensation from Envision from 2015 to 2016,

including $218,008 in 2015, and $208,167 in 2016.  Mactas is a defendant in the Securities Class Action.

36.     Defendant Richard J. Schnall ("Schnall") served as a Director of Envision (previously with EHH) from May 25, 2011 until shortly after the completion of the Merger, when he resigned from the Board on March 27, 2017.  Following the Merger and until the time of his resignation, Schnall served as a member of Envision's Audit Committee.  Schnall received a sum of $364,537 in total compensation from Envision from 2015 to 2016, including $172,454 in 2015, and $192,083 in 2016.  Schnall is a defendant in the Securities Class Action.

37.     Defendant Ronald A. Williams ("Williams") served as a Director of Envision (previously with EHH) from May 2011—including as Chairman of the Board from May 2011 until November 2014, and as Lead Director from November 2014 until April 2015—until he resigned from the Board on October 27, 2017.  Following the Merger and until the time of his resignation, Williams served as a member of Envision's Compensation Committee, and prior to the Merger, he served as a member of Envision's Compliance and Quality Committee.  Williams received a sum of $545,880 in total compensation from Envision from 2015 to 2016, including $338,797 in 2015, and $207,083 in 2016.  Williams is a defendant in the Securities Class Action.

38.     Defendants Sanger, Holden, Burt, Deal, Riggs, Gawaluck, Geringer, Shelton, Jacobs, Smith, Miller, Lavender, Owen, Gulmi, Mactas, Schnall, and Williams are, at times, referred to collectively herein as the "Individual Defendants."[2]

---

[2]  For all allegations in this Complaint referring to Individual Defendants' involvement in events that occurred **before** the Merger was completed on December 1, 2016, and thus, before certain of the Individual Defendants (to wit, Defendants Holden, Miller, Gawaluck, Jacobs, Lavender, Deal, Geringer, and Gulmi) became part of Envision, and began participating in the unlawful acts alleged herein, such allegations refer **only** to the Individual Defendants who were directors and/or officers of Envision (i.e., EHH) **prior to** the Merger (to wit, Defendants Sanger, Burt, Riggs, Shelton, Smith, Owen, Schnall, Mactas, and Williams).  For all allegations that refer to Individual

39. Defendants Sanger, Holden, Burt, Deal, Riggs, Gawaluck, Geringer, Shelton, Jacobs, Smith, Miller, Lavender, Mactas, Schnall, and Williams are, at times, referred to collectively herein as the "Director Defendants."[3]

40. Defendants Sanger, Holden, Owen, and Gulmi, are, at times, referred to collectively herein as the "Officer Defendants."[4]

41. Defendants Burt, Deal, Gawaluck, Smith, and Miller are, at times, referred to collectively herein as the "Audit Committee Defendants."

42. Defendants Geringer, Smith, and Lavender are, at times, referred to collectively herein as the "Compensation Committee Defendants."

43. Defendants Miller, Gawaluck, Riggs, and Shelton are, at times, referred to collectively herein as the "Compliance and Quality Committee Defendants."

---

Defendants' involvement in events that occurred **on or after** the Merger was completed on December 1, 2016, such allegations refer to **each and all** of the Individual Defendants, to the extent they were employed by Envision at that time, unless otherwise noted.

[3] For all allegations in this Complaint referring to Director Defendants' involvement in events that occurred **before** the Merger was completed on December 1, 2016, and thus, before certain of the Director Defendants (to wit, Defendants Holden, Miller, Gawaluck, Jacobs, Lavender, Deal, and Geringer) became part of Envision and began participating in the unlawful acts alleged herein, such allegations refer **only** to the Director Defendants who were directors of Envision (i.e., EHH) **prior to** the Merger (to wit, Defendants Burt, Riggs, Sanger, Shelton, Smith, and Williams). For all allegations that refer to Director Defendants' involvement in events that occurred **on or after** the Merger was completed on December 1, 2016, such allegations refer to **each and all** of the Director Defendants, to the extent they were employed by Envision at that time, unless otherwise noted.

[4] For all allegations in this Complaint referring to Officer Defendants' involvement in events that occurred **before** the Merger was completed on December 1, 2016, and thus, before certain of the Officer Defendants (to wit, Defendants Holden, and Gulmi) became part of Envision and began participating in the unlawful acts alleged herein, such allegations refer **only** to the Officer Defendants who were officers of Envision (i.e., EHH) **prior to** the Merger (to wit, Defendants Sanger and Owen). For all allegations that refer to Officer Defendants' involvement in events that occurred **on or after** the Merger was completed on December 1, 2016, such allegations refer to **each and all** of the Officer Defendants, to the extent they were employed by Envision at that time, unless otherwise noted.

44. Defendants Sanger, Riggs, and Owen are, at times, referred to collectively herein as the "Insider Selling Defendants."

45. Defendants Sanger, Holden, Burt, Deal, Riggs, Gawaluck, Geringer, Shelton, Jacobs, Smith, Miller, and Lavender are at times, referred to collectively herein as the "Demand Defendants."

46. As directors and/or officers of Envision, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known of the adverse, non-public information about Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls, because of their access to internal corporate documents, conversations, and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith. The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Envision through, *inter alia*, the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and Envision stockholders.

## SUBSTANTIVE ALLEGATIONS[5]

### A. Background on the Company

47. Originally founded in 1992, Envision is a Delaware corporation with its principle place of business in Nashville, Tennessee. The Company provides healthcare services nationwide,

---

[5] All textual emphases in quoted material in this Complaint are added unless otherwise noted.

purportedly including a highly differentiated array of clinical solutions, including physician-led services, medical transportation services, and ambulatory services.

48.     Envision is comprised of three primary operating subsidiaries: EmCare, American Medical Response Inc., and Evolution Health.  According to the Company, EmCare is the nation's leading provider of integrated facility-based physician services across five service lines (including emergency medicine, hospital medicine, acute care surgery, anesthesiology, and radiology/teleradiology), with nearly 16,000 affiliated physicians and other clinicians.  EmCare has been a primary operating subsidiary of the Company throughout the Relevant Period.

49.     The Company formerly operated as Envision Healthcare Holdings, Inc.  On or about June 15, 2016, EHH announced the execution of an agreement pursuant to which EHH would combine in an all-stock merger of equals with Tennessee-based AmSurg, and AmSurg's direct wholly owned subsidiary, New Amethyst Corp. ("NAC").  Pursuant to the Merger, EHH and AmSurg would each merge with and into NAC, and the combined entity would be known and operating as Envision Healthcare Corporation.

50.     Pursuant to the Merger, each issued and outstanding share of EHH stock would automatically convert into the right to receive 0.334 shares of stock in the combined company, while former stockholders of EHH and AmSurg would own 53% and 47%, respectively, of the combined company.

51.     Additionally, as part of the Merger, the Board of the combined company would be comprised of 14 members—consisting of seven (7) of Envision's directors and seven (7) of AmSurg's directors—with Defendant Holden (the former President, CEO, and director of AmSurg), serving as President, CEO, and as a director of the combined company.

52. The Company announced the completion of the Merger on December 1, 2016. Following completion of the Merger, EmCare remains one of Envision's primary operating subsidiaries.

**B. The Individual Defendants Caused Envision to Make Materially False and Misleading Statements During the Relevant Period**

53. On March 2, 2015 (the start of the Relevant Period), after the market closed, the Individual Defendants caused Envision to file its annual report on Form 10-K with the SEC (the "2014 10-K"), reporting the Company's financial and operating results for the fourth quarter of 2014 ("Q4 2014") and fiscal year 2014 ("FY 2014"). For Q4 2014, Envision reported net income of $49.9 million (or $0.26 per diluted share), on revenue of $1.16 billion, compared to net income of $7.9 million (or $0.04 per diluted share), on revenue of $984.8 million, for the same period in the prior year. For FY 2014, Envision reported net income of $125.5 million ($0.66 per diluted share), on revenue of $4.4 billion, compared to net income of $6 million ($0.04 per diluted share), on revenue of $3.73 billion, for fiscal year 2013.

54. The earnings figures contained in the 2014 10-K had initially been announced on February 26, 2015, when the Individual Defendants caused Envision to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "February 26, 2015 Press Release"). Under the heading "2015 Guidance," the February 26, 2015 Press Release stated: "The Company reaffirms its recently issued guidance for 2015 of Adjusted EBITDA of $653 million to $665 million, which would be approximately 17% to 20% higher than results for 2014, and Adjusted EPS of $1.42 to $1.50 for 2015." That guidance had initially been announced in a press release issued on January 13, 2015, and was reiterated at a JP Morgan Healthcare Conference on January 15, 2015, where Defendant Sanger confirmed that "[o]n the EmCare side we believe we've got very strong visibility into the ability to continue that organic

growth over the next several years with a very active pipeline on both the organic and the acquisition side." The February 26, 2015 Press Release further explained that, while Envision was reaffirming the Adjusted EBITDA guidance it had initiated a month and a half earlier, it had begun calculating Adjusted EBITDA "to exclude transaction costs related to acquisition activities."

55.     Additionally, the 2014 10-K stated, in relevant part:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities.**   Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business.   We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors.   *We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.*   At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities.   In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts.   We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.**   Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients.   We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies.   At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services.   Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States.   In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives.   *These factors, among others, have increased the percentage*

*of healthcare facilities utilizing multiple EmCare service lines from 11% in 2009 to 24% in 2014.* At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

56. The 2014 10-K was signed by Defendants Sanger, Owen, Williams, Burt, Riggs, Schnall, Smith, and Mactas, and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the 2014 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

57. On April 22, 2015, the Individual Defendants caused Envision to file a proxy statement with the SEC, pursuant to Section 14(a) of the Exchange Act (the "2015 Proxy"). The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection. However, the 2015 Proxy misrepresented and/or failed to disclose that (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

58. On May 8, 2015, the Individual Defendants caused Envision to file its quarterly report on Form 10-Q with the SEC (the "Q1 2015 10-Q"), reporting the Company's financial and operating results for the first quarter of 2015 ("Q1 2015"). For Q1 2015, Envision reported net income of $33.38 million (or $0.17 per diluted share), on revenue of $1.24 billion, compared to

net income of $24.8 million (or $0.13 per diluted share), on revenue of $1.01 billion, for the same period in the prior year.

