# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |
|---|---|
| SCOTT PURRONE, Derivatively on behalf of ENVISION HEALTHCARE CORPORATION f/k/a/ ENVISION HEALTHCARE HOLDINGS, INC., <br><br>            Plaintiff, <br><br>    v. <br><br> WILLIAM A. SANGER, CHRISTOPHER A. HOLDEN, CAROL J. BURT, JAMES A. DEAL, LEONARD M. RIGGS, JR., JOHN T. GAWALUCK, STEVEN I. GERINGER, JAMES D. SHELTON, JOEY A. JACOBS, MICHAEL L. SMITH, CYNTHIA S. MILLER, KEVIN P. LAVENDER, RANDEL G. OWEN, CLAIRE M. GULMI, MARK V. MACTAS, RICHARD J. SCHNALL, and RONALD A. WILLIAMS, <br><br>            Defendants, <br><br>    -and- <br><br> ENVISION HEALTHCARE CORPORATION f/k/a/ ENVISION HEALTHCARE HOLDINGS, INC., a Delaware Corporation, <br><br>            Nominal Defendant. | Lead Civil Action No. 3:17-cv-01472 (Consolidated with Nos. 3:17-cv-01550, 3:17-cv-01570) <br><br> Judge William L. Campbell, Jr. <br> Magistrate Judge Jeffery S. Frensley <br><br> **COMPLAINT - CLASS ACTION** <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

## VERIFIED AMENDED STOCKHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

By and through their undersigned counsel, plaintiffs bring this amended stockholder derivative and class action on behalf of nominal defendant Envision Healthcare Corporation, ("Envision" or the "Company"), formerly known as Envision Healthcare Holdings, Inc., and on behalf of the public stockholders of Envision against certain current and former officers and directors of the Company for issuing false and misleading Proxy Statements in violation of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiffs make these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (i) review and analysis of public filings made by Envision and other related parties with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by certain of the Individual Defendants (as defined herein) and other related nonparties; (iii) review of news articles, stockholder communications, and postings on Envision's website concerning the Company's public statements; (iv) pleadings, papers, and any documents filed with, and publicly available from, the related securities fraud class actions, consolidated as *In re Envision Healthcare Corp. Securities Litigation*, No. 3:17-cv-01112 (M.D. Tenn.) (the "Securities Class Action"); and (v) review of other publicly-available information concerning Envision and the Individual Defendants.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a derivative action, arising from: (i) a fraudulent and illegal scheme by the Individual Defendants to cause the Company to artificially inflate and/or maintain its financials throughout the relevant period by systematically and surreptitiously overbilling and unnecessarily billing medical patients; (ii) the Individual Defendants causing the Company to repeat false and misleading public statements regarding Envision's business practices, operations,

financials, financial prospects, compliance policies, and internal controls, including those concerning the source and sustainability of revenue and growth achieved from Envision's EmCare segment; (iii) the Individual Defendants' massive personal gains, including exorbitant compensation and enormous sales of personally-held Envision stock (***nearly $41 million worth***) at artificially inflated prices, while they were breaching their fiduciary duties to the Company and its stockholders, and while they (but not the market) were aware of the truth regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and lack of internal controls; and (iv) the grave harms caused to the Company by the Individual Defendants' misconduct, including a loss of billions of dollars in market capitalization resulting from the precipitous decline in Envision's stock price, as well as its corporate goodwill.

2.      This is also a class action on behalf of the Company's public stockholders seeking to enjoin the proposed acquisition of the Company by affiliated funds of KKR (as defined herein)  (the "Proposed Acquisition") for the inadequate and unfair price of $46 per share (the "Proposed Consideration").  As detailed below, the Proposed Acquisition is the result of an unfair process and at an unfair price.

3.      Envision, a Delaware corporation headquartered in Nashville, Tennessee, is a nationwide provider of healthcare services, claiming to offer an array of clinical solutions that includes physician-led services, medical transportation services, and ambulatory services.  In its current form, the Company, previously known as Envision Healthcare Holdings, Inc. ("EHH"), is the result of a merger consummated December 1, 2016, between EHH and AmSurg Corp. ("AmSurg") (the "Merger").  Following the Merger, the newly created entity retained Envision's name, and continued operations as Envision Healthcare Corporation.[1]

---

[1]  Since the relevant period covers allegedly unlawful conduct both pre- and post-Merger, EHH and Envision are referred to herein, collectively, as Envision, unless otherwise noted.

4.      Prior to and following the Merger, and at all relevant times, Envision has operated a substantial portion of its business through one of its primary operating subsidiaries, EmCare, Inc. ("EmCare").   According to the Company, EmCare is the nation's leading provider of integrated facility-based physician services across five service lines (including emergency medicine, hospital medicine, acute care surgery, anesthesiology, and radiology/teleradiology), with nearly 16,000 affiliated physicians and other clinicians.

5.      As detailed further below, from at least March 2, 2015 through the present, the Individual Defendants caused the Company to engage in systematic, deceptive business practices involving overbilling and unnecessarily billing medical patients.   For example, arranging for patients who sought treatment at in-network facilities to be treated by out-of-network physicians so that EmCare could subsequently "surprise-bill" those patients at higher rates, ordering tests that were medically unnecessary, admitting patients from the emergency room into a hospital for financial rather than medical reasons, and billing for the most complex, expensive level of care in unwarranted situations.   Envision also engaged in "surprise-billing," in which patients who sought treatment at in-network facilities were treated by out-of-network physicians and subsequently billed at higher rates.

6.      The Individual Defendants' scheme was finally revealed when, on July 24, 2017, *The New York Times* published an article titled: "The Company Behind Many Surprise Emergency Room Bills."   The article reported that hospitals associated with Envision's subsidiary EmCare were disproportionately likely to engage in "surprise-billing" practices.

7.      Immediately following publication of *The New York Times* article, Envision's share price fell $2.33 (or approximately 3.72%), on unusually high trading volume, to close at $60.28 on July 24, 2017, and erasing approximately $273.8 million in market capitalization.

8. On September 18, 2017, Envision announced significant organizational changes, including the retirement of its Chief Financial Officer ("CFO"), a newly established position of Chief Operating Officer ("COO"), and the resignation of the President of Physician Services.

9. Following this announcement, Envision's stock price continued its freefall, declining another $4.56 per share (or nearly 10%), on unusually high trading volume, to close at $43.11 per share on September 19, 2017, and erasing approximately $551 million more in market capitalization.

10. The Individual Defendants also caused the Company to make false and misleading statements regarding expected earnings for Envision in 2015, with investors being told repeatedly that the Company anticipated an Adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") within a range of $653 million to $665 million.

11. Contrary to their prior, repeated representations, on October 22, 2015, the Individual Defendants caused the Company to issue a press release titled, "Envision Healthcare Reports 2015 Third Quarter Results," which announced that "performance at EmCare fell short of our expectations," and that Envision was "adjusting its 2015 annual Adjusted EBITDA guidance to a range of $600 million to $605 million." Remarks made on a conference call held that same day by defendants William A. Sanger ("Sanger") and Randel G. Owen ("Owen") (Envision's Chief Executive Officer ("CEO") and CFO, respectively, at that time), to discuss the Company's financial results, demonstrated that the Individual Defendants were well aware of the issues that resulted in Envision missing its guidance, and necessitating the change in guidance months before the October 22, 2015 announcement.

12. Following this revelation, Envision's stock price declined drastically, tumbling $11.09 per share (or *over 30%*), on unusually high trading volume, to close at $25.40 per share

on October 22, 2015, erasing approximately $2 billion in market capitalization. Nonetheless, the stock price remained artificially inflated because of the continuing scheme described herein, which was not revealed until July 2017.

13. The exposure of the Individual Defendants' wrongful acts and omissions, and their prior false and misleading statements regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and lack of internal controls, has caused the Company to suffer significant damages and harm. Indeed, Envision's share price has continued to decline, closing at $31.20 on December 7, 2017—a loss of approximately $3.6 billion in total market capitalization since the truth began to be revealed upon publication of *The New York Times* article.

14. During the relevant period, and as detailed further below, the Individual Defendants caused Envision to issue false and misleading statements concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls. Specifically, the Individual Defendants made, or caused the Company to make, false and/or misleading statements, and/or failed to disclose that: (i) EmCare routinely arranged for patients who sought treatment at in-network facilities, to be treated by out-of-network physicians, and accordingly, EmCare "surprise-billed" these patients at higher rates than if the patients had received treatment from in-network physicians; (ii) EmCare also engaged in a concerted practice of overbilling and unnecessarily billing patients by ordering physicians to, *inter alia*, frequently order tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial rather than medical reasons, and bill for the most complex, expensive level of care in unwarranted situations; (iii) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of these

unlawful and deceptive business practices; (iv) the Company's statements attributing EmCare's growth during the relevant period to other factors, while failing to disclose that these unlawful and deceitful practices were materially contributing to the Company's growth, were therefore false and/or misleading; (v) Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct was discontinued and/or revealed; (vi) Envision had inadequate corporate accounting and corporate financial-reporting resources; (vii) Envision inadequately assessed the risks associated with the Company's financial reporting; (viii) Envision failed to maintain effective internal controls over financial reporting; and (ix) as a result of the foregoing, Envision's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the relevant period.

15. Then, while the Company's stock price was artificially inflated due to the aforementioned unlawful business practices and the false and misleading statements made by the Individual Defendants, certain Individual Defendants exploited their positions as corporate fiduciaries of Envision and sold their personal stock holdings for ***nearly $41 million*** in insider profits, with knowledge of material, adverse, and nonpublic information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and lack of internal controls.

16. Envision's Board of Directors (the "Board") has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims. Among other things, a substantial majority of the Board members: (i) are directly interested in the personal financial benefits challenged herein that were

not shared with Envision stockholders; (ii) face a substantial likelihood of liability to Envision for breaching their fiduciary duties of loyalty and good faith by (a) authorizing or failing to correct the false and misleading statements alleged herein, (b) engaging in unlawful insider sales, and (c) engaging in corporate waste through the authorization of compensation packages to themselves and other directors and executives while they were in breach of their fiduciary duties; and/or (iii) otherwise lack the requisite independence or disinterestedness. Accordingly, as a matter of Delaware law, a presuit demand upon Envision's Board to bring these claims would be, and is, a useless and futile act. Thus, plaintiffs rightfully bring this action in the name of, and on behalf of, Envision to vindicate the Company's rights against the Individual Defendants named herein, and to hold them responsible for the damages that they, as wayward fiduciaries, have caused—and continue to cause—the Company.

17. Instead of initiating litigation, the Director Defendants (as defined herein), knowing the liability they faced for the derivative claims and the financial distress that they caused, agreed to sell the Company through a self-serving and flawed process to affiliates of KKR for the unfair price of $46 per share. In particular, starting in September and October 2017, the Board began considering strategic alternatives for the Company. Notably, this was the same time period that U.S. Senator Claire McCaskill started investigating Envision's billing practices. The Board's sales process, however, did not truly heat up until January 2018, soon after plaintiffs filed their derivative actions.

18. Soon after began the Board's self-serving process, whereby it allowed conflicted advisers with substantial ties to KKR to provide financial advice concerning the bidding process and the eventual Proposed Consideration. During the process, the Board allowed bidders to take steps that appear designed to ensure an acquisition occurred as quickly as possible, not to

maximize value to stockholders. For example, the Board stifled competition among bidders by allowing certain private equity bidders to combine into groups despite them having made bids that were substantially above the Proposed Consideration and by failing to re-engage bidders that previously offered significantly more than the Proposed Consideration.

19. The flawed sales process resulted in a Proposed Consideration that undervalues the Company. KKR is taking advantage of the Company's stock that was decimated by the Individual Defendants' wrongful actions. Though defendants are able to claim the Proposed Consideration is at a premium to Envision's current stock price, it is only because the Individual Defendants destroyed so much of the Company's value by their faithless and illegal acts. The Proposed Consideration of $46 per share is actually a 23% discount to the Company's fifty-two-week high of over $60 per share. This significant discount demonstrates that the Proposed Consideration fails to take into account the valuable derivative claims currently being pursued against the Individual Defendants.

20. The Company's own financial advisors' analyses show that the Proposed Consideration undervalues Envision. When using the "Management Case" (as defined herein) financial forecasts in its discounted cash flow ("DCF") analysis, J.P. Morgan Securities, LLC ("J.P. Morgan") claimed that Envision was worth between $48.50 and $71.25 per share. Evercore Group L.L.C.'s ("Evercore") DCF analysis using the Management Case in the perpetuity growth rate method showed that the Company was worth between $48.34 and $80.16 per share. Similarly, Guggenheim Securities LLC's ("Guggenheim") DCF analysis using the Management Case provided a valuation of between $48.50 and $71.25 per share. In short, all three financial advisors hired by the Company, each with fees heavily contingent on the consummation of the Proposed Acquisition, reached the same conclusion that the Company was

worth significantly more than the Proposed Consideration.

21.     Realizing that the Management Case forecasts supported a high valuation, the Company's executives created a new set of projections that presumed a significant downturn in Envision's business due to events outside of the Company's control (the "Sensitivity Case").  It was only using this revised sensitivity case that the financial advisors could opine that the Proposed Consideration was fair.  However, there is no evidence that any of the risks that would lead to the downturn were occurring or were soon to occur, or that the Management Case, developed just four months earlier, was faulty in anyway.

22.     Further, to convince Envision stockholders to vote in favor of the Proposed Acquisition, the Board, on July 9, 2018, issued a materially incomplete and misleading Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the SEC.  The Proxy, which recommends that Envision stockholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about: (i) the financial analyses conducted by the Company's financial advisors; (ii) the financial projections used in those analyses; (iii) the conflicts of the various parties involved in the sales process: and (iv) the inputs used in the advisors' financial analyses, among other things, in contravention of sections 14(a) and 20(a) of the Exchange Act and in breach of the Individual Defendants' fiduciary duties.

23.     In short, the Proposed Acquisition is designed to unlawfully divest Envision's public stockholders of their holdings without providing them the maximized value they are entitled to and without providing them sufficient information to evaluate the transaction.

24.     As the Director Defendants have unlawfully placed their own interests ahead of the Company's stockholders, the consummation of the Proposed Acquisition will result in irreparable harm absent judicial intervention.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     Venue is proper in this district under 28 U.S.C. §1391 because: (i) Envision maintains its principal executive offices in this District; (ii) one or more of the defendants reside in this District; (iii) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

27.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

**Plaintiffs**

28.     Plaintiff Scott Purrone has been an Envision stockholder since 2013, and is currently, and at all relevant times has been, a holder of Envision common stock.

29.     Plaintiff Ryan Sevy has been an Envision stockholder since 2013, and is currently, and at all relevant times has been, a holder of Envision common stock.

**Nominal Defendant**

30.     Nominal defendant Envision is a Delaware corporation with principal executive

offices located at 1A Burton Hills Boulevard, Nashville, Tennessee. Envision is a nationwide provider of healthcare services, offering an array of clinical solutions, including physician-led services, medical transportation services and ambulatory services. As of December 31, 2017, Envision and its affiliates employed or contracted with approximately 69,300 people. Upon completion of the Proposed Acquisition, Envision will become an indirect wholly-owned subsidiary of Enterprise Parent Holdings, Inc. ("Parent"), an affiliate of Kohlberg Kravis Roberts & Co. L.P.