59.     Additionally, the Q1 2015 10-Q stated, in relevant part:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 5% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

60.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q1 2015 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

61.     On July 30, 2015, the Individual Defendants caused Envision to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "July 30, 2015 Press Release"), announcing, among other things, Envision's financial results for the second quarter of 2015 ("Q2 2015"). Under the heading "2015 Guidance," the July 30, 2015 Press Release stated:

Envision is maintaining its existing 2015 guidance of Adjusted EBITDA in a range of $653 million to $665 million and Adjusted EPS of $1.42 to $1.50. The Company anticipates that its third quarter of 2015 results will be approximately 26% to 26.5% of its full year guidance. At this time, 2015 guidance does not incorporate any impact from the pending Rural/Metro acquisition.

62.     Also on July 30, 2015, the Individual Defendants caused Envision to hold a conference call with investors and analysts to discuss the Company's Q2 2015 financial results

(the "Q2 2015 Call"). Defendants Sanger and Owen, among others, participated in the Q2 2015 Call on behalf of Envision. On the Q2 2015 Call, Defendant Owen stated the following:

> We are not adjusting our 2015 [annual] guidance at this time. Results to date are in line with our guidance range, and we don't anticipate modifying guidance until we have more details on when the Rural/Metro acquisition will close. We do anticipate Q3 adjusted EBITDA to be approximately 26% to 26.5% of our annual EBITDA guidance. We anticipate a higher growth rate in Q4, based on the timing of new business starts and expected margin improvement at EmCare.

63. On August 3, 2015, the Individual Defendants caused Envision to file its quarterly report on Form 10-Q with the SEC (the "Q2 2015 10-Q"), reporting the Company's financial and operating results for Q2 2015. For Q2 2015, Envision reported net income of $52.42 million (or $0.27 per diluted share), on revenue of $1.35 billion, compared to a net loss of $1.99 million (or $0.01 per diluted share), on revenue of $1.08 billion, for the same period in the prior year.

64. Additionally, the Q2 2015 10-Q stated, in relevant part:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

65. The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q2 2015 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

66.     On November 3, 2015, the Individual Defendants caused Envision to file its quarterly report on Form 10-Q with the SEC (the "Q3 2015 10-Q"), reporting the Company's financial and operating results for the third quarter of 2015 ("Q3 2015").  For Q3 2015, Envision reported net income of $17.24 million (or $0.09 per diluted share), on revenue of $1.37 billion, compared to a net loss of $52.78 million (or $0.28 per diluted share), on revenue of $1.15 billion, for the same period in the prior year.

67.     Additionally, the Q3 2015 10-Q stated, in relevant part:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2015, approximately 74% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 2% from other hospital management services.  Approximately 83% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 17% was generated from billings to hospitals and affiliated physician groups for professional services.

68.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q3 2015 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

69.     On February 29, 2016, the Individual Defendants caused Envision to file its annual report on Form 10-K with the SEC (the "2015 10-K"), reporting the Company's financial and operating results for the fourth quarter of 2015 ("Q4 2015") and fiscal year 2015 ("FY 2015"). For Q4 2015, Envision reported net income of $41.87 million (or $0.22 per diluted share), on revenue of $1.48 billion, compared to net income of $49.9 million (or $0.26 per diluted share), on revenue of $1.16 billion, for the same period in the prior year.  For FY 2015, Envision reported

net income of $144.89 million (or $0.76 per diluted share), on revenue of $5.45 billion, compared to net income of $125.5 million (or $0.66 per diluted share), on revenue of $4.4 billion for FY 2014.

70.     Additionally, the 2015 10-K stated, in relevant part:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities.**   Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business.   We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors.   ***We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.***   At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities.   In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts.   We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.**   Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients.   We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies.   At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services.   Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States.   In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives.   ***These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2010 to 22% in 2015.***   At AMR, we have expanded service lines, such as our managed

transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

71. The 2015 10-K was signed by Defendants Sanger, Owen, Burt, Mactas, Riggs, Schnall, Shelton, Smith, and Williams, and contained signed certifications pursuant to SOX by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the 2015 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

72. On March 23, 2016, the Individual Defendants caused Envision to file a proxy statement with the SEC, pursuant to Section 14(a) of the Exchange Act (the "2016 Proxy"). The 2016 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection. However, the 2016 Proxy misrepresented and/or failed to disclose that (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

73. On May 6, 2016, the Individual Defendants caused Envision to file its quarterly report on Form 10-Q with the SEC (the "Q1 2016 10-Q"), reporting the Company's financial and operating results for the first quarter of 2016 ("Q1 2016"). For Q1 2016, Envision reported net income of $26.85 million (or $0.14 per diluted share), on revenue of $1.6 billion, compared to net income of $33.38 million (or $0.17 per diluted share), on revenue of $1.24 billion, for the same period in the prior year.

74.     Additionally, the Q1 2016 10-Q stated, in relevant part:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

75.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q1 2016 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

76.     On August 3, 2016, the Individual Defendants caused Envision to file its quarterly report on Form 10-Q with the SEC (the "Q2 2016 10-Q"), reporting the Company's financial and operating results for the second quarter of 2016 ("Q2 2016"). For Q2 2016, Envision reported net income of $28.43 million (or $0.15 per diluted share), on revenue of $1.64 billion, compared to net income of $52.41 million (or $0.27 per diluted share), on revenue of $1.35 billion, for the same period in the prior year.

77.     Additionally, the Q2 2016 10-Q stated, in relevant part:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services.

– 26 –

Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

78.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q2 2016 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

79.     On October 21, 2016, Envision and AmSurg filed a Definitive Proxy Statement Relating to Merger or Acquisition on Form DEFM14A with the SEC (the "Merger Proxy") urging investors to approve the Merger.  The Merger Proxy incorporates by reference Envision's financial results from 2011 to 2016 and, "in the opinion of Envision's management, include[d] all normal and recurring adjustments that are considered necessary for the fair presentation of the results for the interim periods."  As indicated in the Merger Proxy, the Boards of Directors of both AmSurg and Envision unanimously recommended that their respective shareholders approve the Merger, instructing investors to "rely only on the information contained in, or incorporated by reference into, this joint proxy statement/prospectus."

80.     On November 3, 2016, the Individual Defendants caused Envision to file its quarterly report on Form 10-Q with the SEC (the "Q3 2016 10-Q"), reporting the Company's financial and operating results for the third quarter of 2016 ("Q3 2016").  For Q3 2016, Envision reported net income of $25.89 million (or $0.13 per diluted share), on revenue of $1.64 billion, compared to net income of $17.24 million (or $0.09 per diluted share), on revenue of $1.37 billion, for the same period in the prior year.

81.     Additionally, the Q3 2016 10-Q stated, in relevant part:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 11% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 2% from our surgery services, 1% from our radiology/tele-radiology services, and less than 1% from other hospital management services. Approximately 80% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 20% was generated from billings to hospitals and affiliated physician groups for professional services.

82.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q3 2016 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

83.     On March 1, 2017, the Individual Defendants caused Envision to file its annual report on Form 10-K with the SEC (the "2016 10-K"), reporting the Company's financial and operating results for the fourth quarter of 2016 ("Q4 2016") and fiscal year 2016 ("FY 2016"). For Q4 2016, Envision reported a net loss of $137.8 million (or $1.84 per diluted share), on revenue of $1.39 billion, compared to net income of $63.3 million (or $1.24 per diluted share), on revenue of $704.3 million, for the same period in the prior year.  For FY 2016, Envision reported a net loss of $27.7 million (or $0.47 per diluted share), on revenue of $3.7 billion, compared to net income of $153.9 million (or $3.16 per diluted share), on revenue of $2.57 billion, for FY 2015.

84.     The 2016 10-K was signed by Defendants Holden, Gulmi, Sanger, Burt, Deal, Gawaluck, Geringer, Jacobs, Lavender, Miller, Riggs, Schnall, Shelton, Smith, and Williams, and contained signed certifications pursuant to SOX by Defendants Holden and Gulmi, in their

capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the 2016 10-K], fairly present in all material respects the financial condition, results of operations" of the Company.

85.     On April 13, 2017, the Individual Defendants caused Envision to file a proxy statement with the SEC, pursuant to Section 14(a) of the Exchange Act (the "2017 Proxy").  The 2017 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection.  However, the 2017 Proxy misrepresented and/or failed to disclose that (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

86.     On May 5, 2017, the Individual Defendants caused Envision to file its quarterly report on Form 10-Q with the SEC (the "Q1 2017 10-Q"), reporting the Company's financial and operating results for the first quarter of 2017 ("Q1 2017").  For Q1 2017, Envision reported a net loss of $445.2 million (or $3.84 per diluted share), on revenue of $1.88 billion, compared to net income of $30.86 million (or $0.53 per diluted share), on revenue of $724.68 million, for the same period in the prior year.

87.     The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Holden and Gulmi, which certified that "the information contained in the [Q1 2017 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

## REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS
## WERE FALSE AND MISLEADING

88.     The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)     EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians, and accordingly, EmCare "surprise-billed" these patients at higher rates than if the patients had received treatment from in-network physicians;

(b)     EmCare also engaged in a concerted practice of overbilling and unnecessarily billing patients by ordering physicians to, *inter alia*, frequently order tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial rather than medical reasons, and bill for the most complex, expensive level of care in unwarranted situations;

(c)     Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of these unlawful and deceptive business practices;

(d)     The Company's statements attributing EmCare's growth during the Relevant Period to other factors, while failing to disclose that these unlawful and deceitful practices were materially contributing to the Company's growth, were therefore, false and/or misleading;

(e)     Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct was discontinued and/or revealed;

(f)     Envision had inadequate corporate accounting and corporate financial-reporting resources;

(g)     Envision inadequately assessed the risks associated with the Company's financial reporting;

(h)     Envision failed to maintain and/or lacked effective internal controls over financial reporting; and

(i)     As a result of the foregoing, Envision's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH IS SLOWLY REVEALED

89.     On October 22, 2015, the Individual Defendants caused Envision to issue a press release entitled "Envision Healthcare Reports 2015 Third Quarter Results," which was also filed as an exhibit to a current report on Form 8-K with the SEC (the "October 22, 2015 Press Release"). The October 22, 2015 Press Release reported that, for Q3 2015, "Adjusted EBITDA was $142.5 million, which was lower than anticipated as a result of several factors specific to the Company's EmCare segment," and quoted Defendant Sanger explaining as follows:

> [P]erformance at EmCare fell short of our expectations . . . . EmCare's same-store revenue growth, while positive, was lower than in recent quarters due to a reduction in anticipated volume. . . . As staffing schedules are set 45 to 60 days in advance, based on anticipated volumes and hospital expectations, we were not successful in adjusting coverage in line with lower-than-expected volumes.
>
> In addition, a number of recent contract starts had staffing challenges that resulted in higher-than-expected temporary compensation costs in the period.