**Individual Defendants**

31.    Defendant Christopher A. Holden ("Holden") is Envision's President, CEO, and a director and has been since December 2016. Defendant Holden is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b), 20(a), and 14(a) of the Exchange Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Holden the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $1,040,000 | $19,000,000 | $1,560,000 | $126,391 | $21,726,391 |
| 2015 | $1,000,000 | $4,280,980 | $1,700,000 | $190,800 | $7,171,780 |

32.    Defendant Sanger is Envision's Nonexecutive Chairman of the Board and has been since December 2017 and a director and has been since December 2016. Defendant Sanger was also Envision's Executive Chairman of the Board from December 2016 to November 2017. Defendant Sanger was EHH's President, CEO, and a director from May 2011 to November 2016 and Chairman of the EHH Board from November 2014 to November 2016. Defendant Sanger was also a member of EHH's Compliance Committee from at least April 2014 to November 2016. Defendant Sanger is named as a defendant in the related Securities Class Action that

alleges he violated sections 10(b), 20(a), and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), as well as additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. While in possession of material, nonpublic information concerning Envision's true business health, defendant Sanger sold 768,500 shares of his stock for $31,590,299.76 in proceeds. Envision paid defendant Sanger the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2016 | $1,670,131 | $4,424,000 | $837,853 | $6,931,984 |
| 2015 | $1,140,865 | - | $345,495 | $1,486,360 |

33.     Defendant Owen is President and CEO of Air Medical Group Holdings, an entity controlled by funds affiliated with KKR, and has been since March 2018. Defendant Owen was Envision's Executive Vice President and Group President of Ambulatory Services from December 2016 to March 2018; an EHH director from August 2011 to February 2016; CFO and Executive Vice President from May 2011 to November 2016; and COO from September 2012 to November 2016. Defendant Owen was also a member of EHH's Compliance Committee from at least April 2014 to at least April 2015. Defendant Owen is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b), 20(a), and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. While in possession of material, nonpublic information concerning Envision's true business health, defendant Owen sold 210,000 shares of his stock for $8,932,800 in proceeds. Envision paid defendant Owen the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2016 | $796,923 | $1,400,000 | $47,508 | $2,244,431 |

| | | | | |
|---|---|---|---|---|
| 2015 | $673,818 | - | $36,611 | $710,429 |

34. Defendant Michael L. Smith ("Smith") is an Envision director and has been since December 2016. Defendant Smith was also an EHH director from August 2011 to November 2016 and Lead Director from April 2015 to November 2016. Defendant Smith is also the Chairman of Envision's Compensation Committee and has been since December 2016 and a member of the Audit Committee and has been since December 2016. Defendant Smith was the Chairman of the EHH's Audit Committee from at least April 2014 to November 2016 and a member of EHH's Compliance Committee from at least April 2014 to November 2016. Defendant Smith is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Smith the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $197,750 | $100,000 | $297,750 |
| 2015 | $192,500 | $100,008 | $292,508 |

35. Defendant Carol J. Burt ("Burt") is an Envision director and has been since December 2016. Defendant Burt was also an EHH director from August 2011 to November 2016. Defendant Burt is a member of Envision's Audit Committee and has been since December 2016. Defendant Burt was also a member of EHH's Audit Committee from at least April 2014 to November 2016 and a member of EHH's Compensation Committee in at least November 2016. Defendant Burt is named as a defendant in the related Securities Class Action that alleges she violated sections 20(a) and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the

- 13 -

Securities Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege she violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Burt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $123,750 | $100,000 | $223,750 |
| 2015 | $119,500 | $100,008 | $219,508 |

36.     Defendant Leonard M. Riggs ("Riggs") is an Envision director and has been since December 2016.  Defendant Riggs was also an EHH director from August 2011 to November 2016.  Defendant Riggs is a member of Envision's Compliance and Quality Committee and has been since December 2016.   Defendant Riggs was also Chairman of EHH's Compliance Committee from at least April 2014 to at least March 2016 and a member of that committee from at least April 2014 to November 2016; a member of EHH's Compensation Committee from at least April 2014 to at least March 2016; and a member of EHH's Audit Committee from August 2014 to at least April 2015.  Defendant Riggs is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act.    While in possession of material, nonpublic information concerning Envision's true business health, defendant Riggs sold 12,000 shares of his stock for $460,520 in proceeds.  Envision paid defendant Riggs the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $117,334 | $100,000 | $217,334 |
| 2015 | $121,750 | $100,008 | $221,758 |

37.     Defendant James D. Shelton ("Shelton") is Envision's Lead Independent Director and has been since January 2018 and a director and has been since December 2016.  Defendant

Shelton was also an EHH director from May 2015 to November 2016. Defendant Shelton is a member of Envision's Compliance and Quality Committee and has been since December 2016 and a member of Envision's Compensation Committee and has been since at least July 2018. Defendant Shelton was also a member of EHH's Audit Committee from May 2015 to November 2016 and a member of EHH's Compensation Committee from May 2015 to November 2016. Defendant Shelton is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Shelton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $57,625 | $157,625 | $215,250 |
| 2015 | $46,125 | $146,081 | $192,206 |

38. Defendant James A. Deal ("Deal") is an Envision director and has been since December 2016. Defendant Deal is also the Chairman of Envision's Audit Committee and has been since December 2016. Defendant Deal is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Deal the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $73,958 | $145,000 | $75,000 | $293,958 |
| 2015 | - | $130,000 | $135,000 | $265,000 |

39. Defendant John T. Gawaluck ("Gawaluck") is an Envision director and has been since December 2016. Defendant Gawaluck is also a member of Envision's Audit Committee

and has been since December 2016 and the Compliance and Quality Committee has been since December 2016. Defendant Gawaluck is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Gawaluck the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $117,500 | $145,000 | $262,500 |
| 2015 | $100,833 | $171,716 | $272,549 |

40.    Defendant Steven I. Geringer ("Geringer") is an Envision director and has been since December 2016. Defendant Geringer is also a member of Envision's Compensation Committee and has been since December 2016. Defendant Geringer is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Geringer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $167,500 | $195,000 | $362,500 |
| 2015 | $150,000 | $180,000 | $330,000 |

41.    Defendant Joey A. Jacobs ("Jacobs") is an Envision director and has been since December 2016. Defendant Jacobs is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Jacobs the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $105,417 | $145,000 | $250,417 |
| 2015 | $100,000 | $130,000 | $230,000 |

42.     Defendant Kevin P. Lavender ("Lavender") is an Envision director and has been since December 2016. Defendant Lavender is also a member of Envision's Compensation Committee and has been since December 2016. Defendant Lavender is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege he violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Lavender the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $96,250 | $145,000 | $42,000 | $283,250 |
| 2015 | $94,500 | $130,000 | $40,500 | $265,000 |

43.     Defendant Cynthia S. Miller ("Miller") is an Envision director and has been since December 2016. Defendant Miller is also the Chairman of Envision's Compliance and Quality Committee and has been since December 2016 and a member of the Audit Committee and has been since December 2016. Defendant Miller is named as a defendant in the related Securities Class Action that alleges she violated sections 20(a) and 14(a) of the Exchange Act, as well as several additional securities class action complaints related to the Proposed Acquisition that allege she violated sections 20(a) and 14(a) of the Exchange Act. Envision paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $140,833 | $145,000 | $285,833 |
| 2015 | $120,000 | $130,000 | $250,000 |

44. Defendant Claire M. Gulmi ("Gulmi") is an Envision advisor and has been since October 2017. Defendant Gulmi was also Envision's CFO from December 2016 to October 2017. Defendant Gulmi is named as a defendant in the related Securities Class Action that alleges she violated sections 10(b), 20(a), and 14(a) of the Exchange Act. Envision paid defendant Gulmi the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $530,000 | $1,060,000 | $413,400 | $63,694 | $2,067,094 |
| 2015 | $500,000 | $999,970 | $510,000 | $98,440 | $2,108,410 |

45. Defendant Ronald A. Williams ("Williams") was an Envision director from December 2016 to October 2017. Defendant Williams was also an EHH director from May 2011 to November 2016; Chairman of the EHH Board from May 2011 to November 2014; and Lead Director from November 2014 to April 2015. Defendant Williams was a member of Envision's Compensation Committee from December 2016 to October 2017. Defendant Williams was also a member of EHH's Compliance Committee from at least April 2014 to November 2016 and a member of EHH's Compensation Committee from at least April 2014 to May 2015. Defendant Williams is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. Envision paid defendant Williams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2016 | - | $207,083 | $207,083 |
| 2015 | $166,667 | $172,130 | $338,797 |

46. Defendant Richard J. Schnall ("Schnall") was an Envision director from December 2016 to March 2017. Defendant Schnall was also an EHH director from May 2011 to November 2016. Defendant Schnall was a member of Envision's Audit Committee from

December 2016 to March 2017. Defendant Schnall is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. Envision paid defendant Schnall the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2016 | $192,083 | $192,083 |
| 2015 | $172,454 | $172,454 |

47.    Defendant Mark V. Mactas ("Mactas") was an EHH director from November 2013 to November 2016. Defendant Mactas was the Chairman of EHH's Compensation Committee from at least April 2014 to November 2016 and a member of EHH's Compliance Committee from at least April 2014 to November 2016. Defendant Mactas is named as a defendant in the related Securities Class Action that alleges he violated sections 20(a) and 14(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. Envision paid defendant Mactas the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $108,167 | $100,000 | $208,167 |
| 2015 | $118,000 | $100,008 | $218,008 |

**Relevant Nondefendants**

48.    Nondefendant Kohlberg Kravis Roberts & Co. L.P is a Delaware limited partnership and a subsidiary of KKR & Co. Inc. f/k/a KKR & Co. L.P. (collectively, "KKR"). KKR's principle executive offices are located at 9 West 57th Street, Suite 4200, New York, New York. KKR is a global investment firm that manages multiple asset classes including private equity, energy, infrastructure, real estate, and credit. KKR also provides a range of investment management services to fund investors, and provides capital markets services to its portfolio companies and third parties. As of December 31, 2017, KKR employed 1,184 people

worldwide.

49.     Nondefendant Parent is a Delaware corporation and an affiliate of investment funds affiliated with KKR. Parent was formed solely for the purpose of entering into the Merger Agreement (as defined herein) and consummating the related transactions.

50.     Nondefendant Enterprise Merger Sub Inc. ("Merger Sub") is a Delaware corporation and an indirect wholly-owned subsidiary of Parent. Upon completion of the transaction, Merger Sub will merge with and into Envision and cease its separate corporate existence.

51.     The defendants identified in ¶¶31-33, 44 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶31-32, 34-47 are referred to herein as the "Director Defendants." The defendants identified in ¶¶34-35, 38-39, 43, 46 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶34, 40, 42, 45 are referred to herein as the "Compensation Committee Defendants." The defendants identified in ¶¶36-37, 39, 43 are referred to herein as the "Compliance and Quality Committee Defendants." The defendants identified in ¶¶32-33, 36 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶31-47 are referred to herein as the "Individual Defendants."

52.     As directors and/or officers of Envision, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known of the adverse, nonpublic information about Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls, because of their access to internal corporate documents, conversations, and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings

thereof, as well as reports and other information provided to them in connection therewith. The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Envision through, *inter alia*, the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and Envision stockholders.

## SUBSTANTIVE DERIVATIVE ALLEGATIONS

**Background on the Company**

53.      Envision is a Delaware corporation with its principle place of business in Nashville, Tennessee. The Company provides healthcare services nationwide, including a highly differentiated array of clinical solutions, including physician-led services, medical transportation services, and ambulatory services.

54.      Envision is comprised of three primary operating subsidiaries: EmCare, American Medical Response ("AMR"), and Evolution Health. According to the Company, EmCare is the nation's leading provider of integrated facility-based physician services across five service lines (including emergency medicine, hospital medicine, acute care surgery, anesthesiology, and radiology/teleradiology), with nearly 16,000 affiliated physicians and other clinicians. EmCare has been a primary operating subsidiary of the Company throughout the relevant period.

55.      The Company formerly operated as EHH. On or about June 15, 2016, EHH announced the execution of an agreement pursuant to which EHH would combine in an all-stock merger of equals with Tennessee-based AmSurg, and AmSurg's direct wholly owned subsidiary, New Amethyst Corp. ("NAC"). Pursuant to the Merger, EHH and AmSurg would each merge with and into NAC, and the combined entity would be known and operated as Envision Healthcare Corporation.

56. Pursuant to the Merger, each issued and outstanding share of EHH stock would automatically convert into the right to receive 0.334 shares of stock in the combined company, while former stockholders of EHH and AmSurg would own 53% and 47%, respectively, of the combined company.

57. Additionally, as part of the Merger, the Board of the combined company would be comprised of fourteen members—consisting of seven of EHH's directors and seven of AmSurg's directors—with defendant Holden (the former President, CEO, and director of AmSurg) serving as President, CEO, and as a director of the combined company.

58. The Company announced the completion of the Merger on December 1, 2016. Following completion of the Merger, EmCare remains one of Envision's primary operating subsidiaries.

**The Individual Defendants Caused Envision to Make Materially False and Misleading Statements During the Relevant Period**

59. On March 2, 2015 (the start of the relevant period), after the market closed, Envision filed its Annual Report on Form 10-K with the SEC (the "2014 Form 10-K"), reporting the Company's financial and operating results for the fourth quarter and fiscal year of 2014. For the fourth quarter, Envision reported net income of $49.9 million (or $0.26 per diluted share), on revenue of $1.16 billion, compared to net income of $7.9 million (or $0.04 per diluted share), on revenue of $984.8 million, for the same period in the prior year. For fiscal year 2014, Envision reported net income of $125.5 million ($0.66 per diluted share), on revenue of $4.4 billion, compared to net income of $6 million ($0.04 per diluted share), on revenue of $3.73 billion, for fiscal year 2013.

60. The earnings figures contained in the 2014 Form 10-K had initially been announced on February 26, 2015, when Envision issued a press release. Under the heading

"2015 Guidance," the press release stated: "The Company reaffirms its recently issued guidance for 2015 of Adjusted EBITDA of $653 million to $665 million, which would be approximately 17% to 20% higher than results for 2014, and Adjusted [Earnings Per Share ("EPS")] of $1.42 to $1.50 for 2015." That guidance had initially been announced in a press release issued on January 13, 2015, and was reiterated at a J.P. Morgan Healthcare Conference on January 15, 2015, where defendant Sanger confirmed that "[o]n the EmCare side we believe we've got very strong visibility into the ability to continue that organic growth over the next several years with a very active pipeline on both the organic and the acquisition side." The press release further explained that, while Envision was reaffirming the Adjusted EBITDA guidance it had initiated a month and a half earlier, it had begun calculating Adjusted EBITDA "to exclude transaction costs related to acquisition activities."

61.    Additionally, the 2014 Form 10-K stated:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities.**  Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business.  We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors.  ***We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.***  At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities.  In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts.  We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for

physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.** Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients. We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies. At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services. Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States. In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives. *These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2009 to 24% in 2014.* At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

62. The 2014 Form 10-K was signed by defendants Sanger, Owen, Williams, Burt, Riggs, Schnall, Smith, and Mactas, and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the 2014 Form 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

63. On April 22, 2015, Envision filed its Proxy Statement on Form DEF 14A with the SEC, pursuant to section 14(a) of the Exchange Act (the "2015 Proxy"). The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection. However, the 2015 Proxy misrepresented and/or failed to disclose that: (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks

- 24 -

associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

64.     On May 8, 2015, Envision filed its Quarterly Report on Form 10-Q with the SEC (the "Q1 2015 Form 10-Q"), reporting the Company's financial and operating results for the first quarter of 2015.  For the first quarter, Envision reported net income of $33.38 million (or $0.17 per diluted share), on revenue of $1.24 billion, compared to net income of $24.8 million (or $0.13 per diluted share), on revenue of $1.01 billion, for the same period in the prior year.

65.     Additionally, the Q1 Form 2015 10-Q stated:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 5% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

66.     The Q1 2015 Form 10-Q contained signed certifications pursuant to SOX by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q1 2015 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

67.     On July 30, 2015, Envision issued a press release announcing, among other things, Envision's financial results for the second quarter of 2015.  Under the heading "2015 Guidance," the press release stated:

Envision is maintaining its existing 2015 guidance of Adjusted EBITDA in a range of $653 million to $665 million and Adjusted EPS of $1.42 to $1.50. The Company anticipates that its third quarter of 2015 results will be approximately 26% to 26.5% of its full year guidance. At this time, 2015 guidance does not incorporate any impact from the pending Rural/Metro acquisition.

68. The same day, Envision held a conference call with investors and analysts to discuss the Company's second quarter financial results. Defendants Sanger and Owen, among others, participated in the call on behalf of Envision. On the call, defendant Owen stated:

We are not adjusting our 2015 [annual] guidance at this time. Results to date are in line with our guidance range, and we don't anticipate modifying guidance until we have more details on when the Rural/Metro acquisition will close. We do anticipate Q3 adjusted EBITDA to be approximately 26% to 26.5% of our annual EBITDA guidance. We anticipate a higher growth rate in Q4, based on the timing of new business starts and expected margin improvement at EmCare.