90.     The Individual Defendants caused Envision to further announce: "Based on the Company's results for the 2015 third quarter and the expected impact on fourth quarter operations, Envision is adjusting its 2015 annual Adjusted EBITDA guidance to a range of $600 million to $605 million. The Company expects that Adjusted EPS will be approximately $1.28 to $1.30."

91.     That same day, October 22, 2015, the Individual Defendants caused Envision to hold a conference call with analysts and investors (the "October 22, 2015 Call").   On the October 22, 2015 Call, Defendant Sanger explained that "[d]uring the quarter, EmCare's results were negatively impacted by decelerating same-store volume growth, which resulted in higher staffing ratios and certain underperforming contracts."   Regarding the volume and related staffing ratios, Sanger reported that "[e]arly in the quarter, the ED volume appeared to be tracking to seasonally lower July levels," but "those levels did not increase in August as anticipated" and Envision's response of changing staffing schedules and renegotiating contracts could not counter the resulting increase in staffing ratios before the end of the quarter because "EmCare's staffing schedules are generally set 45 to 60 days in advance" and "there's a lag in time before we're able to flex our staffing or to go back to the hospital so we can renegotiate these contracts to align with the changes in the volume."

92.     Regarding the underperforming contracts, Defendant Sanger explained that the problem was with "approximately 30 contracts, about 21 of those that were – that came on in the last few quarters," and that those contracts "were underperforming substantially based on the changes [in] [payor] mix that we saw, volume we saw, and we kind of misread what the cash per visit was."   Sanger further told investors that, on these contracts, Envision's "biggest challenge is staffing, as always has been. Many of these contracts were in areas where staffing is very difficult and we [were] unsuccessful in meeting those staffing needs."   Defendant Owen further explained that "a lot of these [underperforming contracts] were starts within the last 12 months that had much bigger issues than we had anticipated."   For example, some of the underperforming contracts "were just in areas that were difficult to recruit.   And I think we underestimated the challenges initially of the recruitment process and ended up paying a much higher rate for temporary staffing because

of what we'd committed from a hospital standpoint than we had expected."  According to Owen, because these contracts "were in smaller communities from rural areas," Envision "misread for the ability to recruit and misread in some of those, how many providers we would have day one.  It was a much bigger challenge from a recruiting [perspective] and had a much higher cost of staffing."

93.     Following this revelation, Envision's stock price once again declined drastically, tumbling $11.09 per share (or *over 30%*), on unusually high trading volume, to close at $25.40 per share on October 22, 2015.  Nonetheless, the stock price remained artificially inflated because of the continuing scheme described herein, which was not revealed until July 2017.

94.     On July 24, 2017, *The New York Times* reported, in an article titled "The Company Behind Many Surprise Emergency Room Bills," that hospitals associated with Envision's subsidiary EmCare were disproportionately likely to engage in "surprise-billing," in which patients who go to in-network hospitals are treated by out-of-network doctors and subsequently billed at higher rates.

95.     According to a study conducted by researchers at Yale University, and discussed in detail in *The New York Times* article, the rate of out-of-network doctors' bills for customers of one large insurer jumped when EmCare entered a hospital.  The Yale researchers, who examined nearly nine million visits made to emergency rooms run by a variety of companies between 2011 and 2015, suggested that EmCare failed to sign contracts with insurance providers, thereby allowing it to charge higher rates.  Fiona Scott Morton, a professor at the Yale School of Management and a co-author of the paper, described the strategy as a "kind of ambushing of patients."  A patient who goes to the emergency room can look for a hospital that takes its insurance but rarely gets to choose the treating physician.

– 33 –



**Out-of-network bills***

96.     *The New York Times* article also highlighted that EmCare physicians used higher billing codes than their predecessors at an exorbitant rate, stating: "Before EmCare, about 6 percent of patient visits in the hospital's emergency room were billed for the most complex, expensive level of care.  After EmCare arrived, nearly 28 percent got the highest-level billing code."  Additionally, Yale's study concluded that the rates of tests ordered and the number of patients admitted from the emergency room into a hospital rose once EmCare entered a hospital.  "It almost looked like a light switch was being flipped on," said Zack Cooper, a health economist at Yale who is one of the study's authors.



**Hospital admissions**



**Highest-level codes**

97.    *The New York Times* article also emphasized that "EmCare's emergency room management has come under scrutiny before."  Envision is a named defendant in two lawsuits filed by whistleblowers alleging that EmCare and Health Management Associates, a for-profit hospital chain, pressured emergency-room doctors to increase admissions and tests even when the physicians believed they were not medically necessary.  According to the lawsuits, the Company "repeatedly terminated physicians and E.R. medical directors" who pushed back.

98.    Upon revelation of this news, Envision's share price fell $2.33 (or approximately 3.72%), on unusually high trading volume, to close at $60.28 on July 24, 2017, erasing approximately $281.9 million in market capitalization.

99.    On September 18, 2017, the Individual Defendants caused Envision to issue a press release, titled "Envision Healthcare Announces Organizational Changes to Align Senior Leadership Structure with Physician-Centric Strategy" (the "September 18, 2017 Press Release"), announcing significant organizational changes, including the retirement of its CFO, a newly established COO position, and the resignation of the President of Physician Services.  The September 18, 2017 Press Release further states, in relevant part:

> Envision Healthcare Corporation ("Envision" or the "Company") (NYSE: EVHC) today announced organizational changes, including a realignment of the senior leadership structure under Christopher A. Holden, Envision's President and Chief Executive Officer, to reflect the Company's focus on its physician-centric strategic plan.
>
> As part of its ongoing efforts to enhance its scale, physician-centric strategy and operational excellence, Envision has created the new role of Executive Vice President and Chief Operating Officer. The Executive Vice President and Chief Operating Officer will report directly to Mr. Holden, with responsibility for Envision's Physician Services and Ambulatory Surgery service lines. In addition, Envision announced the implementation of succession plans for its current Chief Financial Officer, Claire Gulmi, and President of Physician Services, Robert Coward.

100.    Following this announcement, Envision's stock price continued its freefall, declining another $4.56 per share (or nearly 10%), on unusually high trading volume, to close at $43.11 per share on September 19, 2017, and erasing approximately $551.7 million more in market capitalization.

101.    Also in September 2017, it was reported that U.S. Senator Claire McCaskill was investigating potential overcharging of patients by EmCare, and that Senator McCaskill had sent a letter to defendant Holden seeking information regarding EmCare's billing practices.

102.    The exposure of the Individual Defendants' wrongful acts and omissions, and their prior false and misleading statements regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, has caused the Company to suffer significant damages and harm. Indeed, Envision's share price has continued to decline, and is currently trading at $28.99 as of November 20, 2017—a far cry from its $72.48 per share Relevant Period high it reached on February 21, 2017. Indeed, since the publication of *The New York Times* article in July 2017, the Company has lost approximately $3.79 billion in total market capitalization.

## WHILE INDIVIDUAL DEFENDANTS ARTIFICIALLY INFLATED THE COMPANY'S STOCK PRICE, THE INSIDER-SELLING DEFENDANTS CAPITALIZED ON MATERIAL, NON-PUBLIC INFORMATION

103.    While the Company's shares were trading at artificially-inflated prices due to the Individual Defendants' aforementioned unlawful and deceptive business practices, and their false and misleading statements and/or omissions, the Insider Selling Defendants capitalized on this material, non-public information to sell massive quantities of personally-held Envision stock during the Relevant Period.

104.    Indeed, from April 6, 2015 through September 14, 2015, Defendant Sanger sold 768,500 personally-held shares of Envision stock for proceeds of approximately $31,590,299.76.

Likewise, from April 13, 2015 through October 5, 2015, Defendant Riggs sold 12,000 personally-held shares of Envision stock for proceeds of approximately $460,520. Finally, from March 19, 2015 through September 15, 2015, Defendant Owen sold 210,000 personally-held shares of Envision stock for proceeds of approximately $8,932,800.

105.    In total, the Insider-Selling Defendants—all fully aware of the unlawful basis driving the Company's stock to highly-inflated levels—sold a combined 990,500 shares of their personal holdings of Envision stock, at an average price of $41.38 per share, for total proceeds of $40,983,619.76. These insider sales were executed under highly-suspicious circumstances, in that they occurred while the Company's stock price was artificially inflated due to the wrongful conduct and the false and misleading statements and omissions alleged herein.

106.    Because of their roles as directors and/or officers of Envision during the Relevant Period, the Insider-Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business of Envision, including, *inter alia*, that the false and misleading statements and/or omissions alleged herein caused the price of Envision's stock to trade at artificially-inflated prices at the same time these Insider-Selling Defendants were disposing of millions of dollars' worth of Company stock. These Insider- Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls, but they egregiously violated this duty.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

107.    By reason of their positions as officers, directors, and/or fiduciaries of Envision, and because of their ability to control the business and corporate affairs of Envision, the Individual

Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Envision in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Envision and its shareholders, so as to benefit all shareholders equally, and not in furtherance of their personal interests or benefit.