69. On August 3, 2015, Envision filed its Quarterly Report on Form 10-Q with the SEC (the "Q2 2015 Form 10-Q"), reporting the Company's financial and operating results for the second quarter of 2015. For the second quarter, Envision reported net income of $52.42 million (or $0.27 per diluted share), on revenue of $1.35 billion, compared to a net loss of $1.99 million (or $0.01 per diluted share), on revenue of $1.08 billion, for the same period in the prior year.

70. Additionally, the Q2 2015 Form 10-Q stated:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

71. The Q2 2015 Form 10-Q contained signed certifications pursuant to SOX by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively,

which certified that "the financial statements, and other financial information included in [the Q2 2015 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

72.     On November 3, 2015, Envision filed its Quarterly Report on Form 10-Q with the SEC (the "Q3 2015 Form 10-Q"), reporting the Company's financial and operating results for the third quarter of 2015.  For the third quarter, Envision reported net income of $17.24 million (or $0.09 per diluted share), on revenue of $1.37 billion, compared to a net loss of $52.78 million (or $0.28 per diluted share), on revenue of $1.15 billion, for the same period in the prior year.

73.     Additionally, the Q3 2015 Form 10-Q stated:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2015, approximately 74% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 2% from other hospital management services.  Approximately 83% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 17% was generated from billings to hospitals and affiliated physician groups for professional services.

74.     The Q3 2015 Form 10-Q contained signed certifications pursuant to SOX by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q3 2015 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

75.     On February 29, 2016, Envision filed its Annual Report on Form 10-K with the SEC (the "2015 Form 10-K"), reporting the Company's financial and operating results for the fourth quarter and fiscal year of 2015.  For the fourth quarter, Envision reported net income of $41.87 million (or $0.22 per diluted share), on revenue of $1.48 billion, compared to net income

of $49.9 million (or $0.26 per diluted share), on revenue of $1.16 billion, for the same period in the prior year. For fiscal year 2015, Envision reported net income of $144.89 million (or $0.76 per diluted share), on revenue of $5.45 billion, compared to net income of $125.5 million (or $0.66 per diluted share), on revenue of $4.4 billion for fiscal year 2014.

76.    Additionally, the 2015 Form 10-K stated:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities.**  Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business.  We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors.  *We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs.  We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.*  At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities.  In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts.  We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.**  Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients.  We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies.  At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services.  Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States.  In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives.  *These factors, among others, have*

*increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2010 to 22% in 2015.* At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

77. The 2015 Form 10-K was signed by defendants Sanger, Owen, Burt, Mactas, Riggs, Schnall, Shelton, Smith, and Williams, and contained signed certifications pursuant to SOX by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the 2015 Form 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

78. On March 23, 2016, Envision filed its Proxy Statement on Form DEF 14A with the SEC, pursuant to section 14(a) of the Exchange Act (the "2016 Proxy"). The 2016 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection. However, the 2016 Proxy misrepresented and/or failed to disclose that: (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

79. On May 6, 2016, Envision filed its Quarterly Report on Form 10-Q with the SEC (the "Q1 2016 Form 10-Q"), reporting the Company's financial and operating results for the first quarter of 2016. For the first quarter, Envision reported net income of $26.85 million (or $0.14 per diluted share), on revenue of $1.6 billion, compared to net income of $33.38 million (or

$0.17 per diluted share), on revenue of $1.24 billion, for the same period in the prior year.

80.    Additionally, the Q1 2016 Form 10-Q stated:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

81.    The Q1 2016 Form 10-Q contained signed certifications pursuant to SOX by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q1 2016 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

82.    On August 3, 2016, Envision filed its Quarterly Report on Form 10-Q with the SEC (the "Q2 2016 Form 10-Q"), reporting the Company's financial and operating results for the second quarter of 2016. For the second quarter, Envision reported net income of $28.43 million (or $0.15 per diluted share), on revenue of $1.64 billion, compared to net income of $52.42 million (or $0.27 per diluted share), on revenue of $1.35 billion, for the same period in the prior year.

83.    Additionally, the Q2 2016 Form 10-Q stated:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our

locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

84.     The Q2 2016 Form 10-Q contained signed certifications pursuant to SOX by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q2 2016 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

85.     On October 21, 2016, Envision and AmSurg filed a Definitive Proxy Statement on Form DEFM14A with the SEC urging investors to approve the Merger (the "Merger Proxy"). The Merger Proxy incorporates by reference Envision's financial results from 2011 to 2016 and, "in the opinion of Envision's management, include[d] all normal and recurring adjustments that are considered necessary for the fair presentation of the results for the interim periods."  As indicated in the Merger Proxy, the boards of directors of both AmSurg and Envision unanimously recommended that their respective stockholders approve the Merger, instructing investors to "rely only on the information contained in or incorporated by reference into this joint proxy statement/prospectus."

86.     On November 3, 2016, Envision filed its Quarterly Report on Form 10-Q with the SEC (the "Q3 2016 Form 10-Q"), reporting the Company's financial and operating results for the third quarter of 2016.  For the third quarter, Envision reported net income of $25.89 million (or $0.13 per diluted share), on revenue of $1.64 billion, compared to net income of $17.24 million (or $0.09 per diluted share), on revenue of $1.37 billion, for the same period in the prior year.

87.     Additionally, the Q3 2016 Form 10-Q stated:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 11% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 2% from our surgery services, 1% from our radiology/tele-radiology services, and less than 1% from other hospital management services. Approximately 80% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 20% was generated from billings to hospitals and affiliated physician groups for professional services.

88.     The Q3 2016 Form 10-Q contained signed certifications pursuant to SOX by defendants Sanger and Owen, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the Q3 2016 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

89.     On March 1, 2017, Envision filed its Annual Report on Form 10-K with the SEC (the "2016 Form 10-K"), reporting the Company's financial and operating results for the fourth quarter and fiscal year of 2016. For the fourth quarter, Envision reported a net loss of $137.8 million (or $1.84 per diluted share), on revenue of $1.39 billion, compared to net income of $63.3 million (or $1.24 per diluted share), on revenue of $704.3 million, for the same period in the prior year. For fiscal year 2016, Envision reported a net loss of $27.7 million (or $0.47 per diluted share), on revenue of $3.7 billion, compared to net income of $153.9 million (or $3.16 per diluted share), on revenue of $2.57 billion, for fiscal year 2015.

90.     The 2016 Form 10-K was signed by defendants Holden, Gulmi, Sanger, Burt, Deal, Gawaluck, Geringer, Jacobs, Lavender, Miller, Riggs, Schnall, Shelton, Smith, and Williams, and contained signed certifications pursuant to SOX by defendants Holden and Gulmi,

in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other financial information included in [the 2016 Form 10-K], fairly present in all material respects the financial condition, results of operations" of the Company.

91.     On April 13, 2017, Envision filed its Proxy Statement on Form DEF 14A with the SEC, pursuant to section 14(a) of the Exchange Act (the "2017 Proxy").  The 2017 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection.  However, the 2017 Proxy misrepresented and/or failed to disclose that: (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false and misleading at all relevant times.

92.     On May 5, 2017, Envision filed its Quarterly Report on Form 10-Q with the SEC (the "Q1 2017 Form 10-Q"), reporting the Company's financial and operating results for the first quarter of 2017.  For the first quarter, Envision reported a net loss of $445.2 million (or $3.84 per diluted share), on revenue of $1.88 billion, compared to net income of $30.9 million (or $0.53 per diluted share), on revenue of $724.7 million, for the same period in the prior year.

93.     The Q1 2017 Form 10-Q contained signed certifications pursuant to SOX by defendants Holden and Gulmi, in their capacities as Envision's CEO and CFO, respectively, which certified that "the financial statements, and other information included in the [Q1 2017 Form 10-Q], fairly present in all material aspects the financial condition, results of operations cash flows of the [Company] as of, and for, the periods presented in this report."

## REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS
## WERE FALSE AND MISLEADING

94. The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians, and accordingly, EmCare "surprise-billed" these patients at higher rates than if the patients had received treatment from in-network physicians;

(b) EmCare also engaged in a concerted practice of overbilling and unnecessarily billing patients by ordering physicians to, *inter alia*, frequently order tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial rather than medical reasons, and bill for the most complex, expensive level of care in unwarranted situations;

(c) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of these unlawful and deceptive business practices;

(d) The Company's statements attributing EmCare's growth during the relevant period to other factors, while failing to disclose that these unlawful and deceitful practices were materially contributing to the Company's growth, were therefore, false and/or misleading;

(e) Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct was discontinued and/or revealed;

(f) Envision had inadequate corporate accounting and corporate financial-reporting resources;

(g) Envision inadequately assessed the risks associated with the Company's

- 34 -

financial reporting;

(h)     Envision failed to maintain and/or lacked effective internal controls over financial reporting; and

(i)     As a result of the foregoing, Envision's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis, at all relevant times.

## THE TRUTH IS SLOWLY REVEALED

95.     On October 22, 2015, Envision issued a press release titled "Envision Healthcare Reports 2015 Third Quarter Results."  The press release reported that, for the third quarter of 2015, "Adjusted EBITDA was $142.5 million, which was lower than anticipated as a result of several factors specific to the Company's EmCare segment," and quoted defendant Sanger explaining:

> [P]erformance at EmCare fell short of our expectations....  EmCare's same-store revenue growth, while positive, was lower than in recent quarters due to a reduction in anticipated volume....  As staffing schedules are set 45 to 60 days in advance, based on anticipated volumes and hospital expectations, we were not successful in adjusting coverage in line with lower-than-expected volumes.
>
> In addition, a number of recent contract starts had staffing challenges that resulted in higher-than-expected temporary compensation costs in the period.

96.     The press release further announced: "Based on the Company's results for the 2015 third quarter and the expected impact on fourth quarter operations, Envision is adjusting its 2015 annual Adjusted EBITDA guidance to a range of $600 million to $605 million.  The Company expects that Adjusted EPS will be approximately $1.28 to $1.30."

97.     That same day, October 22, 2015, Envision held a conference call with analysts and investors.  On the call, defendant Sanger explained that "[d]uring the quarter, EmCare's results were negatively impacted by decelerating same-store volume growth, which resulted in

higher staffing ratios and certain underperforming contracts." Regarding the volume and related staffing ratios, defendant Sanger reported that "[e]arly in the quarter, the ED volume appeared to be tracking to seasonally lower July levels," but "those levels did not increase in August as anticipated" and Envision's response of changing staffing schedules and renegotiating contracts could not counter the resulting increase in staffing ratios before the end of the quarter because "EmCare's staffing schedules are generally set 45 to 60 days in advance" and "…there's a lag in time before we're able to flex our staffing or to go back to the hospital to renegotiate these contracts to align with the changes in the volume."

98.     Regarding the underperforming contracts, defendant Sanger explained that the problem was with "approximately 30 contracts, about 21 of those that came on in [the] last few quarters," and that those contracts "were underperforming substantially based on the changes in payer mix that we saw, volume we saw, and we kind of misread what the cash per visit was." Defendant Sanger further told investors that, on these contracts, Envision's "biggest challenge is staffing, as it always has been. Many of these contracts were in areas where staffing is very difficult [and] we were unsuccessful in meeting those staffing needs." Defendant Owen further explained that "a lot of these [underperforming contracts] were starts within the last 12 months that had much bigger issues than we had anticipated." For example, some of the underperforming contracts "were just in areas that were difficult to recruit, and I think we underestimated the challenges initially of the recruitment process and ended up paying a much higher rate for temporary staffing because of what we'd committed from a hospital standpoint than we had expected." According to defendant Owen, because these contracts "were in smaller communities or more rural areas," Envision "misread [for] the ability to recruit and misread in some of those how many providers we would have day one. [It] was a much bigger challenge

from a recruiting [perspective] and had a much higher cost of staffing."

99. Following this revelation, Envision's stock price once again declined drastically, tumbling $11.09 per share (or *over 30%*), on unusually high trading volume, to close at $25.40 per share on October 22, 2015. Nonetheless, the stock price remained artificially inflated because of the continuing scheme described herein, which was not revealed until July 2017.

100. On July 24, 2017, *The New York Times* reported, in an article titled "The Company Behind Many Surprise Emergency Room Bills," that hospitals associated with Envision's subsidiary EmCare were disproportionately likely to engage in "surprise-billing," in which patients who go to in-network hospitals are treated by out-of-network doctors and subsequently billed at higher rates.

101. According to a study conducted by researchers at Yale University, and discussed in detail in *The New York Times* article, the rate of out-of-network doctors' bills for customers of one large insurer jumped when EmCare entered a hospital. The Yale researchers, who examined nearly nine million visits made to emergency rooms run by a variety of companies between 2011 and 2015, suggested that EmCare failed to sign contracts with insurance providers, thereby allowing it to charge higher rates. Fiona Scott Morton, a professor at the Yale School of Management and a coauthor of the paper, described the strategy as a "kind of ambushing of patients." A patient who goes to the emergency room can look for a hospital that takes its insurance but rarely gets to choose the treating physician.



102.    *The New York Times* article also highlighted that EmCare physicians used higher billing codes than their predecessors at an exorbitant rate, stating: "Before EmCare, about 6 percent of patient visits in the hospital's emergency room were billed for the most complex, expensive level of care.  After EmCare arrived, nearly 28 percent got the highest-level billing code."  Additionally, Yale's study concluded that the rates of tests ordered and the number of patients admitted from the emergency room into a hospital rose once EmCare entered a hospital. "It almost looked like a light switch was being flipped on," said Zack Cooper, a health economist at Yale who is one of the study's authors.



103.    *The New York Times* article also emphasized that "EmCare's emergency room management has come under scrutiny before."  Envision was a named defendant in two lawsuits filed by whistleblowers alleging that EmCare and Health Management Associates, a for-profit hospital chain, pressured emergency-room doctors to increase admissions and tests even when the physicians believed they were not medically necessary.  According to the lawsuits, which the federal government has since settled for approximately $31 million, the Company "repeatedly terminated physicians and E.R. medical directors" who pushed back.

104.    Upon revelation of this news, Envision's share price fell $2.33 (or approximately 3.72%), on unusually high trading volume, to close at $60.28 on July 24, 2017, erasing approximately $273.8 million in market capitalization.

105.    On September 18, 2017, Envision issued a press release, titled "Envision Healthcare Announces Organizational Changes to Align Senior Leadership Structure with Physician-Centric Strategy," announcing significant organizational changes, including the retirement of its CFO, a newly established COO position, and the resignation of the President of Physician Services.  The September 18, 2017 press release further stated:

> Envision Healthcare Corporation ("Envision" or the "Company") (NYSE: EVHC) today announced organizational changes, including a realignment of the senior leadership structure under Christopher A. Holden, Envision's President and Chief Executive Officer, to reflect the Company's focus on its physician-centric strategic plan.
>
> As part of its ongoing efforts to enhance its scale, physician-centric strategy and operational excellence, Envision has created the new role of Executive Vice President and Chief Operating Officer. The Executive Vice President and Chief Operating Officer will report directly to Mr. Holden, with responsibility for Envision's Physician Services and Ambulatory Surgery service lines. In addition, Envision announced the implementation of succession plans for its current Chief Financial Officer, Claire Gulmi, and President of Physician Services, Robert Coward.

106. Following this announcement, Envision's stock price continued its freefall, declining another $4.56 per share (or nearly 10%), on unusually high trading volume, to close at $43.11 per share on September 19, 2017, and erasing over $550 million more in market capitalization.

107. Also in September 2017, it was reported that U.S. Senator Claire McCaskill was investigating potential overcharging of patients by EmCare, and that Senator McCaskill had sent a letter to defendant Holden seeking information regarding EmCare's billing practices.