108. Each director and officer of the Company owed, and owes, to Envision, and its shareholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

109. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Envision, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Envision, each of the Individual Defendants had knowledge of material, non-public information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

110. To discharge their duties, the officers and directors of Envision were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Envision were required to, among other things:

(a) exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

(b) exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c) when put on notice of problems with the Company's business practices, operations, financials, financial prospects, compliance policies, and/or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## B.    Audit Committee Duties

111.    In addition to the aforementioned fiduciary duties, the members of the Audit Committee owed specific duties to Envision under the Audit Committee's Charter (the "Audit Charter").  According to the Audit Charter, the Audit Committee is responsible for the following:

> The purpose and responsibilities of the Committee shall be to assist the Board in fulfilling its oversight responsibilities relating to (a) the accounting, financial and external reporting policies and practices of the Corporation, (b) the quality and integrity of the Corporation's financial statements, (c) the independence, qualifications and performance of the Corporation's independent auditor (the "Independent Auditor"), (d) the performance of the Corporation's internal audit and enterprise risk management function, (e) the preparation of the report of the Committee required to be included in the Corporation's annual Proxy Statement under the rules of the Securities and Exchange Commission ("SEC"), (f) the Corporation's compliance with other legal and regulatory requirements primarily relating to accounting, auditing, taxation or other financial matters, including without limitation any requirements promulgated by the Public Company Accounting Oversight Board (the "PCAOB") and the Financial Accounting Standards Board and (g) the Corporation's financing and capital allocation strategies, capital structure, financial policies, and financial condition.  In order to ensure that the Committee is well informed regarding the Corporation's compliance program, and compliance and quality matters, the Committee Chair shall coordinate

– 39 –

and communicate directly with the Chair of the Board's Compliance and Quality Committee (the "Compliance Committee").

112. Specifically, according to the Audit Charter, and as reiterated in the Company's proxy statements, the Audit Committee's responsibilities include the following:

*Financial Reporting and Disclosure Responsibilities*

(a) Review any issues that arise with respect to the quality or integrity of the Corporation's financial statements.

(b) Review and discuss with management and the Independent Auditor any significant additions or changes to the Corporation's existing policies, principles or practices as they apply to auditing, accounting, financial reporting, external reporting, and asset-safeguarding.

(c) Review the Corporation's earnings press releases prior to their issuance, as well as any financial information and earnings guidance provided to analysts and ratings agencies.

(d) Review and discuss with management and the Independent Auditor quarterly, unaudited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," major underlying issues and the results of the Independent Auditor's review prior to filing each Form 10-Q (if any such filing is required), and determine whether such information should be distributed to the stockholders, bondholders or lenders.

(e) Review and discuss with management and the Independent Auditor annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and major underlying issues, and recommend to the Board whether such audited financial statements should be distributed to the stockholders, bondholders and lenders, and included with the Corporation's Form 10-K, if applicable.

(f) In the event that the Corporation publishes one, review the "Report of Management" in the Annual Report to Stockholders.

(g) Prepare, review and approve the "Report of Audit Committee" and its inclusion in any other document, including in the Annual Report to Stockholders and in the annual Proxy Statement; and review and discuss with the Corporation's Compensation Committee compensation-related disclosures in the annual Proxy Statement or otherwise.

(h) Receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal controls that

could adversely affect the Corporation's ability to record, process, summarize and report financial data and any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal controls, including management's recommendations regarding the remediation of any such significant deficiency or material weakness.

(i)     Review and discuss quarterly reports from the Independent Auditor on all critical accounting policies and practices to be used; the quality of the Corporation's accounting policies, including the application of the Corporation's accounting policies; all matters required to be communicated to the Committee under PCAOB standards; all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Independent Auditor; and other material written communications between the Independent Auditor and management, such as any management letter or schedule of unadjusted differences.

(j)     Discuss with management and the Independent Auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles, any major issues as to the adequacy of the Corporation's internal controls and any special steps adopted in light of material control deficiencies.

(k)     Review and discuss with management and the Independent Auditor management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act.

(l)     Discuss with management and the Independent Auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures (if any) on the Corporation's financial statements.

*Responsibilities for Oversight of Independent Auditor*

(a)     Possess sole responsibility for the appointment or replacement (subject, if applicable, to stockholder ratification), retention, termination, compensation, evaluation and oversight of the work of the Independent Auditor (including resolution of disagreements between management and the Independent Auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Corporation. The Independent Auditor shall report directly to the Committee.

(b)     Review the proposed audit scope, approach and staffing, including coordination of the audit effort with the internal audit.

(c)     Review the conduct and results of the audit of the consolidated financial statements and, at least annually, discuss with the Independent Auditor, out of the presence of management if deemed appropriate, the audit process, including, without limitation, (i) problems or difficulties and management's response, (ii) any problems or difficulties encountered in the course of the performance of the audit, (iii) any restrictions on the Independent Auditor's activities, audit scope or access to requested information, and (iv) management's response thereto, and any significant disagreements with management.

(d)     Review and evaluate the lead partner of the independent audit team, and ensure proper rotation of audit partner, lead partner and concurring partner. Consider whether it is appropriate to adopt a policy of rotating the independent auditing firm.

(e)     Obtain and review a report from the Independent Auditor at least annually detailing: (i) the Independent Auditor's internal quality-control review, or peer review, and obtain any response from management or corrective action plan; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the Independent Auditor, or any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; (iii) any publicly available reports issued within the past five years by the PCAOB or other governmental or professional authorities concerning the Independent Auditor; (iv) any PCAOB review of the Independent Auditor, or any inquiry or investigation by governmental or professional authorities within the past five years of the Independent Auditor, and any steps taken to deal with such issues; and (v) all relationships between the Independent Auditor and the Corporation consistent with the applicable requirements of the PCAOB.

(f)     Actively engage in a dialogue with the Independent Auditor regarding any disclosed relationships or services that may impact the objectivity and independence of the Independent Auditor. Evaluate the qualifications, performance and independence of the Independent Auditor, including considering whether the Independent Auditor's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the Independent Auditor's independence, taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the performance of the Independent Auditor to the Board.

(g) Pre-approve all auditing and, subject to the de minimis exception of Section 10A(i) of the Exchange Act and the SEC rules promulgated thereunder, all permitted non-audit services performed by the Corporation's Independent Auditor; provided, however, that the Committee may delegate pre-approval authority to committees of one or more of its independent members, who must then provide a report to the full Committee at its next scheduled meeting. When pre-approving non-audit services by the Independent Auditor, the Committee shall consider whether their provision is consistent with maintaining the Independent Auditor's independence.

(h) Review periodic reports from management and the Independent Auditor regarding the Independent Auditor's independence (including the Independent Auditor's fees billed for audit services, audit-related fees, tax fees, and all other non-audit services, respectively, for each fiscal year), discuss such reports with the auditor, and if so determined by the Committee, recommend that the Board take appropriate action regarding the independence of the Independent Auditor.

(i) Confirm that none of the audit partners earn or receive compensation based on procuring engagements with the Corporation for providing products or services, other than audit review or attest services.

(j) As appropriate, discuss with the national office of the Independent Auditor issues on which they were consulted by the Corporation's audit team and matters of audit quality and consistency.

(k) Establish procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal controls or auditing matters, and the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting, internal controls or auditing matters.

(l) Review with management and the Independent Auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Corporation's financial statements or accounting policies.

(m) Establish policies for the Corporation's hiring of employees or former employees of the Independent Auditor who participated in any capacity in the audit of the Corporation to ensure the Independent Auditor's independence under the SEC rules.

(n) Review and discuss with the Chief Executive Officer and President and Chief Financial Officer the procedures undertaken in connection with the Chief Executive Officer and President and Chief Financial Officer certifications in periodic reports, including their evaluation of the Corporation's disclosure controls and procedures and internal controls.

(o)     Obtain annually assurance, if necessary or deemed advisable by the Committee, from the Independent Auditor that the audit was conducted in a manner consistent with Section 10A of the Exchange Act.

(p)     Discuss with the Independent Auditor, out of the presence of management if deemed appropriate, the matters required to be communicated to audit committees in accordance with the auditing standards of the PCAOB as they may be modified or supplemented, relating to the conduct of the audit, including under Auditing Standard No. 16.

*Responsibilities for Oversight of Internal Audit*

(a)     Review and discuss with management the Corporation's risk assessment and risk management process and policies, the results of the annual corporate-wide risk assessment and the related corporate guidelines and policies and commitment of internal audit resources. Such discussions should occur quarterly and include the Corporation's material financial and accounting risk exposures and the actions management has taken to control them.

(b)     Discuss with the Independent Auditor and management the internal audit department responsibilities, internal audit plan, scope of work, performance, budget and staffing.

(c)     Review the appointment, replacement or dismissal of senior internal audit personnel.

(d)     Review completed internal audit reports and management's response at each meeting. The internal auditors shall report directly to the Committee.

(e)     Periodically review internal audit policies.

*Finance Oversight Responsibilities*

(a)     Review and recommend to the Board financial policies and performance objectives as developed by management pertaining to: earnings growth and return on equity; debt ratio, coverage, cash flow and credit rating; dividend policy; investment criteria, including capital investment hurdle rates; and financial risk management strategies, including the use of derivatives.

(b)     Review changes to the capital structure of the Corporation, including: timing and maturities of debt, terms of interest rates; and considerations on common stock sales, repurchases or splits as appropriate and any changes in dividends.

(c)     Review banking relationships and lines of credit.

(d)     Review the adequacy of insurance coverage on the Corporation's assets.

(e)     Review tax strategies and potential tax law changes.

(f)     Review, as appropriate, the financial impact to the Corporation of employee benefit plans such as pension plans, ESOPs, 401Ks and Employee Stock Purchase plans.

(g)     Review annually the business plan prepared by senior management from the perspective of funds flow, capital spending and financing requirements.

(h)     Review and evaluate contemplated acquisitions, joint ventures, partnerships, strategic investments, significant capital spending projects or similar initiatives, in each case, of the Corporation or any of its subsidiaries.

(i)     Report periodically to the Board on all financing related matters for which the Committee has been delegated responsibility.