108. The exposure of the Individual Defendants' wrongful acts and omissions, and their prior false and misleading statements regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, has caused the Company to suffer significant damages and harm. Indeed, Envision's share price has continued to decline, closing at $31.20 on December 7, 2017—a far cry from its $72.48 per share relevant period high it reached on February 21, 2017. Indeed, since the publication of *The New York Times* article in July 2017, the Company has lost approximately $3.6 billion in total market capitalization.

### WHILE THE INDIVIDUAL DEFENDANTS ARTIFICIALLY INFLATED THE COMPANY'S STOCK PRICE, THE INSIDER SELLING DEFENDANTS CAPITALIZED ON MATERIAL, NONPUBLIC INFORMATION

109. While the Company's shares were trading at artificially-inflated prices due to the Individual Defendants' aforementioned unlawful and deceptive business practices, and their false and misleading statements and/or omissions, the Insider Selling Defendants capitalized on this material, nonpublic information to sell massive quantities of personally-held Envision stock during the relevant period.

110. Indeed, from April 6, 2015 through September 14, 2015, defendant Sanger sold 768,500 personally-held shares of Envision stock for proceeds of $31,590,299.76. Likewise,

- 40 -

from April 13, 2015 through October 5, 2015, defendant Riggs sold 12,000 personally-held shares of Envision stock for proceeds of $460,520. Finally, from March 19, 2015 through September 15, 2015, the Individual Defendants caused Envision to file its annual report defendant Owen sold 210,000 personally-held shares of Envision stock for proceeds of $8,932,800.

111. In total, the Insider Selling Defendants—all fully aware of the unlawful basis driving the Company's stock to highly-inflated levels—sold a combined 990,500 shares of their personal holdings of Envision stock, at an average price of $41.38 per share, for total proceeds of $40,986,890. These insider sales were executed under highly-suspicious circumstances, in that they occurred while the Company's stock price was artificially inflated due to the wrongful conduct and the false and misleading statements and omissions alleged herein.

112. Because of their roles as directors and/or officers of Envision during the relevant period, the Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, and nonpublic information about the business of Envision, including, *inter alia*, that the false and misleading statements and/or omissions alleged herein caused the price of Envision's stock to trade at artificially-inflated prices at the same time these Insider Selling Defendants were disposing of millions of dollars' worth of Company stock. These Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, and nonpublic information concerning Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls, but they egregiously violated this duty.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

113.     By reason of their positions as officers, directors, and/or fiduciaries of Envision, and because of their ability to control the business and corporate affairs of Envision, the Individual Defendants owed, and owe, the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Envision in a fair, just, honest, and equitable manner.   The Individual Defendants were, and are, required to act in furtherance of the best interests of Envision and its stockholders, so as to benefit all stockholders equally, and not in furtherance of their personal interests or benefit.

114.     Each director and officer of the Company owed, and owes, to Envision, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

115.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Envision, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Envision, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.   In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

116. To discharge their duties, the officers and directors of Envision were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Envision were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

(b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     when put on notice of problems with the Company's business practices, operations, financials, financial prospects, compliance policies, and/or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**Audit Committee Duties**

117. In addition to the aforementioned fiduciary duties, the members of the Audit Committee owed specific duties to Envision under the Audit Committee's Charter (the "Audit Charter"). According to the Audit Charter, the Audit Committee is responsible for the following:

> The purpose and responsibilities of the Committee shall be to assist the Board in fulfilling its oversight responsibilities relating to (a) the accounting, financial and external reporting policies and practices of the Corporation, (b) the quality and integrity of the Corporation's financial statements, (c) the independence, qualifications and performance of the Corporation's independent auditor (the "Independent Auditor"), (d) the performance of the Corporation's internal audit and enterprise risk management function, (e) the preparation of the report of the Committee required to be included in the Corporation's annual Proxy Statement under the rules of the Securities and Exchange Commission ("SEC"), (f) the Corporation's compliance with other legal and regulatory requirements primarily relating to accounting, auditing, taxation or other financial matters, including

- 43 -

without limitation any requirements promulgated by the Public Company Accounting Oversight Board (the "PCAOB") and the Financial Accounting Standards Board and (g) the Corporation's financing and capital allocation strategies, capital structure, financial policies, and financial condition. In order to ensure that the Committee is well informed regarding the Corporation's compliance program, and compliance and quality matters, the Committee Chair shall coordinate and communicate directly with the Chair of the Board's Compliance and Quality Committee (the "Compliance Committee").

118.    Specifically, according to the Audit Charter, and as reiterated in the Company's

proxy statements, the Audit Committee's responsibilities include the following:

*Financial Reporting and Disclosure Responsibilities*

(a)    Review any issues that arise with respect to the quality or integrity of the Corporation's financial statements.

(b)    Review and discuss with management and the Independent Auditor any significant additions or changes to the Corporation's existing policies, principles or practices as they apply to auditing, accounting, financial reporting, external reporting, and asset-safeguarding.

(c)    Review the Corporation's earnings press releases prior to their issuance, as well as any financial information and earnings guidance provided to analysts and ratings agencies.

(d)    Review and discuss with management and the Independent Auditor quarterly, unaudited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," major underlying issues and the results of the Independent Auditor's review prior to filing each Form 10-Q (if any such filing is required), and determine whether such information should be distributed to the stockholders, bondholders or lenders.

(e)    Review and discuss with management and the Independent Auditor annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and major underlying issues, and recommend to the Board whether such audited financial statements should be distributed to the stockholders, bondholders and lenders, and included with the Corporation's Form 10-K, if applicable.

(f)    In the event that the Corporation publishes one, review the "Report of Management" in the Annual Report to Stockholders.

(g)    Prepare, review and approve the "Report of Audit Committee" and its inclusion in any other document, including in the Annual Report to

Stockholders and in the annual Proxy Statement; and review and discuss with the Corporation's Compensation Committee compensation-related disclosures in the annual Proxy Statement or otherwise.

(h)     Receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal controls that could adversely affect the Corporation's ability to record, process, summarize and report financial data and any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal controls, including management's recommendations regarding the remediation of any such significant deficiency or material weakness.

(i)     Review and discuss quarterly reports from the Independent Auditor on all critical accounting policies and practices to be used; the quality of the Corporation's accounting policies, including the application of the Corporation's accounting policies; all matters required to be communicated to the Committee under PCAOB standards; all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Independent Auditor; and other material written communications between the Independent Auditor and management, such as any management letter or schedule of unadjusted differences.

(j)     Discuss with management and the Independent Auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles, any major issues as to the adequacy of the Corporation's internal controls and any special steps adopted in light of material control deficiencies.

(k)     Review and discuss with management and the Independent Auditor management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act.

(l)     Discuss with management and the Independent Auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures (if any) on the Corporation's financial statements.

*Responsibilities for Oversight of Independent Auditor*

(a)     Possess sole responsibility for the appointment or replacement (subject, if applicable, to stockholder ratification), retention, termination, compensation, evaluation and oversight of the work of the Independent

Auditor (including resolution of disagreements between management and the Independent Auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Corporation. The Independent Auditor shall report directly to the Committee.

(b)    Review the proposed audit scope, approach and staffing, including coordination of the audit effort with the internal audit.

(c)    Review the conduct and results of the audit of the consolidated financial statements and, at least annually, discuss with the Independent Auditor, out of the presence of management if deemed appropriate, the audit process, including, without limitation, (i) problems or difficulties and management's response, (ii) any problems or difficulties encountered in the course of the performance of the audit, (iii) any restrictions on the Independent Auditor's activities, audit scope or access to requested information, and (iv) management's response thereto, and any significant disagreements with management.

(d)    Review and evaluate the lead partner of the independent audit team, and ensure proper rotation of audit partner, lead partner and concurring partner. Consider whether it is appropriate to adopt a policy of rotating the independent auditing firm.

(e)    Obtain and review a report from the Independent Auditor at least annually detailing: (i) the Independent Auditor's internal quality-control review, or peer review, and obtain any response from management or corrective action plan; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the Independent Auditor, or any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; (iii) any publicly available reports issued within the past five years by the PCAOB or other governmental or professional authorities concerning the Independent Auditor; (iv) any PCAOB review of the Independent Auditor, or any inquiry or investigation by governmental or professional authorities within the past five years of the Independent Auditor, and any steps taken to deal with such issues; and (v) all relationships between the Independent Auditor and the Corporation consistent with the applicable requirements of the PCAOB.

(f)    Actively engage in a dialogue with the Independent Auditor regarding any disclosed relationships or services that may impact the objectivity and independence of the Independent Auditor. Evaluate the qualifications, performance and independence of the Independent Auditor, including considering whether the Independent Auditor's quality controls are adequate and the provision of permitted non-audit services is compatible

with maintaining the Independent Auditor's independence, taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the performance of the Independent Auditor to the Board.

(g)     Pre-approve all auditing and, subject to the de minimis exception of Section 10A(i) of the Exchange Act and the SEC rules promulgated thereunder, all permitted non-audit services performed by the Corporation's Independent Auditor; provided, however, that the Committee may delegate pre-approval authority to committees of one or more of its independent members, who must then provide a report to the full Committee at its next scheduled meeting. When pre-approving non-audit services by the Independent Auditor, the Committee shall consider whether their provision is consistent with maintaining the Independent Auditor's independence.

(h)     Review periodic reports from management and the Independent Auditor regarding the Independent Auditor's independence (including the Independent Auditor's fees billed for audit services, audit-related fees, tax fees, and all other non-audit services, respectively, for each fiscal year), discuss such reports with the auditor, and if so determined by the Committee, recommend that the Board take appropriate action regarding the independence of the Independent Auditor.

(i)     Confirm that none of the audit partners earn or receive compensation based on procuring engagements with the Corporation for providing products or services, other than audit review or attest services.

(j)     As appropriate, discuss with the national office of the Independent Auditor issues on which they were consulted by the Corporation's audit team and matters of audit quality and consistency.

(k)     Establish procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal controls or auditing matters, and the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting, internal controls or auditing matters.

(l)     Review with management and the Independent Auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Corporation's financial statements or accounting policies.

(m)     Establish policies for the Corporation's hiring of employees or former employees of the Independent Auditor who participated in any capacity in the audit of the Corporation to ensure the Independent Auditor's independence under the SEC rules.

(n)      Review and discuss with the Chief Executive Officer and President and Chief Financial Officer the procedures undertaken in connection with the Chief Executive Officer and President and Chief Financial Officer certifications in periodic reports, including their evaluation of the Corporation's disclosure controls and procedures and internal controls.

(o)      Obtain annually assurance, if necessary or deemed advisable by the Committee, from the Independent Auditor that the audit was conducted in a manner consistent with Section 10A of the Exchange Act.

(p)      Discuss with the Independent Auditor, out of the presence of management if deemed appropriate, the matters required to be communicated to audit committees in accordance with the auditing standards of the PCAOB as they may be modified or supplemented, relating to the conduct of the audit, including under Auditing Standard No. 16.

*Responsibilities for Oversight of Internal Audit*

(a)      Review and discuss with management the Corporation's risk assessment and risk management process and policies, the results of the annual corporate-wide risk assessment and the related corporate guidelines and policies and commitment of internal audit resources. Such discussions should occur quarterly and include the Corporation's material financial and accounting risk exposures and the actions management has taken to control them.

(b)      Discuss with the Independent Auditor and management the internal audit department responsibilities, internal audit plan, scope of work, performance, budget and staffing.

(c)      Review the appointment, replacement or dismissal of senior internal audit personnel.

(d)      Review completed internal audit reports and management's response at each meeting. The internal auditors shall report directly to the Committee.

(e)      Periodically review internal audit policies.

*Finance Oversight Responsibilities*

(a)      Review and recommend to the Board financial policies and performance objectives as developed by management pertaining to: earnings growth and return on equity; debt ratio, coverage, cash flow and credit rating; dividend policy; investment criteria, including capital investment hurdle rates; and financial risk management strategies, including the use of derivatives.

- 48 -

(b)     Review changes to the capital structure of the Corporation, including: timing and maturities of debt, terms of interest rates; and considerations on common stock sales, repurchases or splits as appropriate and any changes in dividends.

(c)     Review banking relationships and lines of credit.

(d)     Review the adequacy of insurance coverage on the Corporation's assets.

(e)     Review tax strategies and potential tax law changes.

(f)     Review, as appropriate, the financial impact to the Corporation of employee benefit plans such as pension plans, ESOPs, 401Ks and Employee Stock Purchase plans.

(g)     Review annually the business plan prepared by senior management from the perspective of funds flow, capital spending and financing requirements.

(h)     Review and evaluate contemplated acquisitions, joint ventures, partnerships, strategic investments, significant capital spending projects or similar initiatives, in each case, of the Corporation or any of its subsidiaries.

(i)     Report periodically to the Board on all financing related matters for which the Committee has been delegated responsibility.

*Other Responsibilities*

(a)     Report regularly to the full Board on all matters charged to the responsibility of the Committee.

(b)     Review an annual report of the General Counsel on the results of the Corporation's conflict of interest survey.

(c)     Regularly review reports of the General Counsel on pending or threatened litigation relating to accounting, auditing, taxation or other financial matters, including any material reports or inquiries received by the Corporation from regulators or governmental agencies, and other matters, including the scope and effectiveness of compliance policies and programs.

(d)     Discuss with management any pending or threatened litigation, claim or assessment involving potential losses (or gains) as to which the expected effect on the consolidated financial statements may be material.

(e)     Periodically review the annual agenda of the Committee to assess whether the Committee is addressing all material matters related to its

responsibilities delegated from the Board.

(f)     Review and approve all Related Person Transactions, as defined in the Corporation's Related Person Transaction Policy, in accordance with the provisions of such policy.

119.    Upon information and belief, the Company maintained an Audit Charter during the relevant period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

120.    The Individual Defendants, as officers and/or directors of Envision, were also bound by the Company's Code of Business Conduct and Ethics (the "Code") which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Envision, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

121.    With respect to the accuracy of financial records titled, "Keeping Accurate Books, Records and Reports about the Company," the Code provides:

> The Company's books, records, and reports must be truthful and accurate and must be maintained in compliance with Company policy and federal, state and local laws. The failure to maintain accurate books, records and reports may expose the Company and its colleagues to significant civil damages, substantial criminal fines and other penalties.   We expect every colleague to take responsibility for the integrity of information that is included in business documents, whether that information is financial, operational, statistical, or other business data. You must not intentionally enter, record or report false, misleading or inaccurate information.

Accordingly, if any director, officer, or employee believes or suspects a violation of the Code or any law, rule, or regulation, has been committed, "it is [his or her] duty to report [that] concern."

122.    With respect to the use of inside information, the Code states:

> We shall comply with all applicable federal and state security laws, relating to buying or selling stock in our Company.  In the normal course of the business, we may become aware of material, nonpublic information (Inside Information)

regarding the Company, as well as other companies with which we do business. The Company has adopted an insider trading policy (the "Insider Trading Policy") which will be available on our website and which colleagues should review. The following is a summary of the Insider Trading Policy: Insider Trading Policy, you should contact the Company's General Counsel.

***The Following Conduct is Strictly Prohibited:***

A.  "Insiders" include temporary, part-time and full-time employees, independent contractors, clinicians, officers and directors of the Company, as well as the Company's outside advisors, agents, contractors and other third parties with access to Inside Information. Under the Insider Trading Policy, Insiders, members of their immediate families, or any trusts over which the Insider has control, may not buy or sell Envision Healthcare securities or securities of any other publicly-held company, while in possession of Insider Information obtained during the course of employment. This prohibition applies even if the decision to buy or sell is not based on the Inside Information.

B.  Insiders in possession of Inside Information, may not (a) disclose the Inside Information to anyone other than those individuals associated with the company who need to know the information to conduct their job duties; or (b) offer tips, opinions or recommendations regarding Inside Information, to any other individual, including family members, friends, vendors, suppliers or customers, who may trade Envision Healthcare securities. Even outside of the trading context, Insiders are required to maintain the confidentiality of Company information.

C.  The Company considers it improper for any Insider to engage in speculative transactions with Envision Healthcare securities. Therefore, Insiders are prohibited from engaging in the following with respect to Envision Healthcare securities: (a) buying or selling publicly traded options, warrants and other derivatives; (b) engaging in short sales; (c) engaging in hedging transactions; or (d) margin purchases of Envision Healthcare securities. Additional restrictions, including those applicable to individuals subject to the SEC's Section 16 reporting requirements and other colleagues with regular access to Inside Information, are described in the Insider Trading Policy. These policies will continue to apply to any individual whose relationship with the Company terminates as long as the individual possesses Inside Information. If you have any questions about the Insider Trading Policy, you should contact the Company's General Counsel.