*Other Responsibilities*

(a)     Report regularly to the full Board on all matters charged to the responsibility of the Committee.

(b)     Review an annual report of the General Counsel on the results of the Corporation's conflict of interest survey.

(c)     Regularly review reports of the General Counsel on pending or threatened litigation relating to accounting, auditing, taxation or other financial matters, including any material reports or inquiries received by the Corporation from regulators or governmental agencies, and other matters, including the scope and effectiveness of compliance policies and programs.

(d)     Discuss with management any pending or threatened litigation, claim or assessment involving potential losses (or gains) as to which the expected effect on the consolidated financial statements may be material.

(e)     Periodically review the annual agenda of the Committee to assess whether the Committee is addressing all material matters related to its responsibilities delegated from the Board.

(f)     Review and approve all Related Person Transactions, as defined in the Corporation's Related Person Transaction Policy, in accordance with the provisions of such policy.

113.    Upon information and belief, the Company maintained an Audit Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

## C. Duties Pursuant to the Company's Code of Business Conduct and Ethics

114. The Individual Defendants, as officers and/or directors of Envision, were also bound by the Company's Code of Business Conduct and Ethics (the "Code") which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Envision, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

115. With respect to the accuracy of financial records titled, "Keeping Accurate Books, Records and Reports about the Company," the Code provides as follows:

> The Company's books, records, and reports must be truthful and accurate and must be maintained in compliance with Company policy and federal, state and local laws. The failure to maintain accurate books, records and reports may expose the Company and its colleagues to significant civil damages, substantial criminal fines and other penalties. We expect every colleague to take responsibility for the integrity of information that is included in business documents, whether that information is financial, operational, statistical, or other business data. You must not intentionally enter, record or report false, misleading or inaccurate information.

Accordingly, if any director, officer, or employee believes or suspects a violation of the Code or any law, rule, or regulation, has been committed, "it is [his or her] duty to report [that] concern."

116. With respect to the use of inside information, the Code states the following:

> We shall comply with all applicable federal and state security laws, relating to buying or selling stock in our Company. In the normal course of the business, we may become aware of material, non-public information (Inside Information) regarding the Company, as well as other companies with which we do business. The Company has adopted an insider trading policy (the "Insider Trading Policy") which will be available on our website and which colleagues should review. The following is a summary of the Insider Trading Policy: Insider Trading Policy, you should contact the Company's General Counsel.

> ***The Following Conduct is Strictly Prohibited:***

> A. "Insiders" include temporary, part-time and full-time employees, independent contractors, clinicians, officers and directors of the Company, as well as the Company's outside advisors, agents, contractors and other third parties with access to Inside Information. Under the Insider Trading Policy, Insiders, members of their immediate families, or any trusts over

which the Insider has control, may not buy or sell Envision Healthcare securities or securities of any other publicly-held company, while in possession of Insider Information obtained during the course of employment. This prohibition applies even if the decision to buy or sell is not based on the Inside Information.

B.    Insiders in possession of Inside Information, may not (a) disclose the Inside Information to anyone other than those individuals associated with the company who need to know the information to conduct their job duties; or (b) offer tips, opinions or recommendations regarding Inside Information, to any other individual, including family members, friends, vendors, suppliers or customers, who may trade Envision Healthcare securities. Even outside of the trading context, Insiders are required to maintain the confidentiality of Company information.

C.    The Company considers it improper for any Insider to engage in speculative transactions with Envision Healthcare securities. Therefore, Insiders are prohibited from engaging in the following with respect to Envision Healthcare securities: (a) buying or selling publicly traded options, warrants and other derivatives; (b) engaging in short sales; (c) engaging in hedging transactions; or (d) margin purchases of Envision Healthcare securities. Additional restrictions, including those applicable to individuals subject to the SEC's Section 16 reporting requirements and other colleagues with regular access to Inside Information, are described in the Insider Trading Policy. These policies will continue to apply to any individual whose relationship with the Company terminates as long as the individual possesses Inside Information. If you have any questions about the Insider Trading Policy, you should contact the Company's General Counsel.

117.    In addition to the Code, the Company also maintains a Code of Ethics for the Executive Chairman, CEO, and Senior Health Financial Officers (the "Executive Code"), which bound Envision's Executive Chairman (Defendant Sanger), CEO (Defendant Holden), CFO (at various points in time throughout the Relevant period, Defendants Owen, and Gulmi), and other corporate financial officers with financial, accounting, and reporting responsibilities, to abide by specific ethical requirements above and beyond those listed in the Code. According to the Executive Code, its purpose is to deter wrongdoing and to promote ethical and honest behavior. To that end, the Executive Code imparts the following requirements, *inter alia*, upon covered officers:

### 3. Disclosures

When filing reports or submitting documents to the Securities and Exchange Commission, and in all other public communications, the Senior Financial Officers are expected to make disclosures which are full, fair, accurate, timely, and understandable in all material respects.

### 4. Compliance with Governmental Laws, Rules and Regulations

It is the responsibility of the Chairman, CEO, and Senior Financial Officers to abide by all laws, rules and regulations related to the Corporation. While the Corporation does not expect any single individual to understand all details of the laws, rules, and regulations potentially impacting the Corporation, the Senior Financial Officers should seek guidance as to the applicability and effect of such laws, rules and regulation and report any violation or suspected violations to the Corporation's General Counsel or the Corporation's Board of Directors.

### 5. Reporting of Violations of this Code of Ethics

The Chairman, CEO and Senior Financial Officers are accountable to this Code of Ethics and responsible for adhering to its provisions. All violations and/or suspected violations of the Code of Ethics must be reported immediately to the Corporation's General Counsel. A violation of this Code of Ethics may result in disciplinary action, up to and including termination, as determined by the Corporation's Board of Directors.

118. Upon information and belief, the Company maintained versions of the Code and the Executive Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### D. Duties Pursuant to the Company's Compliance and Quality Committee Charter

119. In addition to the aforementioned fiduciary duties and duties pursuant to the Code, the members of the Compliance and Quality Committee owed specific duties to Envision under the Compliance and Quality Committee's Charter (the "Compliance Charter"). According to the Compliance Charter, the Compliance and Quality Committee is responsible for the following:

The purpose and responsibilities of the Committee shall be to assist the Board in fulfilling its oversight responsibilities relating to (a) the Corporation's compliance with applicable laws and regulations, except for laws and regulations pertaining to accounting, auditing, taxation or other financial matters, which shall be the responsibility of the Board's Audit Committee (the "Audit Committee"), (b) the Corporation's compliance program, (c) the adequacy of the Corporation's internal and external compliance controls, (d) the effectiveness of management policies, procedures and practices relating to compliance, and (e) the Corporation's policies and procedures relating to the delivery of quality medical care to patients. The Committee shall advise the Board as to the status of the Corporation's compliance program and ongoing developments relating to compliance and quality matters. In order to ensure that the Audit Committee is well informed regarding the Corporation's compliance program, and compliance and quality matters, the Committee Chair shall coordinate and communicate directly with the Chair of the Audit Committee.

120. Specifically, according to the Compliance Charter, and as reiterated in the Company's proxy statements, the Compliance and Quality Committee's responsibilities include, *inter alia*, the following:

*Compliance Related Duties*

The Committee shall have the following goals and responsibilities with respect to the Corporation's compliance efforts:

(a) Provide oversight of the Corporation's compliance with applicable laws and regulations, except for laws and regulations pertaining to accounting, auditing, taxation or other financial matters, which shall be the responsibility of the Audit Committee, and communicate significant compliance issues to the Board and to other Board committees;

(b) Review significant compliance risk areas and the steps management has taken to monitor, control and report such compliance risk exposures;

(c) Regularly review reports of the General Counsel on pending or threatened litigation, any material reports or inquiries received by the Corporation from regulators or governmental agencies, and other matters, including the scope and effectiveness of compliance policies and programs, except for any such reports primarily relating to accounting, auditing, taxation or other financial matters, which shall be the responsibility of the Audit Committee.

(d) Review reports of the Corporation's Corporate Quality Committee;

(e) Review and evaluate, at least annually, the effectiveness of the Corporation's compliance staff and compliance and ethics program;

(f)      Review and approve compliance related policies and procedures, including employee standards of conduct and whistleblower policies and procedures, except for such policies and procedures related to accounting, internal controls or auditing matters, which shall be the responsibility of the Audit Committee;

(g)      Report compliance issues that may have significant financial implications to the Audit Committee and otherwise assist the Audit Committee in the discharge of such committee's obligations related to such compliance issues; and

(h)      Meet regularly in executive session with the Corporation's Chief Compliance Officer.

121.    Upon information and belief, the Company maintained versions of the Compliance Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### E.    Duties Pursuant to the Company's Compensation Committee Charter

122.    In addition to the aforementioned fiduciary duties and duties pursuant to the Code, the members of the Compensation Committee owed specific duties to Envision under the Compensation Committee's Charter (the "Compensation Charter"). According to the Compensation Charter, the Compensation Committee is responsible for the following:

The purpose and responsibilities of the Committee shall be to assist the Board in fulfilling its oversight responsibilities relating to (a) the compensation of the Corporation's Chief Executive Officer ("CEO"), "officers" (as defined in SEC Rule 16a-1(f)) and other members of the Corporation's senior management (as determined by the Committee from time to time, the "Senior Management Group") and relating to the compensation of the independent directors of the Board, (b) the "Compensation Discussion & Analysis" to be included in the Corporation's annual proxy statement or Annual Report on Form 10-K, and any "Report of the Compensation Committee" required by Item 407(e)(5) of Regulation S-K and (c) attracting and retaining high quality leadership for the Corporation. The Committee shall take such actions relating to the compensation and benefits structure of the Corporation as the Committee deems necessary or appropriate.

123.     Specifically, according to the Compensation Charter, and as reiterated in the Company's proxy statements, the Compensation Committee's responsibilities include, *inter alia*, the following:

(a)     Establish and periodically review the Corporation's compensation philosophy, strategy and policies applicable to the Corporation's executives and other members of the Senior Management Group.

(b)     Review and approve annual bonus and incentive plans, including equity plans and long-term incentive plans.