123.  In addition to the Code, the Company also maintains a Code of Ethics for the Executive Chairman, CEO, and Senior Health Financial Officers (the "Executive Code"), which

bound Envision's Executive Chairman (defendant Sanger), CEO (defendant Holden), CFO (at various points in time throughout the relevant period, defendants Owen and Gulmi), and other corporate financial officers with financial, accounting, and reporting responsibilities, to abide by specific ethical requirements above and beyond those listed in the Code. According to the Executive Code, its purpose is to deter wrongdoing and to promote ethical and honest behavior. To that end, the Executive Code imparts the following requirements, *inter alia*, upon covered officers:

\* \* \*

3. **Disclosures**

When filing reports or submitting documents to the Securities and Exchange Commission, and in all other public communications, the Senior Financial Officers are expected to make disclosures which are full, fair, accurate, timely, and understandable in all material respects.

4. **Compliance with Governmental Laws, Rules and Regulations**

It is the responsibility of the Chairman, CEO, and Senior Financial Officers to abide by all laws, rules and regulations related to the Corporation. While the Corporation does not expect any single individual to understand all details of the laws, rules, and regulations potentially impacting the Corporation, the Senior Financial Officers should seek guidance as to the applicability and effect of such laws, rules and regulation and report any violation or suspected violations to the Corporation's General Counsel or the Corporation's Board of Directors.

5. **Reporting of Violations of this Code of Ethics**

The Chairman, CEO and Senior Financial Officers are accountable to this Code of Ethics and responsible for adhering to its provisions. All violations and/or suspected violations of the Code of Ethics must be reported immediately to the Corporation's General Counsel. A violation of this Code of Ethics may result in disciplinary action, up to and including termination, as determined by the Corporation's Board of Directors.

124. Upon information and belief, the Company maintained versions of the Code and the Executive Code during the relevant period that imposed the same, or substantially and

materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Compliance and Quality Committee Charter**

125. In addition to the aforementioned fiduciary duties and duties pursuant to the Code, the members of the Compliance and Quality Committee owed specific duties to Envision under the Compliance and Quality Committee's Charter (the "Compliance Charter"). According to the Compliance Charter, the Compliance and Quality Committee is responsible for the following:

> The purpose and responsibilities of the Committee shall be to assist the Board in fulfilling its oversight responsibilities relating to (a) the Corporation's compliance with applicable laws and regulations, except for laws and regulations pertaining to accounting, auditing, taxation or other financial matters, which shall be the responsibility of the Board's Audit Committee (the "Audit Committee"), (b) the Corporation's compliance program, (c) the adequacy of the Corporation's internal and external compliance controls, (d) the effectiveness of management policies, procedures and practices relating to compliance, and (e) the Corporation's policies and procedures relating to the delivery of quality medical care to patients. The Committee shall advise the Board as to the status of the Corporation's compliance program and ongoing developments relating to compliance and quality matters. In order to ensure that the Audit Committee is well informed regarding the Corporation's compliance program, and compliance and quality matters, the Committee Chair shall coordinate and communicate directly with the Chair of the Audit Committee.

126. Specifically, according to the Compliance Charter, and as reiterated in the Company's proxy statements, the Compliance and Quality Committee's responsibilities include, *inter alia*, the following:

*Compliance Related Duties*

> The Committee shall have the following goals and responsibilities with respect to the Corporation's compliance efforts:

> (a) Provide oversight of the Corporation's compliance with applicable laws and regulations, except for laws and regulations pertaining to accounting, auditing, taxation or other financial matters, which shall be the responsibility of the Audit Committee, and communicate significant

- 53 -

compliance issues to the Board and to other Board committees;

(b)  Review significant compliance risk areas and the steps management has taken to monitor, control and report such compliance risk exposures;

(c)  Regularly review reports of the General Counsel on pending or threatened litigation, any material reports or inquiries received by the Corporation from regulators or governmental agencies, and other matters, including the scope and effectiveness of compliance policies and programs, except for any such reports primarily relating to accounting, auditing, taxation or other financial matters, which shall be the responsibility of the Audit Committee.

(d)  Review reports of the Corporation's Corporate Quality Committee;

(e)  Review and evaluate, at least annually, the effectiveness of the Corporation's compliance staff and compliance and ethics program;

(f)  Review and approve compliance related policies and procedures, including employee standards of conduct and whistleblower policies and procedures, except for such policies and procedures related to accounting, internal controls or auditing matters, which shall be the responsibility of the Audit Committee;

(g)  Report compliance issues that may have significant financial implications to the Audit Committee and otherwise assist the Audit Committee in the discharge of such committee's obligations related to such compliance issues; and

(h)  Meet regularly in executive session with the Corporation's Chief Compliance Officer.

127.  Upon information and belief, the Company maintained versions of the Compliance Charter during the relevant period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Compensation Committee Charter**

128.  In addition to the aforementioned fiduciary duties and duties pursuant to the Code, the members of the Compensation Committee owed specific duties to Envision under the Compensation Committee's Charter (the "Compensation Charter").  According to the

- 54 -

Compensation Charter, the Compensation Committee is responsible for the following:

> The purpose and responsibilities of the Committee shall be to assist the Board in fulfilling its oversight responsibilities relating to (a) the compensation of the Corporation's Chief Executive Officer ("CEO"), "officers" (as defined in SEC Rule 16a-1(f)) and other members of the Corporation's senior management (as determined by the Committee from time to time, the "Senior Management Group") and relating to the compensation of the independent directors of the Board, (b) the "Compensation Discussion & Analysis" to be included in the Corporation's annual proxy statement or Annual Report on Form 10-K, and any "Report of the Compensation Committee" required by Item 407(e)(5) of Regulation S-K and (c) attracting and retaining high quality leadership for the Corporation. The Committee shall take such actions relating to the compensation and benefits structure of the Corporation as the Committee deems necessary or appropriate.

129. Specifically, according to the Compensation Charter, and as reiterated in the Company's proxy statements, the Compensation Committee's responsibilities include, *inter alia*, the following:

(a) Establish and periodically review the Corporation's compensation philosophy, strategy and policies applicable to the Corporation's executives and other members of the Senior Management Group.

(b) Review and approve annual bonus and incentive plans, including equity plans and long-term incentive plans.

(c) Review and approve corporate and individual performance measures and objectives for the Chief Executive Officer of the Corporation (the "CEO") and other members of the Senior Management Group.

(d) Evaluate the CEO's performance in light of the corporate and individual performance measures and objectives, and, based on that evaluation, determine and approve base salary, annual bonus, equity awards and all other compensation or special benefits for the CEO. The CEO shall not be present during voting or deliberations by the Committee on the CEO's compensation. In establishing long term incentive compensation for the CEO, the Committee will consider the Corporation's performance, relative stockholder return, the value of similar incentive awards to chief executive officers at comparable companies, and the value of the awards given to the CEO in past years. Following such evaluation, the Committee shall report its decisions regarding the CEO's compensation to the Board.

(e) Review the CEO's recommended compensation structure (i.e., base salaries, annual bonus awards, equity awards and any other compensation

or special benefits) for the Corporation's other executives and other members of the Senior Management Group who directly or indirectly report to the CEO (including by reviewing the CEO's process for evaluating these elements of compensation) and, on an annual basis, consider the compensation structure for these individuals.

(f)     Annually review with the CEO the performance scores and compensation of the other members of the Senior Management Group who directly or indirectly report to the CEO. Review the CEO's recommendation for compensation, including base salary, short term incentive, and long term incentive and equity, for all other members of the Senior Management Group who directly or indirectly report to the CEO, and make recommendations to the Board with respect to the same.

(g)     Develop recommendations with respect to Board compensation, in consultation with the Nominating and Corporate Governance Committee, and make such recommendations to the Board for approval.

(h)     Periodically review the terms of the stock ownership guidelines applicable to directors and officers of the Corporation, including compliance therewith, and report to the Board on such review.

(i)     On a periodic basis, review the compensation and benefits policies and structures of the Corporation (e.g., material tax-qualified, welfare and other material benefit plans, and all material compensation arrangements), in each case subject to the requirements and limitations of the Second Amended and Restated Certificate of Incorporation of the Corporation and the By-laws.

(j)     Review and approve appointments, terminations, employment agreements, consulting agreements, severance arrangements, change in control arrangements and related compensation and benefit packages for the Corporation's executives, other members of the Senior Management Group and former members of the Senior Management Group.

(k)     Review and approve major organizational restructurings of the Corporation's employees.

(l)     Review and approve management development and succession plans for the CEO and, as the Committee deems appropriate, other members of the Senior Management Group.

(m)     Review the results of any advisory stockholder votes on executive compensation and consider whether to adjust (or recommend that the Board adjusts) the Corporation's executive compensation policies and practices in response to such voting results.

(n)   Evaluate and make recommendations to the Board regarding stockholder proposals that relate to executive compensation or other matters with respect to which the Committee has responsibility.

(o)   Develop and implement policies with respect to the recovery or "clawback" of any excess compensation (including equity awards) paid to members of the Senior Management Group as required by the rules of the NYSE or applicable law, or otherwise determined to be in the best interest of the Corporation.

(p)   Select and retain services of independent consultants or other advisors to provide advice to the Committee.

(q)   Commission special studies, when deemed necessary, on any matter of concern relating to overall corporate organization, compensation practice or compensation policy for the Corporation.

(r)   Oversee regulatory compliance with respect to compensation matters, including policies on structuring compensation programs to maximize tax deductibility.

(s)   Review and assess whether compensation of the Corporation's employees (including the Senior Management Group) encourages employees to engage in excessive risk.

(t)   Prepare, review and approve the "Report of the Compensation Committee", as required by Item 407(e)(5) of Regulation S-K, for inclusion in the Corporation's annual proxy statement or Annual Report on Form 10-K in accordance with applicable SEC rules and regulations.

(u)   Periodically report to the Board on all matters for which the Committee has been delegated responsibility pursuant to this Charter.

(v)   Undertake and review with the Board, in such manner as the Committee deems appropriate, an annual performance evaluation of the Committee, which shall compare the performance of the Committee with the requirements of this Charter and set forth the goals and objectives of the Committee for the upcoming year.

(w)   Annually review and reassess the adequacy of this Charter and recommend to the Board for approval such changes as the Committee believes are appropriate.

(x)   Exercise such other powers and perform such other duties and responsibilities as are incidental to the purposes, duties and responsibilities specified herein or as may from time to time be delegated to the Committee.

(y)     At least annually, assess the Corporation's compensation policies to evaluate whether such policies create risks that are reasonably likely to have a material adverse effect on the Corporation.

130.     Upon information and belief, the Company maintained versions of the Compensation Charter during the relevant period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

131.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Envision, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Envision.

132.     Because of their advisory, executive, managerial, and directorial positions with Envision, each of the Individual Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of Envision.

133.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Envision, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

134.     To discharge their duties, the officers and directors of Envision were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Envision were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating

- 58 -

truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(d)     remain informed as to how Envision conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e)     refrain from trading on material, adverse, and nonpublic information; and

(f)     ensure that Envision was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## **BREACHES OF DUTIES**

135.    The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and/or directors of Envision, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

136.    The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing

public, and artificially inflating and maintaining the market price of Envision's securities by making, or causing to be made, untrue statements and omissions about making untrue statements and omissions about Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls, by engaging in and concealing deceitful business practices, by engaging in unlawful insider sales, and/or by wasting corporate assets through the authorization of excessive compensation for various of the Individual Defendants in connection with the Merger, and excessive payments for the upcoming high-level executive departure of defendant Gulmi, who will receive over $2 million in compensation in connection with her departure.

137. The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Action. As a result of these and other breaches of fiduciary duties, Envision has expended, and will continue to expend, significant sums of money.

138. Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Envision, were able to, and did, directly, and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Envision.

139. Specifically, as members of the Audit Committee, the Audit Committee Defendants, Burt, Smith, Deal (Chair), Miller, Gawaluck, and Schnall, breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements. Because of this failure,

the Company issued false and misleading statements concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls.

140. Specifically, as members of the Compliance and Quality Committee, the Compliance and Quality Committee Defendants, Miller (Chair), Gawaluck, Riggs, and Shelton, breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to oversee and implement sufficient compliance policies and procedures, and/or recklessly and indifferently failing to follow compliance policies and procedures, to ensure the Company's compliance with applicable laws and regulations, including those regarding the accuracy of the Company's public statements. Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls.

141. Specifically, as members of the Compensation Committee, the Compensation Committee Defendants, Smith (Chair), Geringer, Lavender, and Williams, breached their fiduciary duties of good faith and loyalty by, *inter alia*, recommending and/or approving unjust compensation and incentive packages for the Individual Defendants which disincentivized them from identifying, addressing, and reporting problems to investors as they were encountered, as well as by authorizing excessive compensation as a result of the Merger for Company executives, including defendants Sanger, Holden, Owen, and Gulmi—***totaling $58,667,386***—despite the fact those individuals were breaching their fiduciary duties to Envision and its stockholders, and by authorizing excessive payments for the upcoming high-level executive departure of defendant Gulmi, who will receive over $2 million in compensation, in connection with her departure.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

142.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted, and/or assisted each other in breaching their respective duties.

143.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to mislead stockholders into believing that the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

144.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment, insider trading, and violations of the federal securities laws; and (ii) disguise and misrepresent the Company's actual business practices, operations, financials, financial prospects, compliance policies, and internal controls.

145.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

146.     Each of the Individual Defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and in furtherance of, the wrongdoing.

**DAMAGES TO ENVISION**

147.     As a result of the Individual Defendants' wrongful conduct, Envision conducted its affairs in evident violation of federal and state laws and regulations.  In addition, the Company was caused to disseminate false and misleading statements, and to omit material information to make such statements not false and misleading when made.  This misconduct has devastated Envision's credibility.  Further, Envision is the subject of the Securities Class Action.  Envision has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

148.     As a direct and proximate result of the Individual Defendants' actions, as alleged above, Envision's market capitalization has been substantially damaged, having lost over $5.4 billion in value as a result of the conduct described herein.

149.     Further, as a direct and proximate result of the Individual Defendants' conduct, Envision has expended, and will continue to expend, significant sums of money.  Such expenditures include, without limitation:

(a)     costs incurred in investigating and defending Envision and certain officers and directors in the Securities Class Action, plus potentially tens of millions of dollars in settlement, or to satisfy an adverse judgment;

(b)     costs incurred in connection with any government investigations in

- 63 -

connection with the allegations made herein, including any attorneys' fees, fines, or other expenses paid by the Company as a result thereof;

(c)     costs incurred in investigating and defending Envision in connection with, and ultimately settling, the two whistleblower lawsuits and related federal investigations, including approximately $31 million paid in connection with the settlement of "all federal government civil claims related to this matter";

(d)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Envision's artificially-inflated financials and stock price;

(e)     costs incurred from the misappropriation of Company information by the Insider Selling Defendants for the purpose of selling Envision common stock at artificially-inflated prices; and

(f)     costs incurred from the loss of the Company's customers' confidence in Envision and its products and services.

150.     Moreover, these actions have irreparably damaged Envision's corporate image and goodwill.  For at least the foreseeable future, Envision will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Envision's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

151.     Plaintiffs bring this action derivatively, in the right and for the benefit of Envision, to redress injuries suffered, and to be suffered, by Envision as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Envision is named as a nominal defendant solely in a derivative capacity.

152.    Plaintiffs will adequately and fairly represent the interests of Envision in enforcing and prosecuting its rights.

153.    Plaintiffs have been Envision stockholders since 2013, and are currently, and at all relevant times have been, holders of Envision common stock.