(c)     Review and approve corporate and individual performance measures and objectives for the Chief Executive Officer of the Corporation (the "CEO") and other members of the Senior Management Group.

(d)     Evaluate the CEO's performance in light of the corporate and individual performance measures and objectives, and, based on that evaluation, determine and approve base salary, annual bonus, equity awards and all other compensation or special benefits for the CEO. The CEO shall not be present during voting or deliberations by the Committee on the CEO's compensation. In establishing long term incentive compensation for the CEO, the Committee will consider the Corporation's performance, relative stockholder return, the value of similar incentive awards to chief executive officers at comparable companies, and the value of the awards given to the CEO in past years. Following such evaluation, the Committee shall report its decisions regarding the CEO's compensation to the Board.

(e)     Review the CEO's recommended compensation structure (i.e., base salaries, annual bonus awards, equity awards and any other compensation or special benefits) for the Corporation's other executives and other members of the Senior Management Group who directly or indirectly report to the CEO (including by reviewing the CEO's process for evaluating these elements of compensation) and, on an annual basis, consider the compensation structure for these individuals.

(f)     Annually review with the CEO the performance scores and compensation of the other members of the Senior Management Group who directly or indirectly report to the CEO. Review the CEO's recommendation for compensation, including base salary, short term incentive, and long term incentive and equity, for all other members of the Senior Management Group who directly or indirectly report to the CEO, and make recommendations to the Board with respect to the same.

(g)    Develop recommendations with respect to Board compensation, in consultation with the Nominating and Corporate Governance Committee, and make such recommendations to the Board for approval.

(h)    Periodically review the terms of the stock ownership guidelines applicable to directors and officers of the Corporation, including compliance therewith, and report to the Board on such review.

(i)    On a periodic basis, review the compensation and benefits policies and structures of the Corporation (e.g., material tax-qualified, welfare and other material benefit plans, and all material compensation arrangements), in each case subject to the requirements and limitations of the Second Amended and Restated Certificate of Incorporation of the Corporation and the By-laws.

(j)    Review and approve appointments, terminations, employment agreements, consulting agreements, severance arrangements, change in control arrangements and related compensation and benefit packages for the Corporation's executives, other members of the Senior Management Group and former members of the Senior Management Group.

(k)    Review and approve major organizational restructurings of the Corporation's employees.

(l)    Review and approve management development and succession plans for the CEO and, as the Committee deems appropriate, other members of the Senior Management Group.

(m)    Review the results of any advisory stockholder votes on executive compensation and consider whether to adjust (or recommend that the Board adjusts) the Corporation's executive compensation policies and practices in response to such voting results.

(n)    Evaluate and make recommendations to the Board regarding stockholder proposals that relate to executive compensation or other matters with respect to which the Committee has responsibility.

(o)    Develop and implement policies with respect to the recovery or "clawback" of any excess compensation (including equity awards) paid to members of the Senior Management Group as required by the rules of the NYSE or applicable law, or otherwise determined to be in the best interest of the Corporation.

(p)    Select and retain services of independent consultants or other advisors to provide advice to the Committee.

(q)    Commission special studies, when deemed necessary, on any matter of concern relating to overall corporate organization, compensation practice or compensation policy for the Corporation.

(r)     Oversee regulatory compliance with respect to compensation matters, including policies on structuring compensation programs to maximize tax deductibility.

(s)     Review and assess whether compensation of the Corporation's employees (including the Senior Management Group) encourages employees to engage in excessive risk.

(t)     Prepare, review and approve the "Report of the Compensation Committee", as required by Item 407(e)(5) of Regulation S-K, for inclusion in the Corporation's annual proxy statement or Annual Report on Form 10-K in accordance with applicable SEC rules and regulations.

(u)     Periodically report to the Board on all matters for which the Committee has been delegated responsibility pursuant to this Charter.

(v)     Undertake and review with the Board, in such manner as the Committee deems appropriate, an annual performance evaluation of the Committee, which shall compare the performance of the Committee with the requirements of this Charter and set forth the goals and objectives of the Committee for the upcoming year.

(w)     Annually review and reassess the adequacy of this Charter and recommend to the Board for approval such changes as the Committee believes are appropriate.

(x)     Exercise such other powers and perform such other duties and responsibilities as are incidental to the purposes, duties and responsibilities specified herein or as may from time to time be delegated to the Committee.

(y)     At least annually, assess the Corporation's compensation policies to evaluate whether such policies create risks that are reasonably likely to have a material adverse effect on the Corporation.

124.    Upon information and belief, the Company maintained versions of the Compensation Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## F.     Control, Access, and Authority

125.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Envision, were able to, and did, directly and/or indirectly, exercise

– 53 –

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Envision.

126.    Because of their advisory, executive, managerial, and directorial positions with Envision, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Envision.

127.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Envision, and was at all times acting within the course and scope of such agency.

### G.    Reasonable and Prudent Supervision

128.    To discharge their duties, the officers and directors of Envision were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Envision were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide shareholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

– 54 –

(d) remain informed as to how Envision conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e) refrain from trading on material, adverse, non-public information; and

(f) ensure that Envision was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

129. The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and/or directors of Envision, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

130. The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public, and artificially inflating and maintaining the market price of Envision's securities by making, or causing to be made, untrue statements and omissions about making untrue statements and omissions about Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls, by engaging in and concealing deceitful business practices, by engaging in unlawful insider sales, and/or by wasting corporate assets through the authorization of excessive compensation for various of the Individual Defendants in connection with the Merger, and excessive payments for the high-level executive departure of Defendant Gulmi, who received over $2 million in compensation in connection with her departure.

131. The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Action. As a result of these and other breaches of fiduciary duties, Envision has expended, and will continue to expend, significant sums of money.

132. Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Envision, were able to, and did, directly, and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Envision.

133. Specifically, as members of the Audit Committee, Defendants Burt, Smith, Deal (Chair), Miller, and Gawaluck breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements. Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls.

134. Specifically, as members of the Compliance and Quality Committee, Defendants Miller (Chair), Gawaluck, Riggs, and Shelton breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to oversee and implement sufficient compliance policies and procedures, and/or recklessly and indifferently failing to follow compliance policies and procedures, to ensure the Company's compliance with applicable laws and regulations, including those regarding the accuracy of the Company's public statements. Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls.

135.    Specifically, as members of the Compensation Committee, Defendants Smith (Chair), Geringer, and Lavender breached their fiduciary duties of good faith and loyalty by, *inter alia*, recommending and/or approving unjust compensation and incentive packages for the Individual Defendants which disincentivized them from identifying, addressing, and reporting problems to investors as they were encountered, as well as by authorizing excessive compensation as a result of the Merger for Company executives, including Defendants Sanger, Holden, Owen, and Gulmi—***totaling $58,667,386***—despite the fact those individuals were breaching their fiduciary duties to Envision and its shareholders, and by authorizing excessive payments for the high-level executive departure of Defendant Gulmi, who received over $2 million in compensation, in connection with her departure.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

136.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted, and/or assisted each other in breaching their respective duties.

137.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

138.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, corporate waste,

unjust enrichment, insider trading, and violations of the federal securities laws; and (b) disguise and misrepresent the Company's actual business practices, operations, financials, financial prospects, compliance policies, and internal controls.

139.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

140.    Each of the Individual Defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and in furtherance of, the wrongdoing.

## DAMAGES TO ENVISION

141.    As a result of the Individual Defendants' wrongful conduct, Envision conducted its affairs in evident violation of federal and state laws and regulations.  In addition, the Company was caused to disseminate false and misleading statements, and to omit material information to make such statements not false and misleading when made.  This misconduct has devastated Envision's credibility.  Further, Envision is the subject of the Securities Class Action.  Envision has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

142. As a direct and proximate result of the Individual Defendants' actions, as alleged above, Envision's market capitalization has been substantially damaged, having lost over $5.2 billion in value as a result of the conduct described herein.

143. Further, as a direct and proximate result of the Individual Defendants' conduct, Envision has expended, and will continue to expend, significant sums of money. Such expenditures include, without limitation:

a) costs incurred in investigating and defending Envision and certain officers and directors in the Securities Class Action, plus potentially tens of millions of dollars in settlement, or to satisfy an adverse judgment;

b) costs incurred in connection with any government investigations in connection with the allegations made herein, including any attorneys' fees, fines, or other expenses paid by the Company as a result thereof;

c) costs incurred in investigating and defending Envision in connection with the two lawsuits filed by whistleblowers alleging that EmCare and Health Management Associates, a for-profit hospital chain, pressured emergency room doctors to increase admissions and tests even when the physicians believed they were not medically necessary, including any attorneys' fees, fines, settlements, judgments, or other expenses paid by the Company as a result thereof; costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Envision's artificially-inflated financials and stock price;

d) costs incurred from the misappropriation of Company information by the Insider-Selling Defendants for the purpose of selling Envision common stock at artificially-inflated prices; and

e)    costs incurred from the loss of the Company's customers' confidence in Envision and its products and services.

144.    Moreover, these actions have irreparably damaged Envision's corporate image and goodwill.  For at least the foreseeable future, Envision will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Envision's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

145.    Plaintiff brings this action derivatively, in the right and for the benefit of Envision, to redress injuries suffered, and to be suffered, by Envision as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Envision is named as a nominal defendant solely in a derivative capacity.

146.    Plaintiff will adequately and fairly represent the interests of Envision in enforcing and prosecuting its rights.

147.    Plaintiff has been an Envision shareholder since 2013, and is currently, and at all relevant times has been, a holder of Envision common stock.

148.    Plaintiff has not made a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

149.    Plaintiff has not made any demand on shareholders of Envision to institute this action because such a demand would be a futile and useless act for the following reasons:

(a)    Envision is a publicly-traded company with hundreds, if not thousands of shareholders, with approximately 120.99 million shares outstanding as of November 20, 2017;

(b)     making a demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, and/or phone numbers of Envision shareholders; and

(c)     making demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of reasonable certainty.

150.    The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties owed to Envision. Plaintiff, as a shareholder of Envision, seeks damages and other relief on behalf of the Company, in an amount to be proven at trial.