154.    Plaintiffs have not made a presuit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

155.    Plaintiffs have not made any demand on stockholders of Envision to institute this action because such a demand would be a futile and useless act for the following reasons:

(a)    Envision is a publicly-traded company with hundreds, if not thousands of stockholders, with over 121 million shares outstanding as of June 7, 2018;

(b)    making a demand on such a number of stockholders would be impossible for plaintiffs, who have no means of collecting the names, addresses, and/or phone numbers of Envision stockholders; and

(c)    making demand on all stockholders would force plaintiffs to incur excessive expense and obstacles, assuming all stockholders could even be individually identified with any degree of reasonable certainty.

156.    The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties owed to Envision.  Plaintiffs, as stockholders of Envision, seek damages and other relief on behalf of the Company, in an amount to be proven at trial.

157.    At the time this action was commenced, the Board of Envision consisted of the following twelve individuals: defendants Burt, Holden, Miller, Gawaluck, Jacobs, Lavender, Riggs, Deal, Geringer, Sanger, Shelton, and Smith (the "Demand Defendants").  Each of these

twelve individuals is, or would be, incapable of independently and disinterestedly assessing a stockholder's demand to bring the legal claims set forth herein. Because the Demand Defendants constituted a majority (indeed, the entirety) of Envision's Board when this action was initiated, demand is excused as futile.

**Demand Is Futile as to the Demand Defendants Because They Face a Substantial Likelihood of Liability in Connection with the Unlawful Conduct, Including the False and Misleading Financial Statements, Alleged Herein**

158. Each of the Demand Defendants faces a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith, and other misconduct. Each of the Demand Defendants currently serving as a director of Envision—to wit, defendants Burt, Holden, Miller, Gawaluck, Jacobs, Lavender, Riggs, Deal, Geringer, Sanger, Shelton, and Smith—has served as a director during a substantial portion of (if not throughout) the relevant period, and as such, had fiduciary duties to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business practices, operations, financials, financial prospects, compliance policies, and internal controls were truthful, accurate, and complete.

159. Indeed, the Demand Defendants were responsible for reviewing and approving the Company's financial statements. The Demand Defendants authorized false financial statements and public statements during the relevant period, as alleged herein, including the Merger Proxy, 2016 Form 10-K, 2017 Proxy, and the Q1 2017 Form 10-Q, while various of the Demand Defendants who were also directors of Envision prior to the Merger (to wit, defendants Burt, Riggs, Sanger, Shelton, and Smith), authorized additional false financial statements and public statements during the relevant period, as alleged herein, including the 2014 Form 10-K, February 26, 2015 press release, 2015 Proxy, Q1 2015 Form 10-Q, July 30, 2015 press release, Q2 2015 Form 10-Q, Q3 Form 2015 10-Q, 2015 Form 10-K, 2016 Proxy, Q1 2016 Form 10-Q,

Q2 2016 Form 10-Q, and Q3 2016 Form 10-Q, among other financial statements made with the SEC during the relevant period, as well as failed to correct other statements the Officer Defendants made during the relevant period. Accordingly, the Demand Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to lawsuits claiming violations of the federal securities laws. A director's breach of the duty of candor is not entitled to protection under the business judgment rule. As a result, any demand upon the Demand Defendants to bring suit against themselves or the Officer Defendants would be a useless and futile act.

160. The Demand Defendants caused and/or allowed the Company to engage in the unlawful conduct alleged herein, and each of the Demand Defendants faces a substantial likelihood of liability for causing Envision to engage in such unlawful conduct. As is described above, the Demand Defendants either knew and caused, or were reckless in not knowing, the false and misleading nature of the public statements and/or omissions alleged herein. The business judgment rule protects a wide variety of business decisions, but does not protect a corporation's officers and directors from causing a company to engage in illegal and unlawful conduct.

161. As a result of the unlawful conduct described above, each of the Demand Defendants—to wit, defendants Burt, Holden, Miller, Gawaluck, Jacobs, Lavender, Riggs, Deal, Geringer, Sanger, Shelton, and Smith (i.e., the entirety of the Board)—faces a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile. Moreover, this conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

162.     Additionally, the Demand Defendants were specifically responsible for ensuring that Envision had adequate internal controls regarding the Company's compliance with federal and state rules and regulations.   Thus, the Demand Defendants are directly responsible for Envision's failure to adopt and implement such internal controls, and for the substantial damages Envision is subject to in the ongoing Securities Class Action.   As such, each of the Demand Defendants faces a substantial likelihood of liability for the claims asserted herein.   Demand is therefore, futile.

163.     Indeed, the Demand Defendants, knowingly and/or with reckless disregard for the truth, reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the relevant period that caused the Company's stock to trade at artificially-inflated prices, and caused its financial statements and guidance to be artificially inflated.

164.     The Demand Defendants' making (or authorization) of false and misleading statements during the relevant period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the duties of the Audit Committee, the Compliance and Quality Committee, and the Compensation Committee were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties, for which the Demand Defendants face a substantial likelihood of liability.   If the Demand Defendants were to bring a suit on behalf of Envision to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.   This is something they will not do.   For this reason, demand is futile.

**Demand Is Futile as to Defendants Sanger and Riggs Based on Insider Sales of Envision Stock**

165.    During the relevant period, defendants Sanger and Riggs illicitly sold a combined 780,500 shares of Envision stock, worth $32,050,819.76, while in possession of material, adverse, and nonpublic information, and during a time in which Envision's stock was artificially inflated due to the Individual Defendants' misconduct alleged herein, including the false and misleading statements made, caused to be made, or recklessly disregarded by the Individual Defendants concerning Envision's business practices, operations, financials, financial prospects, compliance policies, and internal controls.    Moreover, in making or causing these sales, defendants Sanger and Riggs violated the Company's insider trading policy, as set forth in the Code.

166.    As a result of these illicit insider sales, defendants Sanger and Riggs each received direct financial benefits not shared with all other Envision stockholders.    Each is, therefore, objectively unable to assess any stockholder demand to bring the claims asserted herein, including, but not limited to: (i) the issuance of false and misleading statements; (ii) unlawful insider trading; (iii) failure to maintain adequate internal controls; and/or (iv) wasting corporate assets in connection with misconduct alleged herein.

167.    Additionally, defendants Sanger and Riggs face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.    As a result of these illicit insider sales, defendants Sanger and Riggs each received direct financial benefits not shared with Envision stockholders, and are, therefore, each directly interested in, and incapable of disinterestedly considering, a demand to bring these claims.

**Demand Is Futile as to Defendants Burt, Smith, Deal, Miller, and Gawaluck Because They Face a Substantial Likelihood of Liability for Consciously Disregarding the Company's Lack of Internal Controls over Financial Reporting**

168.    During the relevant period, defendants Burt, Smith, Deal (Chair), Miller, and Gawaluck served as members of the Audit Committee.  The allegations set forth in this Complaint establish a substantial likelihood of liability for each of the Audit Committee Defendants for breach of the fiduciary duties of loyalty, good faith, due care, full and fair disclosure, and oversight.  Each of the Audit Committee Defendants consciously knew—or consciously disregarded the risk—that Envision's internal controls were either inadequate or nonexistent, that its financial reporting was therefore, inaccurate, and that, as a result, the Company's results were materially overstated.

169.    The Audit Committee was required to conduct a plenary review with management and the independent accountants of all quarterly and annual results *before* any such statements were issued.  The Audit Committee also was tasked with: (i) overseeing the Company's accounting practices, internal controls, audit processes, and financial reporting processes; (ii) carefully monitoring and ensuring the Company's compliance with all applicable laws, regulations, and Company policies, procedures and controls; and (iii) reviewing and ensuring the adequacy of all of the Company's financial-reporting processes, disclosure controls, and processes, among other duties set forth in the Audit Charter.

170.    However, the Audit Committee Defendants consciously, or at least recklessly, disregarded these duties and responsibilities, in violation of their fiduciary duties to Envision by, among other things: (i) knowingly or recklessly reviewing and approving, and failing to prevent the dissemination of false and misleading information in the Company's earnings press releases, SEC filings, and earnings guidance; (ii) knowingly or recklessly approving and/or allowing the Company to issue false and misleading statements to the investing public certifying that the

- 70 -

Company maintained adequate and effective internal controls and procedures over financial reporting during the relevant period; and (iii) knowingly or recklessly failing to ensure that the Company had effectively functioning internal controls over financial reporting.

171. In addition, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient, and that statements made by the Company regarding its business, operational, and compliance policies were accurate. These defendants breached their fiduciary duties by, instead, causing the Company to make false and misleading statements.

172. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the defendants Burt, Smith, Deal, Miller, and Gawaluck is therefore, futile.

**Demand Is Futile as to the Defendants Miller, Gawaluck, Riggs, and Shelton Because They Face a Substantial Likelihood of Liability for Consciously Permitting and/or Disregarding the Company's Compliance Issues**

173. During the relevant period, defendants Miller (Chair), Gawaluck, Riggs, and Shelton served as members of the Compliance and Quality Committee. The allegations set forth in this Complaint establish a substantial likelihood of liability for each of the Compliance and Quality Committee Defendants for breach of the fiduciary duties of loyalty, good faith, due care, full and fair disclosure, and oversight. Each of the Compliance and Quality Committee Defendants consciously knew—or consciously disregarded the risk—that Envision was out of compliance with applicable laws and regulations as a result of the conduct described herein, specifically relating to the Company's fraudulent and deceptive billing practices, and its

corresponding financial reporting issues.

174. The Compliance and Quality Committee was tasked with overseeing the Company's compliance with applicable laws and regulations, reviewing the Company's compliance policies, procedures, and efforts, and reviewing and reporting risk areas and management's actions in connection therewith (including working with the Audit Committee regarding compliance issues that may have significant implications to the Audit Committee), among other duties set forth in the Compliance Charter.

175. However, the Compliance and Quality Committee Defendants consciously, or at least recklessly, disregarded these duties and responsibilities, in violation of their fiduciary duties to Envision by, among other things: (i) knowingly or recklessly reviewing and approving, and failing to prevent the dissemination of false and misleading information in, the Company's earnings press releases, SEC filings, and earnings guidance; (ii) knowingly or recklessly approving and/or allowing the Company to engage in business practices that violated company policy and/or applicable laws and regulations; (iii) knowingly or recklessly approving and/or allowing the Company to issue false and misleading statements to the investing public certifying that the Company was in compliance with applicable laws, regulations and/or internal policies, including that it maintained adequate and effective internal controls and procedures over financial reporting during the relevant period; and (iv) knowingly or recklessly failing to ensure that the Company was in compliance with applicable laws and regulations, including that it had effectively functioning internal controls over financial reporting.

176. Accordingly, the Compliance and Quality Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon defendants Miller, Gawaluck, Riggs, and Shelton is therefore,

futile.

**Demand Is Futile as to Defendants Smith, Geringer, and Lavender Because They Face a Substantial Likelihood of Liability for Authorizing Improper and Unjust Compensation that Incentivized the Individual Defendants' Unlawful Conduct**

177.    During the relevant period, defendants Smith (Chair), Geringer, and Lavender served as members of the Compensation Committee. The allegations set forth in this Complaint establish a substantial likelihood of liability for each of the Compensation Committee Defendants for breach of the fiduciary duties of loyalty, good faith, due care, full and fair disclosure, and oversight. Each of the Compensation Committee Defendants knowingly or recklessly failed to perform their duties to review, approve, and/or make recommendations for compensation goals, objectives, and performance for CEO and non-CEO executive officer compensation.

178.    The Compensation Committee Defendants had, but failed to exercise, the power to prevent the conduct alleged herein from occurring. Indeed, rather than designing compensation programs and policies that incentivized Envision's executives and employees to identify, address, and report problems to investors as they were encountered, Envision's compensation programs and policies were designed to reward management only for achieving revenue and profitability goals, as well as for increasing the price of the Company's stock. Envision's compensation programs gave senior executives a direct, personal, and significant financial motive to overstate profits and to conceal the Company's lack of internal controls.

179.    The fact that the Compensation Committee bestowed, or allowed to be bestowed, upon the Individual Defendants improper and unjust compensation, benefits, incentives, and severance payments that should have been subject to forfeiture had the true reasons for their roles in the misconduct alleged herein been disclosed and appropriate disciplinary actions taken, further underscores defendants Smith, Geringer, and Lavender's inability to consider a demand.

**Demand Is Futile as to Defendants Holden, Sanger, Burt, Riggs, Shelton, and Smith for Additional Reasons**

180.    In addition to the reasons discussed herein as to why demand is futile as to all Demand Defendants, demand is futile as to defendant Sanger because, when this action was commenced, there was substantial reason to doubt that he was an independent director capable of objectively considering a presuit demand.  In addition to serving as a director, defendant Sanger is also Executive Chairman of the Board, and thus, not an independent director, as the Company has acknowledged (most recently in its 2017 Proxy).  Moreover, as defendant Sanger served as CEO and President of Envision prior to the Merger, he expressly made or authorized most of the false and misleading statements and/or omissions alleged herein, and also signed the SOX certifications for each of Envision's public filings discussed herein, in his capacity as Envision's CEO.    Additionally, defendant Sanger's principal professional occupation has been his employment with Envision as its Executive Chairman, pursuant to which he has been employed full-time, and has received and continues to receive, substantial monetary compensation and other benefits.  Indeed, defendant Sanger received a sum of $8,418,344 in total compensation from Envision between 2015 and 2016 alone, and additionally, he received substantial compensation in connection with the Merger totaling $5,996,301.  Thus, defendant Sanger depends for his livelihood on his employment by Envision.  As such, defendant Sanger cannot independently consider any demand to sue himself for breaching his fiduciary duties to Envision because that would expose him to liability and threaten his livelihood.  Finally, defendant Sanger is named as a defendant in the Securities Class Action and faces a substantial likelihood of liability in connection therewith, rendering demand upon him futile.

181.    Similarly, in addition to the reasons discussed above as to why demand is futile as to defendant Sanger, and indeed all Demand Defendants, demand is futile as to defendant Holden

because, when this action was commenced, there was reason to doubt that he was an independent director capable of objectively considering a presuit demand. In addition to serving as a director, defendant Holden is also Envision's CEO and President, and thus, not an independent director, as the Company has acknowledged (most recently in its 2017 Proxy). Moreover, defendant Holden expressly made or authorized many of the false and misleading statements and/or omissions alleged herein. Additionally, defendant Holden's principal professional occupation is his employment with Envision as its CEO and President, pursuant to which he is employed full-time and receives substantial monetary compensation and other benefits. In 2016 alone, the year the Merger was completed, defendant Holden received $21,726,391 in compensation, in addition to receiving compensation in connection with the Merger totaling $37,738,261. Thus, defendant Holden depends for his livelihood on his employment by Envision. As such, defendant Holden cannot independently consider any demand to sue himself for breaching his fiduciary duties to Envision because that would expose him to liability and threaten his livelihood. Finally, defendant Holden is named as a defendant in the Securities Class Action and faces a substantial likelihood of liability in connection therewith, rendering demand upon him futile.

182. Additionally, like defendants Sanger and Holden, defendants Burt, Riggs, Shelton, and Smith are named as defendants in the Securities Class Action, and face a substantial likelihood of liability in connection therewith, rendering demand upon each of them futile.

## SUBSTANTIVE CLASS ALLEGATIONS

## THE DIRECTOR DEFENDANTS AGREE TO SELL THE COMPANY IN AN UNFAIR PROCESS AND FOR AN UNFAIR PRICE

**The Unfair Process**

183. As explained above, the Individual Defendants' actions are directly responsible for a massive decline in the Company's market capitalization through their faithless acts and

omissions. Once the public began to learn about this wrongdoing, Envision's stock price plummeted. In particular, on July 24, 2017, *The New York Times* published an article detailing the abusive billing practices. This report by *The New York Times* led to a massive decline in the Company's stock price. Then reports emerged in September 2017, that Senator McCaskill was investigating the Company for overcharging patients. According to reports, Senator McCaskill sent a letter directly to defendant Holden concerning EmCare's billing practices.

184.     Unsurprisingly, in September 2017, the Individual Defendants also began to explore the "strategic alternatives" available to the Company with Envision's financial advisors, Evercore and Guggenheim. The Board had Evercore and Guggenheim advise in the sales process despite their clear conflict with a significant potential (and the eventual) buyer, KKR. Evercore received approximately $32.5 million in fees from KKR in the past two years, over six times the $5 million it received from Envision during that same time period. Over the past two years, KKR and its affiliates paid Guggenheim $9 million in fees.