151.    At the time this action was commenced, the Board of Envision consisted of the following twelve (12) directors: Burt, Holden, Miller, Gawaluck, Jacobs, Lavender, Riggs, Deal, Geringer, Sanger, Shelton, and Smith. Each of these twelve individuals is, or would be, incapable of independently and disinterestedly assessing a shareholder's demand to bring the legal claims set forth herein. Because the Demand Defendants constituted a majority (indeed, the entirety) of Envision's Board when this action was initiated on November 20, 2017, demand is excused as futile.

### A.     Demand is Futile as to the Demand Defendants Because They Face a Substantial Likelihood of Liability in Connection with the Unlawful Conduct, Including the False and Misleading Financial Statements, Alleged Herein

152.    Each of the Demand Defendants faces a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith, and other misconduct. Each of the Demand Defendants currently serving as a Director of Envision—to wit, Defendants Burt, Holden, Miller, Gawaluck, Jacobs, Lavender, Riggs, Deal, Geringer, Sanger, Shelton, and Smith—has served as a Director during a substantial portion of (if not throughout) the Relevant Period, and as such, had

fiduciary duties to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business practices, operations, financials, financial prospects, compliance policies, and internal controls were truthful, accurate, and complete.

153.    Indeed, the Demand Defendants were responsible for reviewing and approving the Company's financial statements.  The Demand Defendants authorized false financial statements and public statements during the Relevant Period, as alleged herein, including the Merger Proxy, 2016 10-K, 2017 Proxy, and the Q1 2017 10-Q, while various of the Demand Defendants who were also Directors of Envision prior to the Merger (to wit, Defendants Burt, Riggs, Sanger, Shelton, and Smith), authorized additional false financial statements and public statements during the Relevant Period, as alleged herein, including the 2014 10-K, February 26, 2015  Press Release, 2015 Proxy, Q1 2015 10-Q, July 30, 2015 Press Release, Q2 2015 10-Q, Q3 2015 10-Q, 2015 10-K,  2016 Proxy, Q1 2016 10-Q,  Q2 2016 10-Q,  and  Q3 2016 10-Q,  among  other  financial statements made with the SEC during the Relevant Period, as well as failed to correct other statements the Officer Defendants made during the Relevant Period.  Accordingly, the Demand Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to lawsuits claiming violations of the federal securities laws.  A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon the Demand Defendants to bring suit against themselves or the Officer Defendants would be a useless and futile act.

154.    The Demand Defendants caused and/or allowed the Company to engage in the unlawful conduct alleged herein, and each of the Demand Defendants faces a substantial likelihood of liability for causing Envision to engage in such unlawful conduct.  As is described above, the

Demand Defendants either knew and caused, or were reckless in not knowing, the false and misleading nature of the public statements and/or omissions alleged herein. The business judgment rule protects a wide variety of business decisions, but does not protect a corporation's officers and directors from causing a company to engage in illegal and unlawful conduct.

155. As a result of the unlawful conduct described above, each of the Demand Defendants —to wit, Defendants Burt, Holden, Miller, Gawaluck, Jacobs, Lavender, Riggs, Deal, Geringer, Sanger, Shelton, and Smith (i.e., the entirety of the Board)—faces a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile. Moreover, this conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

156. Additionally, the Demand Defendants were specifically responsible for ensuring that Envision had adequate internal controls regarding the Company's compliance with federal and state rules and regulations. Thus, the Demand Defendants are directly responsible for Envision's failure to adopt and implement such internal controls, and for the substantial damages Envision is subject to in the ongoing Securities Class Action. As such, each Demand Defendants faces a substantial likelihood of liability for the claims asserted herein. Demand is therefore, futile.

157. Indeed, the Demand Defendants, knowingly and/or with reckless disregard for the truth, reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially-inflated prices, and caused its financial statements and guidance to be artificially inflated.

158. The Demand Defendants' making (or authorization of) false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing

and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the duties of the Audit Committee, the Compliance and Quality Committee, and the Compensation Committee were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties, for which the Demand Defendants face a substantial likelihood of liability. If the Demand Defendants were to bring a suit on behalf of Envision to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**B.   Demand is Futile as to Demand Defendants Sanger and Riggs Based on Insider Sales of Envision Stock**

159.    During the Relevant Period, Defendants Sanger and Riggs illicitly sold a combined 780,500 shares of Envision stock, worth $32,050,819.76, while in possession of material, adverse, non-public information, and during a time in which Envision's stock was artificially inflated due to the Individual Defendants' misconduct alleged herein, including the false and misleading statements made, caused to be made, or recklessly disregarded by the Individual Defendants concerning Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls. Moreover, in making or causing these sales, Sanger and Riggs violated the Company's insider trading policy, as set forth in the Code.

160.    As a result of these illicit insider sales, Defendants Sanger and Riggs each received direct financial benefits not shared with all other Envision shareholders. Each is, therefore, objectively unable to assess any shareholder demand to bring the claims asserted herein, including, but not limited to: (i) the issuance of false and misleading statements; (ii) unlawful insider trading;

(iii) failure to maintain adequate internal controls; and/or (iv) wasting corporate assets in connection with misconduct alleged herein.

161.     Additionally, Defendants Sanger and Riggs face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  As a result of these illicit insider sales, Defendants Sanger and Riggs each received direct financial benefits not shared with Envision shareholders, and are, therefore, each directly interested in, and incapable of disinterestedly considering, a demand to bring these claims.

### C.    Demand is Futile as to the Audit Committee Defendants because they Face a Substantial Likelihood of Liability for Consciously Disregarding the Company's Lack of Internal Controls Over Financial Reporting

162.     During the Relevant Period, Defendants Burt, Smith, Deal (Chair), Miller, and Gawaluck served as members of the Audit Committee.  The allegations set forth in this Complaint establish a substantial likelihood of liability for each of the Audit Committee Defendants for breach of the fiduciary duties of loyalty, good faith, due care, full and fair disclosure, and oversight. Each of the Audit Committee Defendants consciously knew—or consciously disregarded the risk—that Envision's internal controls were either inadequate or non-existent, that its financial reporting was therefore, inaccurate, and that, as a result, the Company's results were materially overstated.

163.     The Audit Committee was required to conduct a plenary review with management and the independent accountants of all quarterly and annual results *before* any such statements were issued.  The Audit Committee also was tasked with: overseeing the Company's accounting practices, internal controls, audit processes, and financial reporting processes; carefully monitoring and ensuring the Company's compliance with all applicable laws, regulations, and Company policies, procedures and controls; and reviewing and ensuring the adequacy of all of the

Company's financial-reporting processes, disclosure controls, and processes, among other duties set forth in the Audit Charter.

164. However, the Audit Committee Defendants consciously, or at least recklessly, disregarded these duties and responsibilities, in violation of their fiduciary duties to Envision by, among other things: (i) knowingly or recklessly reviewing and approving, and failing to prevent the dissemination of false and misleading information in the Company's earnings press releases, SEC filings, and earnings guidance; (ii) knowingly or recklessly approving and/or allowing the Company to issue false and misleading statements to the investing public certifying that the Company maintained adequate and effective internal controls and procedures over financial reporting during the Relevant Period; and (iii) knowingly or recklessly failing to ensure that the Company had effectively functioning internal controls over financial reporting.

165. In addition, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient, and that statements made by the Company regarding its business, operational, and compliance policies were accurate. These Defendants breached their fiduciary duties by, instead, causing the Company to make false and misleading statements.

166. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants is therefore, futile.

**D.     Demand is Futile as to the Compliance and Quality Committee Defendants because they Face a Substantial Likelihood of Liability for Consciously Permitting and/or Disregarding the Company's Compliance Issues**

167.    During the Relevant Period, Defendants Miller (Chair), Gawaluck, Riggs, and Shelton served as members of the Compliance and Quality Committee.  The allegations set forth in this Complaint establish a substantial likelihood of liability for each of the Compliance and Quality Committee Defendants for breach of the fiduciary duties of loyalty, good faith, due care, full and fair disclosure, and oversight.  Each of the Compliance and Quality Committee Defendants consciously knew—or consciously disregarded the risk—that Envision was out of compliance with applicable laws and regulations as a result of the conduct described herein, specifically relating to the Company's fraudulent and deceptive billing practices, and its corresponding financial reporting issues.

168.    The Compliance and Quality Committee was tasked with overseeing the Company's compliance with applicable laws and regulations, reviewing the Company's compliance policies, procedures, and efforts, and reviewing and reporting risk areas and management's actions in connection therewith (including working with the Audit Committee regarding compliance issues that may have significant implications to the Audit Committee), among other duties set forth in the Compliance Charter.

169.    However, the Compliance and Quality Committee Defendants consciously, or at least recklessly, disregarded these duties and responsibilities, in violation of their fiduciary duties to Envision by, among other things: (i) knowingly or recklessly reviewing and approving, and failing to prevent the dissemination of false and misleading information in, the Company's earnings press releases, SEC filings, and earnings guidance; (ii) knowingly or recklessly approving and/or allowing the Company to engage in business practices that violated company policy and/or applicable laws and regulations (iii) knowingly or recklessly approving and/or allowing the

Company to issue false and misleading statements to the investing public certifying that the Company was in compliance with applicable laws, regulations and/or internal policies, including that it maintained adequate and effective internal controls and procedures over financial reporting during the Relevant Period; and (iv) knowingly or recklessly failing to ensure that the Company was in compliance with applicable laws and regulations, including that it had effectively functioning internal controls over financial reporting.

170. Accordingly, the Compliance and Quality Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Compliance and Quality Committee Defendants is therefore, futile.

### E. Demand is Futile as to the Compensation Committee Defendants because they Face a Substantial Likelihood of Liability for Authorizing Improper and Unjust Compensation that Incentivized the Individual Defendants' Unlawful Conduct

171. During the Relevant Period, Defendants Smith (Chair), Geringer, and Lavender served as members of the Compensation Committee. The allegations set forth in this Complaint establish a substantial likelihood of liability for each of the Compensation Committee Defendants for breach of the fiduciary duties of loyalty, good faith, due care, full and fair disclosure, and oversight. Each of the Compensation Committee Defendants knowingly or recklessly failed to perform their duties to review, approve, and/or make recommendations for compensation goals, objectives, and performance for CEO and non-CEO executive officer compensation.