185.     On October 31, 2017, the Company publicly announced its earnings results for the third quarter and the Board's decision to review strategic alternatives.

186.     In November 2017, the Company added another financial advisor to the mix, retaining J.P. Morgan to also review strategic alternatives. The Company retained J.P. Morgan despite J.P. Morgan having received approximately $110 million in fees from KKR in the two years before it issued its fairness opinion. Further, the Company paid only $3 million of J.P. Morgan's $32 million fee at the time it issued its opinion. A substantial, but undisclosed, portion of the remaining $29 million is contingent on the consummation of the Proposed Acquisition.

187.     At the same time, Envision began to receive inbounds calls from interested third parties. It does not appear, however, that the Board contacted or authorized any representative to

contact potential third parties at this time, despite the earlier press release.

188.    On January 22, 2018, management finally presented the Board with its 2018 and five-year financial forecast model (the "Management Case") at a Board meeting.   At this meeting, four months after the Board supposedly began looking at strategic alternatives, and also two months after this action was filed, the Board finally gave permission to management and Envision's financial advisors to contact parties that might be interested in acquiring Envision.

189.    On January 23, 2018, the Company's financial advisors began reaching out to potential counterparties.   The Individual Defendants, looking to cause Envision to enter into a deal quickly, gave these potential counterparties only until February 16, 2018 to provide preliminary indications of interest.

190.    Between February 16, 2018 and February 20, 2018, nine financial sponsors made bids for the Company.   Of those nine, seven submitted ranges that at least reached Proposed Consideration of $46 per share, five offered ranges that included a per share price above $46 per share, and three offered a range in which even the low end was above the Proposed Consideration of $46 per share.   Five other potential counterparties offered to purchase just the Company's ambulatory surgery center business.

191.    On February 20, 2018 and February 21, 2018, the Board met again with management.   Management provided its final 2018 budget forecast, which contained no material changes from its preliminary draft.   Inexplicably, and despite the substantial interest already generated in the Company, the Board at this meeting stifled the competition bidding process by allowing financial sponsors to partner together for bids for Envision.   The Board's action was not prompted by any request from a potential acquiror to partner.

192.     After being given permission to partner, many bidders for the Company did just that.  In particular, seven of the original bidders paired up to make three groups.  While one group consisted of only low-bidder offers (Group A), the next group consisted of three bidders that all offered over the Proposed Consideration (Group B), and the last group included the bidders that offered the most for the Company, $60 per share (Group C).

193.     On April 17, 2018, Group A, Group B, and KKR provided updated indications of interest.  Group B and KKR both offered $50 per share, $4 per share above the Proposed Consideration.  Group A, which consisted of the lowest initial offers, contained to undervalue the Company, offering only a range of $43 to $45 per share.

194.     One of the Company's financial advisors, J.P. Morgan, instructed the remaining bidders to provide their final proposals by May 31, 2018.  Around this same time period, management began preparing a second set of projections that accounted for market and sector risks outside of the Company's control, the Sensitivity Case.  The Proxy does that claim any of these risks had begun affecting the Company or were even likely to affect the Company.

195.     On June 4, 2018, KKR submitted a proposal to acquire the Company at a price of $45.25 per share.  The Company's stock price traded as high as $43.80 on June 5, 2018, meaning that KKR's offer represented a premium of just 3.3%, just $1.45 per share higher than Envision's closing price.  After the Board instructed the financial advisors to reject that offer, KKR increased its bid to $45.75 per share.

196.     The next day the Board instructed the financial advisors to have KKR present its best and final offer.  KKR then offered to acquire the Company for $46 per share.  The Board agreed to that offer, without reaching out to the other bidders that had previously offered substantially more than $46 per share for Envision.

197.    The parties negotiated the Agreement and Plan of Merger (the "Merger Agreement") over the next week, coming to an agreement on June 10, 2018.  It was only then, before the June 10, 2018 meeting, that the Board received conflict disclosure letters from the Company's financial advisors.  Despite the significant fees the advisors had received from KKR described above, the Board decided that none of the advisors were disqualified and approved the Proposed Acquisition and the Merger Agreement.

198.    The next day, on June 11, 2018, defendants announced that KKR would acquire the Company in an all-cash transaction for $46.00 per share.

**The Individual Defendants Self-Dealing**

199.    The Proposed Acquisition, if allowed to close, is a significant win for the Individual Defendants.  If allowed to close, the Proposed Acquisition may extinguish Envision stockholders' ability to pursue the derivative claims against them and relieve them of liability for their massive destruction of the Company's value.

200.    In addition, before the Board even agreed to the final terms of the Proposed Acquisition, Company management had engaged with KKR in discussions concerning their post-acquisition employment.  As the Proxy admits, certain of the executive officers of the Company will enter into new employment agreements effective as of the closing of the Proposed Acquisition.  While the Proxy implies that there is a "preliminary understanding" as to these agreements, the Proxy does not disclose any specifics as to the agreements or even who entered into such agreements.

201.    Further, in connection with the Proposed Acquisition,  the Individual Defendants and other members of management will receive tens of millions of dollars in benefits in the form of accelerated vesting of stock-based awards.  If KKR terminates certain of management's

employment, these individuals will receive millions of dollars in additional benefits. The following table demonstrates the benefits that the Individual Defendants and management are set to receive, not even including the new employment agreements:

| Defendants | Common Share Consideration | Accelerated Consideration | Total Merger Consideration |
|---|---|---|---|
| Christopher A. Holden[1] | $ 15,972,488.00 | $ 27,020,450.17 | $ 42,992,938.17 |
| William A. Sanger[2] | $ 66,168,651.30 | $ 5,467,263.69 | $ 71,635,914.99 |
| Michael L. Smith | $ 494,546.00 | $ 781,678.00 | $ 1,276,224.00 |
| Carol J. Burt | $ 519,984.00 | $ 184,782.00 | $ 704,766.00 |
| Leonard M. Riggs | $ 2,128,328.00 | $ 184,782.00 | $ 2,313,110.00 |
| James D. Shelton | $ 1,564.00 | $ 625,232.00 | $ 626,796.00 |
| James A. Deal | $ 1,696,572.00 | $ 184,782.00 | $ 1,881,354.00 |
| John T. Gawaluck | $ 423,384.00 | $ 184,782.00 | $ 608,166.00 |
| Steven I. Geringer | $ 1,543,852.00 | $ 328,486.00 | $ 1,872,338.00 |
| Joey A. Jacobs | $ 618,930.00 | $ 184,782.00 | $ 803,712.00 |
| Kevin P. Lavender | $ 560,280.00 | $ 328,486.00 | $ 888,766.00 |
| Cynthia S. Miller | $ 891,250.00 | $ 184,782.00 | $ 1,076,032.00 |
| Claire M. Gulmi[3] | $ 4,787,542.00 | $ 1,254,816.56 | $ 6,042,358.56 |
| **Total** | **$ 95,807,371.30** | **$ 36,915,104.41** | **$ 132,722,475.71** |
| (1) Accelerated Consideration includes a combined cash severance and prorated bonus of $9,900,000, $135,699 in pension benefits, and $48,138 in continued welfare benefits. | | | |
| (2) Common Share Consideration includes $54,645,513.30 that is payable upon conversion of options which are fully vested. Pursuant to the preliminary proxy, "*each Company option that is outstanding as of immediately prior to the effective time will, at the effective time, be converted into the right to receive an amount in cash equal to the product of (i) the excess, if any, of the merger consideration over the exercise price per share of such Company option and (ii) the total number of shares subject to such Company option*." Sanger currently has fully vested options to purchase 1,563,534 shares of common stock at a strike price of $11.05. | | | |
| (3) Accelerated Consideration includes $72,959 in pension benefits | | | |

**The Unfair Consideration**

202. The Individual Defendants' fiduciary duties require them to maximize stockholder value when entering into a change-in-control transaction such as the Proposed Acquisition. Here, however, the Individual Defendants' eagerness to enter into an acquisition with KKR (and

secure for themselves the personal financial benefits described above) resulted in a sales process that was not designed to obtain the maximum price for Envision stockholders. As a result, the Company's public stockholders have been, and will continue to be, denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. Indeed, the Proposed Consideration does not reflect the true inherent value of the Company as known to the Individual Defendants.

203. As an initial matter, the wrongdoing described above drove down Envision's stock price. However, through this derivative action, the Company would be able to recover tens of millions of dollars from the Individual Defendants for that loss in value. Moreover, this loss in value is only temporary, due, in large part, to the market's distrust of the faithless fiduciaries currently running the Company. The failure to price in this increased value is demonstrated by the Proposed Consideration falling considerably below the Company's stock price of more than $60 per share before the truth was revealed about the Individual Defendants' wrongdoing.

204. Analysts covering Envision also realized that the Company was worth more than the Proposed Consideration. The Company announced that it was reviewing strategic alternatives on October 31, 2017. Before this announcement at least *eleven* analysts had target prices for the Company over the Proposed Consideration. Among these analysts:

  (a)   RBC Capital Markets had a $77 per share price target;

  (b)   Oppenheimer & Co had a $77 per share price target;

  (c)   Raymond James had a $75 per share price target;

  (d)   J.P. Morgan had a $72 per share price target;

  (e)   Jefferies had a $71 per share price target;

  (f)   Stephens Inc. had a $70 per share price target;

(g)     Baird had a $70 per share price target;

(h)     Canaccord Genuity had a $68 per share price target;

(i)     KeyBanc Capital Markets had a $67 per share price target;

(j)     Mizuho Securities USA had a $57 per share price target; and

(k)     Suntrust Robinson Humphrey had a $55 per share price target.

205.    Further, the Company received several acquisition proposals during the sales process higher than the Proposed Consideration.  Rather than allow a true auction to occur, whereby stockholders' value might  actually be realized, the Individual Defendants stifled the competitive process by allowing bidders to join together to submit bids.  Further, even after the Board received only KKR's lowball offer of $46 per share, it did not go back to any of the other higher bidders to see if any were still interested in the Company.

206.    Most importantly, the analyses performed by the Company's own financial advisors demonstrated the unfairness of the Proposed Consideration.  Using the Management Case, all three financial advisors found the Company per share price to be higher than the Proposed Consideration, even on the low end of the ranges they found.  In fact, Evercore found the Company could be worth as much as $80.16 per share and J.P. Morgan and Guggenheim as high as $71.25 per share.  Notably, at least one of the advisors found the Management Case to be at least as likely as the Sensitivity Case.  In fact, the Management Case was more likely to occur as the Proxy makes no mention of the risks associated with the Sensitivity Case occurring or likely to occur.

## THE FALSE AND MATERIALLY MISLEADING PROXY

207.    In order to secure stockholder approval of the unfair Proposed Acquisition, defendants filed the false and materially misleading Proxy with the SEC on July 9, 2018.  The

Proxy misrepresents and/or omits material information necessary for Envision stockholders to make an informed decision whether to vote in favor of the Proposed Acquisition. Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information and/or provides them with materially misleading information concerning the financial projections and the valuation analyses prepared by the Company's financial advisors.

**Disclosure Deficiencies Concerning the Role of Large Investors in the Sales Process**

208. Institutional investors owns approximately 50% of the Company's outstanding shares as of January 2018. The Proxy on page 38 notes that management and defendant Burt (as the Chair of the Nominating and Corporate Governance Committee) conducted an investor roadshow to solicit feedback on the Company's performance, the risks it faced, and strategic alternatives. Page 39 of the Proxy notes that an investor submitted a notice of its intention to nominate five candidates to the Board, and then subsequently withdrew that nomination. On page 42, the Proxy also states that management developed the Sensitivity Case after receiving feedback from stockholders, among others.

209. The Proxy fails to disclose any details concerning whether stockholders threatened to propose an alternate slate of directors to the Board, whether any discussions occurred with the stockholder that nominated the dissent slate of directors, or the specific feedback from stockholders that led to the Sensitivity Case. If the Board was threatened with replacement or pursuing a sale for that reason, that information is material to stockholders in deciding how to weigh the Board's recommendation to vote in the favor of the Proposed Acquisition.

210. In addition, the Proxy fails to disclose what feedback it received from stockholders (and bidders) that led to the creation of the Sensitivity Case. It was only through

the use of the Sensitivity Case in its analyses that the financial advisors were able to perform DCF analyses with value ranges indicating the Proposed Consideration was fair. Accordingly, the circumstances surrounding the creation of the Sensitivity Case is of critical importance to stockholders.

**Disclosure Deficiencies Concerning Management's Interests in the Proposed Acquisition**

211. According to page 44 of the Proxy, the Board was "provided a summary of the proposed employment and compensation arrangements between certain members of management and KKR following the consummation of the proposed merger." On pages 76-82, the Proxy also contains a section titled "Interests of the Company's Directors and Executive Officers in the Merger" that purports to detail the interests of the Company's management in the Proposed Acquisition. However, this section omits any discussion of the proposed employment agreements certain members of management will to enter into with KKR. In fact, it does not even specify which members of management will enter into agreements with KKR.

212. This information is material because it informs whether Envision management placed its own interests ahead of those of the Company's public stockholders in agreeing to the Proposed Acquisition with KKR. Further, by only partially disclosing information about the employment agreements, the Proxy omits material information that makes the section specified above materially misleading.

**Disclosure Deficiencies Concerning Management's Projections**

213. The Proxy contains certain parts of the Management Case and the Sensitivity Case on pages 49-51. As noted these widely divergent forecasts led Envision's financial advisors to reach vastly different value ranges in their analyses. The Proxy, however, fails to disclose which scenario is more likely to occur. Further, while the Proxy discloses the effect of the

materialization of the risks outside of the Company's control to Envision's business health, it does not detail what those risks are or if they were likely to materialize. Absent more disclosure about the rationale for the creation of the Sensitivity Case and management's view as to which case was more likely to occur, Envision stockholders are unable to assess the reliability of the analyses.

214. For instance, both the Management Case and Sensitivity Case show increasing revenues, EBITDA, and EPS. However, both also show drastic decreases in unlevered free cash flow that actually turn negative in 2020 in the Management Case and 2019 in the Sensitivity Case. For the Management Case, unlevered free cash flow falls from $88.6 million in 2018 to *negative $680.9 million* in 2022. For the Sensitivity Case unlevered free cash flow falls from $88.6 million in 2018 to *negative $843.5 million* in 2022. There is no explanation for this drastic decrease in unlevered free cash flow. Since unlevered free cash flow is one of the most important inputs in any DCF analysis, the explanation for such a decrease in unlevered free cash flow is material information. The analysis also appears inconsistent, as a negative cash flow would lead to less acquisitions, but that does not appear to be happening in the analyses.

215. The Proxy also contains non-generally accepted accounting principles ("GAAP") financial metrics and fails to reconcile these non-GAAP metrics to GAAP metrics. In particular, the Proxy discusses Adjusted EBITDA, Adjusted EBITDA margin, Adjusted EPS, and unlevered free cash flow. There is no universal definition for these non-GAAP financial metrics. Accordingly, without the reconciliation, stockholders have no idea what exactly the non-GAAP metrics are showing or how much weight, if any, to place on these metrics in deciding how to vote.

216. The Proxy fails to disclose certain parts of "Management Projections" provided by the Company's management and relied upon by J.P. Morgan, Evercore, and Guggenheim for purposes of their analyses, for fiscal years 2018-2022. Namely, the Proxy fails to disclose the following items:

(a) depreciation and amortization;

(b) EBIT;

(c) taxes;

(d) capital expenditures;

(e) changes in net working capital;

(f) stock-based compensation expense;

(g) any other adjustments to unlevered free cash flow;

(h) after tax transaction expenses; and

(i) information about how acquisitions were modeled into the projection period.

217. The Proxy fails to disclose certain parts of the "Management Sensitivity Projections" provided by the Company's management and relied upon by J.P. Morgan, Evercore, and Guggenheim for purposes of their analyses, for fiscal years 2018-2022. In particular, the Proxy fails to disclose the following items:

(a) depreciation and amortization;

(b) EBIT;

(c) taxes;

(d) capital expenditures;

(e) changes in net working capital;

        (f)      stock-based compensation expense;

        (g)      any other adjustments to unlevered free cash flow;

        (h)      after tax transaction expenses; and

        (i)      information about how acquisitions were modeled into the projection period.