172. The Compensation Committee Defendants had, but failed to exercise, the power to prevent the conduct alleged herein from occurring. Indeed, rather than designing compensation programs and policies that incentivized Envision's executives and employees to identify, address, and report problems to investors as they were encountered, Envision's compensation programs

and policies were designed to reward management only for achieving revenue and profitability goals, as well as for increasing the price of the Company's stock. Envision's compensation programs gave senior executives a direct, personal, and significant financial motive to overstate profits and to conceal the Company's lack of internal controls.

173. The fact that the Compensation Committee bestowed, or allowed to be bestowed, upon the Individual Defendants improper and unjust compensation, benefits, incentives, and severance payments that should have been subject to forfeiture had the true reasons for their roles in the misconduct alleged herein been disclosed and appropriate disciplinary actions taken, further underscores the Compensation Committee Defendants' inability to consider a demand.

**F. Demand is Futile as to Defendants Holden, Sanger, Burt, Riggs, Shelton, and Smith for Additional Reasons**

174. In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Defendant Sanger because, when this action was commenced, there was substantial reason to doubt that Sanger was an independent director capable of objectively considering a pre-suit demand. In addition to serving as a Director, Sanger is also Executive Chairman of the Board, and thus, not an independent director, as the Company has acknowledged (most recently in its 2017 Proxy). Moreover, as Defendant Sanger served as CEO and President of Envision prior to the Merger, he expressly made or authorized most of the false and misleading statements and/or omissions alleged herein, and also signed the SOX certifications for each of Envision's public filings discussed herein, in his capacity as Envision's CEO. Additionally, Sanger's principal professional occupation has been his employment with Envision as its Executive Chairman, pursuant to which he has been employed full-time, and has received and continues to receive, substantial monetary compensation and other benefits. Indeed, Sanger received a sum of $8,418,344 in total compensation from Envision between 2015 and 2016 alone,

and additionally, Sanger received substantial compensation in connection with the Merger totaling $5,996,301. Thus, Sanger depends for his livelihood on his employment by Envision. As such, Sanger cannot independently consider any demand to sue himself for breaching his fiduciary duties to Envision because that would expose him to liability and threaten his livelihood. Finally, Sanger is named as a defendant in the Securities Class Action and faces a substantial likelihood of liability in connection therewith, rendering demand upon him futile.

175.     Similarly, in addition to the reasons discussed above as to why demand is futile as to Defendant Sanger, and indeed all Director Defendants, demand is futile as to Defendant Holden because, when this action was commenced, there was reason to doubt that Holden was an independent director capable of objectively considering a pre-suit demand. In addition to serving as a Director, Holden is also Envision's CEO and President, and thus, not an independent director, as the Company has acknowledged (most recently in its 2017 Proxy). Moreover, Defendant Holden expressly made or authorized many of the false and misleading statements and/or omissions alleged herein. Additionally, Holden's principal professional occupation is his employment with Envision as its CEO and President, pursuant to which he is employed full-time and receives substantial monetary compensation and other benefits. In 2016 alone, the year the Merger was completed, Holden received $21,726,391 in compensation, in addition to receiving compensation in connection with the Merger totaling $37,738,261. Thus, Holden depends for his livelihood on his employment by Envision. As such, Holden cannot independently consider any demand to sue himself for breaching his fiduciary duties to Envision because that would expose him to liability and threaten his livelihood. Finally, Holden is named as a defendant in the Securities Class Action and faces a substantial likelihood of liability in connection therewith, rendering demand upon him futile.

176. Additionally, like Sanger and Holden, Defendants Burt, Riggs, Shelton, and Smith are named as defendants in the Securities Class Action, and face a substantial likelihood of liability in connection therewith, rendering demand upon each of them futile.

## CAUSES OF ACTION
### COUNT I

**Breach of Fiduciary Duties for Disseminating False and Misleading Information
to Shareholders (Individual Defendants)**

177. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178. As alleged in detail herein, each of the Individual Defendants owed, and owe, Envision and its shareholders fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision. These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor. To execute this duty, the Individual Defendants were required to disseminate accurate, truthful, and complete information to shareholders at all times.

179. In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls. Specifically, the Individual Defendants made, or caused the Company to make, false and/or misleading statements, and/or failed to disclose that: (1) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians, and accordingly, EmCare "surprise-billed" these patients at higher rates than if the patients had received treatment from in-network physicians; (2) EmCare also engaged in a concerted practice of overbilling and unnecessarily billing patients by ordering physicians to, *inter alia*, frequently

order tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial rather than medical reasons, and bill for the most complex, expensive level of care in unwarranted situations; (3) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of these unlawful and deceptive business practices; (4) the Company's statements attributing EmCare's growth during the Relevant Period to other factors, while failing to disclose that these unlawful and deceitful practices were materially contributing to the Company's growth, were therefore, false and/or misleading; (5) Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct was discontinued and/or revealed; (6) Envision had inadequate corporate accounting and corporate financial-reporting resources; (7) Envision inadequately assessed the risks associated with the Company's financial reporting; (8) Envision failed to maintain effective internal controls over financial reporting; and (9) as a result of the foregoing, Envision's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

180.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Envision has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff, on behalf of Envision, has no adequate remedy at law.

# COUNT II

## Breach of Fiduciary Duties for Failure to Maintain Internal Controls
### (Individual Defendants)

182.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.    As alleged in detail herein, each of the Individual Defendants had a duty to exercise good faith in order to ensure that the Company maintained adequate internal controls. When put on notice of problems with Envision's business practices, operations, financials, financial prospects, compliance policies, and/or internal controls, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

184.    In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Envision's internal control practices and procedures, and failed to make a good faith effort to correct the problems or their recurrence. As directors and/or officers of Envision, the Individual Defendants were responsible for the authorizing of, or the failure to monitor, the business practices which resulted in violations of the law as alleged herein. Each of the Individual Defendants had knowledge of and actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

185.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Envision has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff, on behalf of Envision, has no adequate remedy at law.

# COUNT III

## Breach of Fiduciary Duties for Failure to Oversee and Manage the Company
### (Individual Defendants)

187. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188. As alleged in detail herein, each of the Individual Defendants had a duty to exercise prudent oversight and supervision of Company officers and other employees to ensure that they conducted Envision's affairs in conformity with all applicable laws and regulations.

189. In direct violation of these duties, the Individual Defendants turned a blind eye to their duties of oversight and supervision, and willfully or in bad faith, allowed Company officers or other employees to conduct the Company's operations in violation of applicable laws and regulations, and in a manner that grievously harmed the best interests of the Company and its shareholders, rather than protecting those interests.

190. As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Envision has sustained significant damages, not only financially, but also to its reputation, corporate image, goodwill, and ability to continue as a going concern.

191. As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Envision has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192. Plaintiff, on behalf of Envision, has no adequate remedy at law.

# COUNT IV

## Unjust Enrichment (Individual Defendants)

193. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Envision.

195.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Envision.

196.    Plaintiff, as a shareholder and representative of Envision, seeks restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants' proceeds from their misconduct, and/or an order requiring the Individual Defendants to disgorge all profits, benefits, and other compensation obtained through, or as a result of, their wrongful conduct and fiduciary breaches.

197.    As a direct and proximate result of these Defendants' misconduct, the Company has suffered significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198.    Plaintiff, on behalf of Envision, has no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets (Individual Defendants)

199.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

200.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Envision's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

201. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against the Securities Class Action.

202. As a direct and proximate result of these Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein. As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

203. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## COUNT VI

**Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information (Insider Selling Defendants)**

204. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205. At the time the Insider Selling Defendants sold their Envision stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

206. The material, adverse, non-public information at issue—which concerned the Company's financial condition, future business prospects, and the sufficiency of its Company's internal controls and accounting procedures—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms. Instead, the Insider-Selling Defendants misappropriated this information entirely for their own benefit.

207. At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's unlawful business practices and operations, falsely and/or misleadingly reported financial prospects, artificially inflated financials and stock price, lack of compliance policies, and faulty internal controls.

208. The Insider-Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

209. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider-Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider-Selling Defendants obtained thereby.

210. As a direct and proximate result of these Insider-Selling Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

211. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## COUNT VII

### Violation of Section 14(a) of the Exchange Act (Individual Defendants)

212. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

214.     The Company's 2015, 2016, and 2017 Proxy Statements, and the Merger Proxy (collectively, the "Proxies"), violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

215.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the Proxies were materially false and misleading.  The misrepresentations and omissions in the Proxies were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxies, including, but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

216.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' wrongdoing as alleged herein;

B.     Directing Envision to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Envision and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws

or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Envision's directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting be elected on an annual basis;

- a provision to strengthen the Company's oversight and controls over insiders' purchases and sales of Company stock;

- a provision charging the Board, or a committee thereof, or a sub-committee thereof, to investigate, review, and recommend changes to the Company's (and any subsidiaries thereof) core medical patient billing practices so that such practices are done in an ethical manner, and in accordance with all applicable local, state, and federal laws;

- a provision to permit the shareholders of Envision to nominate three candidates for election to the Board to replace existing directors;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test, and then strengthen, the Company's internal operational control functions.

C.      Awarding to Envision restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  November 20, 2017

DAVIES, HUMPHREYS, HORTON
   & REESE PLC

By:    _____
              *s/Wade B. Cowan*
              WADE B. COWAN

85 White Bridge Road, Suite 300
Nashville, TN 37205
Telephone: (615) 256-8125
Facsimile: (615) 242-7853
wcowan@dhhrplc.com

*Local counsel for Plaintiff*

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
DAVID A. WEISZ
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com
DavidW@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

***Counsel for Plaintiff***

# __VERIFICATION__

I, Scott Purrone, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: November 17, 2017

DocuSigned by:

Scott Purrone

0261FC7086DE4F0...

(Signature of Scott Purrone)