218.    Stockholders need this information material in order to either determine what weight, if any, to give the analyses of the financial advisors.

**Disclosure Deficiencies Concerning the Valuation Analysis Prepared by J.P. Morgan**

219.    The Proxy cites to and annexes the opinion of the Company's financial advisor J.P. Morgan, which concludes that the Proposed Consideration to be received by Envision's stockholders is fair from a financial point of view. However, the Proxy fails to disclose material information about the analyses J.P. Morgan's performed in support of its fairness opinion, rendering it impossible for the Company's stockholders to determine what weight, if any, to place on J.P. Morgan's opinion in deciding how to vote on the Proposed Acquisition.

220.    For instance, page 55 of the Proxy describes J.P. Morgan's DCF analysis. A key input in any DCF analysis is the Company's "unlevered free cash flow." However, the Proxy fails to explain the definition of unlevered free cash flow used by J.P. Morgan in its analysis, which can have a dramatic effect on the outcome of the analysis.

221.    Another key input in the DCF analysis is terminal year unlevered free cash flow. The Proxy, however, fails to disclose the exact normalizing adjustments made by J.P. Morgan to the terminal year unlevered free cash flow.

222.    Because DCF is the most important valuation analysis, and the above inputs are key to that analysis, stockholders would find this information material in deciding what weight,

if any, to place on J.P. Morgan's fairness opinion in deciding how to vote on the Proposed Acquisition.

**Disclosure Deficiencies Concerning the Valuation Analysis Prepared by Evercore**

223. The Proxy also contains a description of Evercore's DCF analysis on pages 61-62. The Proxy fails to disclose the exact normalized value of the Company's terminal year unlevered free cash flow used by Evercore. The Proxy also fails to disclose the value of the "run-rate impact of acquisitions made in 2022" or the assumed acquisition and transaction expenses used by Evercore.

224. Such undisclosed or explained adjustments can have an outsized effect on the value ranges resulting from a DCF analysis. Accordingly such adjustments made by Evercore in its analysis are material.

**Disclosure Deficiencies Concerning the Valuation Analysis Prepared by Guggenheim**

225. The Proxy on page 71 contains Guggeneheim's DCF analysis. Guggenheim applied a perpetual growth rate of 1% to 1.5%. The Proxy fails to disclose the individual assumptions utilized by Guggenheim to derive this range. Small changes in the perpetual growth rate can have a large impact on the resulting value range, accordingly stockholders would find the assumptions used to derive the growth rate material.

226. The Proxy also fails to disclose the exact normalized value of the Company's unlevered free cash flow utilized by Guggenheim in its analysis or the implied terminal EBITDA multiple range resulting from this analysis.

227. Further, the Proxy fails to disclose which case Guggenheim considered more likely, the Management Case or the Sensitivity Case.

228. Without the information described above, stockholders cannot replicate the analyses, nor can they properly evaluate the fairness opinions.

**Disclosure Deficiencies Concerning Potential Conflicts of Interest Among the Financial Advisors**

229.    As explained above, the financial advisors all did a substantial amount of work for KKR.  The Proxy states on page 44 that the Board received potential conflict notices from the financial advisors on June 10, 2018, after the Board had already agreed to the Proposed Consideration.  The Proxy fails to disclose if the Board knew of or inquired about these conflicts earlier in the process.

230.    The Proxy also fails to disclose why the Board felt compelled to hire three financial advisors to render three fairness opinions.

231.    The Proxy also fails to disclose how much of J.P. Morgan's, Evercore's, and Guggenheim's fees are contingent on the consummation of the Proposed Acquisition.

232.    Whether the Board was knowingly relying on conflicted advisors is material information that stockholders need to know in deciding how to weigh the Board's recommendation to vote in favor of the Proposed Acquisition.  Further, the full extent and detail of the conflicts is material information to stockholders in knowing how much weight to accord the financial advisors' opinions and work.

## CLASS ACTION ALLEGATIONS

233.    Plaintiffs bring this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other public stockholders of Envision that have been or will be harmed by defendants' conduct described herein (the "Class").  Excluded from the Class are defendants and any individual or entity affiliated with any defendant.

234.    This action is properly maintainable as a class action.

235.     The Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, there are over 121 million shares of Envision common stock outstanding as of June 7, 2018.

236.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include the following:

(a)     whether defendants have violated sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by disseminating a materially false and misleading Proxy to Envision stockholders;

(b)     whether the Individual Defendants breached their fiduciary duties to the Class;

(c)     whether the Individual Defendants failed to maximize stockholder value;

(d)     whether defendants are unjustly enriching themselves and other insiders or affiliates of the Company at the expense of Envision stockholders and/or their fiduciary obligations; and

(e)     whether plaintiffs and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

237.     Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

238.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately represent and protect the interests of the Class.

239.     The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

240. Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

241. Defendants have acted, or failed to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Derivatively Against the Individual Defendants for
### Violation of Section 14(a) of the Exchange Act

242. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

243. Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

244. The Company's 2015 Proxy, 2016 Proxy, and 2017 Proxy, and the Merger Proxy (collectively, the "Proxies"), violated section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that (i) Envision had inadequate corporate accounting and corporate financial reporting resources; (ii) Envision inadequately assessed the risks associated with the Company's financial reporting; (iii) Envision failed to maintain effective internal controls over financial reporting; and (iv) as a result of the foregoing, Envision's public statements were materially false

and misleading at all relevant times.

245. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions in the Proxies were material to plaintiffs in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

246. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

**COUNT II**

**Derivatively Against the Individual Defendants for Breach of Fiduciary Duties**

247. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

248. As alleged in detail herein, each of the Individual Defendants had a duty to exercise good faith in order to ensure that the Company maintained adequate internal controls. When put on notice of problems with Envision's business practices, operations, financials, financial prospects, compliance policies, and/or internal controls, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

249. Further, each of the Individual Defendants had a duty to exercise prudent oversight and supervision of Company officers and other employees to ensure that they conducted Envision's affairs in conformity with all applicable laws and regulations. These duties include the duty of full and fair disclosure to stockholders, also known as the duty of candor. To execute this duty, the Individual Defendants were required to disseminate accurate, truthful, and

complete information to stockholders at all times.

250.    In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Envision's internal control practices and procedures, and failed to make a good faith effort to correct the problems or their recurrence.  As directors and/or officers of Envision, the Individual Defendants were responsible for the authorizing of, or the failure to monitor, the business practices which resulted in violations of the law as alleged herein.  Each of the Individual Defendants had knowledge of and actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

251.    The Individual Defendants turning a blind eye to their duties of oversight and supervision, and willfully or in bad faith, allowed Company officers or other employees to conduct the Company's operations in violation of applicable laws and regulations, and in a manner that grievously harmed the best interests of the Company and its stockholders, rather than protecting those interests.

252.    In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false public statements to stockholders that misrepresented and/or failed to disclose material information concerning the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls. Specifically, the Individual Defendants made, or caused the Company to make, false and/or misleading statements, and/or failed to disclose that: (i) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians, and accordingly, EmCare "surprise-billed" these patients at higher rates than if the patients had received treatment from in-network physicians; (ii) EmCare also engaged in a concerted practice of overbilling and unnecessarily billing patients by ordering physicians to, *inter alia*, frequently

order tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial rather than medical reasons, and bill for the most complex, expensive level of care in unwarranted situations; (iii) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of these unlawful and deceptive business practices; (iv) the Company's statements attributing EmCare's growth during the relevant period to other factors, while failing to disclose that these unlawful and deceitful practices were materially contributing to the Company's growth, were therefore, false and/or misleading; (v) Envision's EmCare revenues were likely to be unsustainable after the foregoing conduct was discontinued and/or revealed; (vi) Envision had inadequate corporate accounting and corporate financial-reporting resources; (vii) Envision inadequately assessed the risks associated with the Company's financial reporting; (viii) Envision failed to maintain effective internal controls over financial reporting; and (ix) as a result of the foregoing, Envision's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the relevant period. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its stockholders.

253. As a direct and proximate result of the Individual Defendants' breach of their fiduciary obligations, Envision has sustained significant damages.

254. Further, the Insider Selling Defendants also breached their fiduciary duty to Envision. At the time they sold their Envision stock, the Insider Selling Defendants were in possession of material, adverse, and nonpublic information concerning the Company, and they

sold their stock on the basis of that information.

255. The material, adverse, and nonpublic information at issue—which concerned the Company's financial condition, future business prospects, and the sufficiency of its Company's internal controls and accounting procedures—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its stockholders on equal terms. Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

256. At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's unlawful business practices and operations, falsely and/or misleadingly reported financial prospects, artificially inflated financials and stock price, lack of compliance policies, and faulty internal controls.

257. The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, and nonpublic information was a breach of their fiduciary duties of loyalty and good faith.

258. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

259. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

260. Plaintiffs, on behalf of Envision, have no adequate remedy at law.

## COUNT III

### Derivatively Against the Individual Defendants for Waste of Corporate Assets

261. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

262.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Envision's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing throughout the relevant period.  It resulted in continuous, connected, and ongoing harm to the Company.

263.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against the Securities Class Action.

264.     As a direct and proximate result of these defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.  As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

265.     Plaintiffs, on behalf of Envision, have no adequate remedy at law.

## COUNT IV

### Derivatively Against the Individual Defendants for Unjust Enrichment

266.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

267.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Envision.

268.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Envision.

- 96 -

269. Plaintiffs, as stockholders and representatives of Envision, seek restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants' proceeds from their misconduct, and/or an order requiring the Individual Defendants to disgorge all profits, benefits, and other compensation obtained through, or as a result of, their wrongful conduct and fiduciary breaches.

270. As a direct and proximate result of these defendants' misconduct, the Company has suffered significant damages, as alleged herein. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

271. Plaintiffs, on behalf of Envision, have no adequate remedy at law.

## COUNT V

**Directly Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder on Behalf of the Class**

272. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

273. During the relevant period, the Director Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

274. By virtue of their positions within Envision, the defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the

Company's assets. The Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

275. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

276. By reason of the foregoing, the defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

277. Because of the false and misleading statements in the Proxy, plaintiffs and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT VI

### Directly Against the Individual Defendants for Violation of
### Section 20(a) of the Exchange Act on Behalf of the Class

278. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

279. The Individual Defendants acted as controlling persons of Envision within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of Envision and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

280.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

281.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Envision, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition. They were, thus, directly involved in the making of the document.

282.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition.   The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

283.     By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

284.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.   As a direct and proximate result of defendants' conduct, Envision's stockholders will be irreparably harmed.

# COUNT VII

### Directly Against the Individual Defendants for Breach of
### Fiduciary Duties on Behalf of the Class

285.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

286.    The Individual Defendants have violated the fiduciary duties of care, loyalty, and good faith owed to the public stockholders of Envision and have acted to put their personal interests ahead of the interests of Envision's stockholders.

287.    By the acts, transactions, and course of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiffs and the other members of the Class of the true value of Envision.

288.    The Individual Defendants have violated their fiduciary duties by entering Envision into the Proposed Acquisition without regard to the effect of the Proposed Acquisition on Envision's stockholders.

289.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required and breached their duty of loyalty owed to the stockholders of Envision because, among other reasons:

(a)    they failed to take steps to maximize the value of Envision to its public stockholders;

(b)    they failed to properly value Envision and its various assets and operations; and

(c)    they ignored or did not protect against the Individual Defendants' numerous conflicts of interests in the Proposed Acquisition.

290.     Because the Individual Defendants control the business and corporate affairs of Envision, and have access to private corporate information concerning Envision's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Envision that makes it inherently unfair for them to pursue and recommend the Proposed Acquisition wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

291.     By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary duties toward plaintiffs and the other members of the Class.

292.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiffs and the other members of the Class, and have breached and are breaching their fiduciary duties to the Class.

293.     As a result of the Individual Defendants' unlawful actions, plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Envision's assets and operations.  Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiffs and the members of the Class, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

294.     Plaintiffs and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiffs and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## <u>DERIVATIVE PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs demand judgment as follows:

A.      Against all defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' wrongdoing as alleged herein;

B.      Directing Envision to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Envision and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

(1)      a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

(2)      a proposal to strengthen the Company's internal reporting and financial disclosure controls;

(3)      a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

(4)      a proposal to ensure the accuracy of the qualifications of Envision's directors, executives, and other employees;

(5)      a proposal to require an independent Chairman of the Board;

(6)      a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting be elected on an annual basis;

(7)      a provision to strengthen the Company's oversight and controls over insiders' purchases and sales of Company stock;

(8)      a provision charging the Board, or a committee thereof, or a subcommittee

thereof, to investigate, review, and recommend changes to the Company's (and any subsidiaries thereof) core medical patient billing practices so that such practices are done in an ethical manner, and in accordance with all applicable local, state, and federal laws;

(9)     a provision to permit the stockholders of Envision to nominate three candidates for election to the Board to replace existing directors;

(10)    a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

(11)    a provision to appropriately test, and then strengthen, the Company's internal operational control functions.

C.      Awarding to Envision restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

D.      Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DIRECT PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand injunctive relief, in their favor and in favor of the Class and against defendants as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until they comply with their obligations under sections 14(a) and 20(a) of the Exchange Act to provide stockholders with all material information about the unfair sales process for the Company, the conflicts of interest suffered by defendants in connection with the Proposed Acquisition, the

- 103 -

inadequate consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company;

      C.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

      D.      Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

      E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 2, 2018

**ROBBINS ARROYO LLP**
BRIAN J. ROBBINS*
STEPHEN J. ODDO
KEVIN A. SEELY*
ASHLEY R. RIFKIN*
STEVEN M. McKANY*

*s/ Ashley R. Rifkin*

ASHLEY R. RIFKIN

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
kseely@robbinsarroyo.com
arifkin@robbinsarroyo.com
smckany@robbinsarroyo.com

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.*
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101

MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON*
KRISTEN L. O'CONNOR
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com
KristenO@johnsonfistel.com

*admitted *pro hac vice*

*Co-Lead Counsel for Plaintiffs*

**DAVIES, HUMPHREYS, HORTON &
    REESE PLC**
WADE B. COWAN
85 White Bridge Road, Suite 300
Nashville, TN 37205
Telephone: (615) 256-8125
Facsimile: (615) 242-7853
wcowan@dhhrplc.com

*Liaison Counsel for Plaintiffs*

1282659

DocuSign Envelope ID: 879C7CB6-360C-46F1-9F71-8DEE4EDDC3A2

## CERTIFICATION OF PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAW</u>

Scott Purrone ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

      1.     Plaintiff has reviewed the Verified Amended Stockholder Derivative and Class Action Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment and has retained Johnson Fistel, LLP as counsel in this action for all purposes, and authorized the filing of the Complaint.

      2.     Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

      3.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
|  |  |  |  |  |
|  | No transactions during the Class Period |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

      4.     Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

      5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: None.

      6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

      7.     Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this <u>31</u> day of July, 2018.

<u>SCOTT PURRONE</u>

<u>VERIFICATION</u>

I, Scott Purrone, hereby declare as follows:

I am one of the plaintiffs in the within entitled action. I have read the Verified Amended Stockholder Derivative and Class Action Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:

Dated: July <u>31</u>, 2018



_____
SCOTT PURRONE

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Ryan Sevy ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1. Plaintiff has reviewed the Verified Amended Stockholder Derivative and Class Action Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment and has retained Robbins Arroyo LLP as counsel in this action for all purposes, and authorized the filing of the Complaint.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| | | | | |
| | No transactions during the Class Period | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: __None__

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7. Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this $29$ day of July, 2018.

RYAN SEVY

## VERIFICATION

I, Ryan Sevy, hereby declare as follows:

I am one of the plaintiffs in the within entitled action. I have read the Verified Amended Stockholder Derivative and Class Action Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 7/25/18

RYAN SEVY

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

*s/ Ashley R. Rifkin*

Ashley R. Rifkin
**ROBBINS ARROYO LLP**
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
arifkin@robbinsarroyo.com